Revised 1/06/99



**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

## FORM TO BE USED IN FILING A COMPLAINT
## UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983
(Prisoner Complaint Form)

### 1. CAPTION OF ACTION

02-CV-1077

**A.     Full Name And Prisoner Number of Plaintiff:  NOTE:**  *If more than one plaintiff files this action and seeks in forma pauperis status, each plaintiff must submit an in forma pauperis application and a signed Authorization or the only plaintiff to be considered will be the plaintiff who filed an application and Authorization.*

ELBERT WELCH

-vs-

**U.S. DISTRICT COURT - N.D. OF N.Y.**

**F I L E D**

AUG 2 0 2002

AT_____O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

**B.     Full Name(s) of Defendant(s)  NOTE:**  *Pursuant to Fed.R.Civ.P. 10(a), the names of all parties must appear in the caption. The court may not consider a claim against anyone not identified in this section as a defendant.*

1.  SEE ATTACHED CAPTION OF ACTION          2._____
    FOR ALL DEFENDANTS
3._____          4._____

5._____          6._____

## 2. STATEMENT OF JURISDICTION

This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States.  This action is brought pursuant to 42 U.S.C. § 1983.  The Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), and 2201.

## 3. PARTIES TO THIS ACTION

**PLAINTIFF'S INFORMATION  NOTE:**  *To list additional plaintiffs, use this format on another sheet of paper.*

Name and Prisoner Number of Plaintiff:  ELBERT WELCH #00-B-1648                     .

Present Place of Confinement & Address:  CLINTON CORR. FACILITY ANNEX

    P.O. BOX 2002, DANNEMORA, NEW YORK L0(0(12929

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF   :W YORK

FLBERT WELCH,   #00-B-1648

                              Plaintiff,       CAPTION OF ACTION

        against

DEFENDANTS:

ATTICA C.F. OFFICIALS: DR. SAMUELS; DEPUTY SUPERINTENDENT FEITZ;
SUPERINTENDENT HAROLD SMITH; DEPUTY SUPERINTENDENT
CHARLES SCULLY; DR. SCHMIDT(PSYCHOLOGIST);DR.
BISSELL; ONE   JOHN DOE PSYCHIATRIST; REGISTERED
NURSE FRANCIS MILLS;SUPERINTENDENT WALTER KELLY
CORRECTION OFFICERS AHEARN, CORONA, CORCORAN,
FRASER, HORVATITS, CZERNIAK; LT. KIHL; SGT. D.
STARKA; LT. R. HENNEBERG; DEPUTY SUPERINTENDENT
HANS WALKER; PAROLE BOARD MEMBERS EICHELBERGER,
UMINA, LEVY (1993) AND BUCHANAN, McSHERRY AND
JOHN DOE (1991); ONE JOHN DOE ASSISTANT NEW YORK
STATE ATTORNEY GENERAL OF BUFFALO OFFICE WHO
FILED SUMMARY JUDGMENT MOTION IN 1990

CLINTON C.F. OFFICIALS: SUPERINTENDENT E.S. FLEFEVRE; DEPUTY SUPERIN-
TENDENT OF SECURITY SULLIVAN; CORRECTION OFFICERS
ROBIN STEIN, BLAIR, R. FOUNTAIN, FACTEAU, KRIPLIN,
FRENYEA, ELEEH, PESCIA, D. MALARK, D. LAVARNWAY,
GRIDRICH; LT. WAY; LT. RENEDITTI (PHONETIC); LT.
RIVERS; LT. KAVANAUGH;                 ; DR. S. REYES;
DR. EDWARDS; DR. PHIL (PSYCHOLOGIST)

GREAT MEADOW C.F. OFFICIALS: SUPERINTENDENT E.W. JONES; DEPUTY SUPERIN-
TENDENT EISENSCHMIDT; SGT. COPELAND; CORRECTION
OFFICERS B. BAILEY,GOLDSMITH, DUNSTER, GRIFFITH,
GRIDRISH, T.E. MATTESON, BUMP. PRAYER; PAROLE
BOARD MEMBERS UMINA, BURKE AND JOHN DOE (1995);
DR. FOOTE; DR. KOOCK JUNG; VNURSE YULE; JUDGE
THOMAS MOYNIHAN ; LT. WINCH; C.O. DuBrey;

MARCY CENTRAL NEW YORK PSYCHIATRIC CENTER OFFICIALS: DR. SUE(WOMAN);
TWO JOHN DOE PSYCHIATRISTS (MALES IN 1982,1985
AND 1990); TEN OR MORE JOHN DOE TREATMENT
ASSISTANTS AND NURSES; SUPERINTENDENT/DIRECTOR
OF CNYPC IN 1982, 1985, 1990)

CAPTION CONTINUED
DEFENDANTS CONTINUED

NIAGARA FALLS CITY OFFICIALS: DETECTIVES JOHN GALIE, PAT STACK, PAUL PIERINI; JIM GALIE; PASCOTT DALLAVIA; CITY COURT JUDGE MARK VIOLANTE; ATTORNEY MIKAEL VIOLANTE

NEW YORK STATE PAROLE OFFICIALS: PAROLE SPECIALIST JUDY BUNDY; ADMINISTRATIVE LAW JUDGE JUDITH CUMMINGS; CHAIRMAN MARTIN HORN; OCOMMISSIONER JOHN DOE; HEARING OFFICER RICHARD LAW; PAROLE OFFICER ANDERSON; ADMINISTRATIVE LAW JUDGGE GEORGE TRIMPER; PAROLE SPECIALIST ALPINA TAYLOR

NIAGARA COUNTY DEFENDANTS: JUDGE CHARLES HANNIGAN; JUDGE PETER BRODERICK ; ALDO DIFLORIO, FORMER DISTRICT ATTORNEY; MICHAEL VIOLANTE,ATTORNEY; LESTER SCONIERS, ATTORNEY; JOSEPH CAROSELLA, ATTORNEY

APPELLATE DIVISION FOURTH DEPARTMENT OFFICIALS: Justices JOHN DOER, CALLAHAN; SCHNEPP; WITMER; SIMONS ; PINE, HAYES; WISNER; HURLBUTT; LAWTON ; UNKNOWN NAMED COURT CLERK OFFICIAL

ONEIDA COUNTY OFFICIALS:  Justice ANTHONY SHAHEEN OF NEW YORK STATE SUPREME COURT.

NEW YORK STATE POLICE OFFICIALS: INVESTIGATORS JIMMIE PHELPS; BRENDA ROBERTS; GARY COLON; JAMES TALFORD; CLINTON CALLOWAY; LIEUTENANT MOMS

CAPTION CONTINUED
EFENDANTS CONTINUED

MOHAWK CORRECTIONAL FACILITY OFFICIALS: SUPERINTENDENT REYNOLDS;
SERGEANT HUND; INSPECTOR GENERAL DENBIK;
RIOT SECURITY OFFICER ID #8-75

NIAGARA COUNTY JAIL OFFICIALS: DEPUTY SUPERINTENDENT SAXTON;
SUPERINTENDENT CLARK; CAPTAIN PAYNE;
SERGEANT STICKNEY; SERGEANT GREENWALD;
CAPTAIN FITCHTINGER; CORR. OFFICER TIM
BLACKLEY; CORR. OFFICER GARY MAYE; CORR
OFFIVCER ROTOLO; NUMEROUS JOHN DOE
CORR. OFFICERS OF CERT TEAM ;
DR. SUSAN WAYTAK

NIAGARA COUNTY COURT OFFICIALS: JUDGE JAMES PUNCH; ASSIST. DISTRICT
ATTORNEY CLAUDE JEORG

NIAGARA COUNTY SHERIFF OFFICIALS: Investigators WILLIAM EVENS;
PETER COCCO; MIKE MESSINA; MARK DRIESS

MUNICIPAL DEFENDANTS: NIAGARA COUNTY; ONEIDA COUNTY; WASHINGTON
COUNTY;
INTER COMMUNITY MEMORIAL HOSPITAL(NEWFANE)

CORPORATION DEFENDANTS: NBC TV; ABC TV; WBL1 TV; ESPN TV
BILL COSBY; OPRAH WINFREY; KATIE COURIC;
PETER JENNINGS; MATT LAURER

Name and Prisoner Number of Plaintiff:_____.

Present Place of Confinement & Address:_____

_____

_____

**DEFENDANT'S INFORMATION** **NOTE:** *To list additional defendants, use this format on another sheet of paper.*

Name of Defendant:_____.

(If applicable) Official Position of Defendant:_____

(If applicable) Defendant is Sued in _____Individual and/or _____Official Capacity

Address of Defendant:_____

_____

Name of Defendant:_____.

(If applicable) Official Position of Defendant:_____

(If applicable) Defendant is Sued in _____Individual and/or _____Official Capacity

Address of Defendant:_____

_____

Name of Defendant:_____.

(If applicable) Official Position of Defendant:_____

(If applicable) Defendant is Sued in _____Individual and/or _____Official Capacity

Address of Defendant:_____

_____

## 4.  PREVIOUS LAWSUITS IN STATE AND FEDERAL COURT

**A.**    Have you begun any other lawsuits in **state or federal court** dealing with **the same facts involved in this action**?   Yes_____   No_____

If Yes, complete the next section.  **NOTE:** *If you have brought more than one lawsuit dealing with the same facts as this action, use this format to describe the other action(s) on another sheet of paper.*

1.   Name(s) of the parties to this other lawsuit: SEE ATTACHED SHEET

Plaintiff(s):_____.

Defendant(s):_____

_____

2.   Court (if federal court, name the district; if state court, name the county):_____

_____.

3.   Docket or Index Number:_____.

4.   Name of Judge to whom case was assigned:_____.

5.   The approximate date the action was filed:_____.

6.   What was the disposition of the case?

- Is it still pending?  Yes_____   No_____

   - If not, give the approximate date it was resolved._____.

- Disposition (check the boxes which apply):

   ☐ Dismissed (check the box which indicates why it was dismissed):

      ☐   By court *sua sponte* as frivolous, malicious or for failing to
           state a claim upon which relief can be granted;

      ☐   By court for failure to exhaust administrative remedies;

      ☐   By court for failure to prosecute, pay filing fee or otherwise
           respond to a court order;

      ☐   By court due to your voluntary withdrawal of claim;

   ☐ Judgment upon motion or after trial entered for

      ☐ plaintiff

      ☐ defendant.

**B.**   Have you begun **any other lawsuits** in **federal court** which **relate to your imprisonment?**

Yes_xx___   No_____

<u>If Yes, complete the next section.</u>  NOTE:  *If you have brought more than one other lawsuit dealing with your imprisonment, use this same format to describe the other action(s) on another sheet of paper.*

1.   Name(s) of the parties to this other lawsuit:   SEE ATTACHED SHEET

Plaintiff(s):_____.

Defendant(s):_____

_____.

3

2.    District Court:_____.

3.    Docket Number:_____.

4.    Name of District or Magistrate Judge to whom case was assigned:_____

_____.

5.    The approximate date the action was filed:_____.

6.    What was the disposition of the case?

- Is it still pending?  Yes_____  No_____

    - If not, give the approximate date it was resolved._____.

- Disposition (check the boxes which apply):

    ☐ Dismissed (check the box which indicates why it was dismissed):

        ☐    By court *sua sponte* as frivolous, malicious or for failing to state
             a claim upon which relief can be granted;

        ☐    By court for failure to exhaust administrative remedies;

        ☐    By court for failure to prosecute, pay filing fee or otherwise respond to
             a court order;

        ☐    By court due to your voluntary withdrawal of claim;

    ☐ Judgment upon motion or after trial entered for

        ☐ plaintiff

        ☐ defendant.

---

## 5.  STATEMENT OF CLAIM

For your information, the following is a list of some of the most frequently raised grounds for relief in proceedings under 42 U.S.C. § 1983.  (This list does not include all possible claims.)

- Religion
- Free Speech
- Due Process
- Equal Protection
- Access to the Courts
- False Arrest
- Excessive Force
- Failure to Protect
- Search & Seizure
- Malicious Prosecution
- Denial of Medical Treatment
- Right to Counsel

**Please note that** it is not enough to just list the ground(s) for your action.  You **must** include a statement of the facts which you believe support each of your claims.

**Fed.R.Civ.P. 8(a)** states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "The function of pleadings under the Federal Rules is to give fair notice of the claim asserted.  Fair notice is that which will enable the adverse party to answer and prepare for trial,

allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial."  Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995).

**Fed.R.Civ.P. 10(b)** states that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far a practicable to a single set of circumstances."

**A. FIRST CLAIM:**  On (date of the incident) ____SEE ATTACHED SHEETS FOR ALL CLAIMS____,

defendant (give the **name and position held** of **each defendant** involved in this incident) _____

_____

_____

_____

did the following to me (briefly state what each defendant named above did): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____.

The constitutional basis for this claim under 42 U.S.C. § 1983 is:  _SEE ATTACHED SHEETS_

___FOR ALL CAUSES OF ACTION_____

The relief I am seeking for this claim is (briefly state the relief sought): _____

_____

### Exhaustion of Administrative Remedies

According to **42 U.S.C. § 1997e(a)**, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prison er confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Did you grieve and/or appeal this claim:     Yes_____     No_____     DEFENDANTS
ACTS OF CONSPIRACY PREVENTED ME FROM USING GRIEVANCE PROCEDURES IN
TIMELY AND PROPER MANNER AS SET FORETH IN COMPLAINT ATTACHED

If your answer is yes, state the result:_____.

Did you appeal that decision:    Yes_____    No_____

If your answer is yes, state the result:_____.

> Attach any documents which indicate that you have
> exhausted your administrative remedies regarding this claim.

If your answer is no, state why you did not: _____

_____.


**B.  SECOND CLAIM:**  On (date of the incident) _____,

defendant (give the **name and position held** of **each defendant** involved in this incident) _____

_____

_____

_____

did the following to me (briefly state what each defendant named above did): _____

_____

_____

_____

_____

_____

_____

_____

_____.

The constitutional basis for this claim under 42 U.S.C. § 1983 is: _____

_____

The relief I am seeking for this claim is (briefly state the relief sought): _____

_____

1. The State And Lo al defendants (hereinb. Ar "DEF."), acting under color of state or local law, committed the following acts and overtacts in furtherance of the goals of a long-standing extra-judicial conspiracy which began in or about 1978, to violate my civil rights and to kill me and, among other things, to discredit the existence of such conspiracy and their involvement in it.

2. In July 1978, a jury trial commenced before DEF. NIAGARA COUNTY JUDGE CHARLES J. HANNIGAN by impanelling and swearing a jury under indictments 5946 & 5946A which charged me with robbery and attempted murder. DEF. PETER BRODERICK was prosecuting attorney and DEF. MICHAEL VIOLANTE was court assigned defense counsel.

3. A witness was sworn, one RICHARD KELLICK (a complainant and brother of former Niagara Falls City Court Judge Robert Kellick - not a defendant herein - And a personal acquaintance of DEF. JUDGE HANNIGAN according to information and belief) And evidence was taken. During this proceeding DEF. BRODERICK Announced, on the record, that his material witness, one JEAN KAYE, was vacationing in the Canadian Rockies and was unavailable for trial. After this proceeding, the case was adjourned.

4. During the adjournment, the court assigned counsel, DEF. VIOLANTE, claimed he had gone out and investigated the duress defense that I had proposed raising and claimed, on the record, that he had found this defense to be "unfounded in fact". This was a mere pretext by DEF. VIOLANTE who at this point sought to frustrate my trial and to cause a mistrial by withdrawing from my case to attribute a mistrial to me and thereby help the prosecution secure another more favorable opportunity to convict me, as ultimately occurred.

5. On the resuming of court proceedings in July 1978, DEF. VIOLANTE used the said pretextual reason to request DEF. JUDGE HANNIGAN for leave to withdraw. DEF. BRODERICK, then prosecutor, knowing well that his case was going badly and of the plot to attribute the mistrial to me to help him, made certain comments and objections on the record to protect his case and stating, in effect and words, that allowing DEF. VIOLANTE's withdrawal would "create a double jeopardy problem."

6. DEF. JUDGE H. HANNIGAN, As part of the conspiracy to attribute the mistrial to me, said he would ALLOW DEF. VIOLANTE to withdraw and would assign "two new attorneys" and allow them to decide if a mistrial would be necessary.

7. Ultimately, DEF. HANNIGAN allowed DEF. VIOLANTE to withdraw and assigned two new attorneys, DEF. JOSEPH CAROSELLA and LESTER SCOVIERS who, acting under the directions, plan and influence of DEF. HANNIGAN, BRODERICK and VIOLANTE as expressed on the transcript of the proceeding wherein DEF. VIOLANTE was allowed to withdraw (which the new attorneys had in their possession) as well as from telephone and other communications they had with DEF. HANNIGAN according to copies of letters notifying them of their new appointments, DEFS. CAROSELLA and SCOVIERS joined in requesting a mistrial to help the prosecution.

8. DEFS. CAROSELLA and SCOVIERS also possessed copies of the transcript which showed that the prosecution's case was going badly because of an unavailable witness and, therefore, knew fully of the circumstances. Further, in requesting a mistrial these new attorneys claimed in bad-faith that they could not intervene at such juncture and give the defendant "proper re-presentation". The trial record discloses deliberate acts and conduct of these attorneys in helping to secure a conviction such as refusals to honor my legitimate requests of them to make objections, frivolous and feigned arguments with the prosecutor in the jury's presence, and other unprofessional conduct.

9. Further, the new attorneys as well as DEF. HANNIGAN knew of my clear statements prior to the declaration of mistrial on July 19, 1978, that "I am not asking for a mistrial". Yet they persisted in their requests and declaration of a mistrial to help the prosecution.

10. Further, DEF. HANNIGAN allowed DEF. VIOLANTE to withdraw from my case without affording me the assistance of counsel at that point and called on me to respond to DEF. VIOLANTE's request under such inherently coercive circumstances, later claiming

that I agreed to DEF. VIOLANTE's withdrawal.

11. I was retried before a second jury and DEF. HANNIGAN in September 1978 at which time the previously unavailable witness, JEAN KAYE, was available and testified.

12. DEF. HANNIGAN denied all of my pro se motion to dismiss the case on Double Jeopardy grounds which were made before trial

13. DEFS. CAROSELLA and SCONIERS were present and aware of my motions to dismiss on Double Jeopardy grounds but failed to render any assistance to me on same despite knowing they had merit.

14. On the September 1978 retrial, DEF. ALDO DIFLORIO was the prosecutor. He engaged in repeated acts of misconduct to secure a conviction at all costs. Inter alia, he exceeded bounds of legitimate prosecutorial advocacy by repeated calling me and my defense witnesses "LIARS" during his summation; he shouted at defense counsel in feigned attempts to create a hostile atmos- phere to irrevocably influence the jury against me; he repeatedly harassed and badgered me and my witnesses while on the stand and engaged in improper cross- examination and started feigned arguments with the assigned attorneys when they made objections; he accused me of acting with "mental telepathy" in the course of the alleged robbery and accused me of having prior convictions for "stealing" despite a ruling that had been made by DEF. HANNIGAN before I took the witness stand prohibiting him from going into the underlying details of my prior criminal record. All of such conduct was designed to insure conviction at all costs in violation of my Double Jeopardy rights. See United State v Dinitz,      US               )    S. Ct.    (1976) as it did.

15. On October 13, 1978, DEF. HANNIGAN sentenced me to 12½ to 25 years imprisonment based on the September 1978 retrial and conviction.

16. During my direct appeal to the Appellate Division, Fourth Department, in 1979, despite much opposition and interference as more fully set forth, infra, I raised the foregoing Double Jeopardy claims

3

in a pro se supplemental Appeal brief; As well as in a complaint of unprofessional conduct filed with the Buffalo, New York Attorney Grievance Committee, Fourth Dept. The Attorney Grievance committee members, Robert Gannon and Paul Mullen, informed me that findings of misconduct were made by the Appellate Division with respect to DEF. VIOLANTE and DEF. HANNIGAN but that New York State Judiciary Law, Section 90, Subd. 10 prevents disclosure of such materials without permission of the Appellate Division members.

17. In furtherance of the goals of the conspiracy, the Appellate Division Justices who decided my Appeal (DEFS JOHN N. DOERR, CALLANAN, SCHNEPP, WITMER, SIMONS while reprimanding DEFS. HANNIGAN and VIOLANTE for their misconduct in violating my Double Jeopardy rights, failed to reverse my conviction despite their findings of misconduct which vitiate any reasonable or good-faith hope of maintaining a valid conviction in this matter. As a result of this conspiratorial action, I remained confined on this tainted conviction continuously from 1978 to April 25, 1996, when I was first released on conditional parole. I have also twice been re-incarcerated for alleged parole violation on this same tainted conviction: once from July 5, 1996 to July 15, 1998; and again from March 3, 1999 to the present.

18. Over the years I have made numerous attempts to have the Appellate Division members disclose the records and information which shows their own action which taints my conviction, all to no avail. Most recently, I made a motion for disclosure of records in April 2000, pursuant to 22 NYCRR 1022.36 and Judiciary Law, #90(10) which was denied by DEFS. JUSTICES PINE, HAYES, WISNER, HURLBUTT and LAWTON by order dated June 16, 2000. No reasons were given for this denial. Further, members of the Court Clerk's Office in 1983 refused to perform mandatory ministerial duties to file a similar pro se motion submitted by me for disclosure of records and returned my motion to me stating that the Justices of the court directed this action.

4

19. Throughout my incarceration from 1973 to 1996, and my re-incarcerations as well as while I was released on parole supervision, I have been subjected to repeated acts of conspiracy, civil rights violations and attempts to harm me in furtherance of the aforesaid conspiracy.

20. For example, in 1979 while at Attica C.F. under the 1978 Robbery conviction, numerous mental health officials made known false and defamatory statements against me in furtherance of a conspiracy to deny me protective custody (PC) housing, to cause me harm and to kill me to prevent me from gaining access to the Appellate Division to raise the misconduct and Double Jeopardy claims against DEF. HANNIGAN and DEF. VIOLANTE. For example, DEF. DR. SAMUELS of Attica C.F. made a known false and defamatory statement accusing me of "paranoid schizophrenia" and falsely saying my "eyes shift rapidly" and that I "find it anxiety provoking to deal with new and/or ambiguous stimuli". Dr. Samuels had absolutely no reasonable scientific basis on which to make these false written statements about me and had as a motive in doing so, to deny my requests for PC and to cause my death to prevent me from pursuing my appeals which involved serious misconduct and Double Jeopardy violations which could well have resulted in removal of DEF. HANNIGAN from the bench and disbarment of DEF. VIOLANTE. DEF. DR. SAMUELS was aware, as shown by his written report where he makes reference thereto, of my request for PC to avoid problems I was having with certain inmates. Despite the reasonableness of my request, DEF. DR. SAMUELS made known false and baseless defamatory statement to discredit and deny my request for PC as part of the conspiracy to cause my death and thereby prevent me from pursuing my appeals in violation of my federally protected constitutional rights. See Stevens v Rifkin, 608 F. Supp. 710, 726-727 (N.D. Cal. 1984); Wisconsin v Constantineau, 400 US 433, 434 n.2, 97 S. Ct. 507, 508, n2 (1971); Gobel v Maricopa County, 867 F2d 1201, 1205 (9th Cir. 1989)

21. During the period of March - May 1, 19 when the defamatory statements were written by Def. Dr. Samuels, I was being denied requests for PC and being placed in mental observation and disciplinary SHU by Attica C.F. officials despite my written and verbal requests for PC housing to then Def Supt. Harold Smith, Dep. Supt. Charles Scully, psychologist Def. Dr. Schmidt, Def. R.N. Francis Mills and Albany DOCS. I was repeatedly either put in mental observation, disciplinary SHU cells and treated improperly when I refused to return to general population during this period. Attica C.F. officials also took my legal work and would not allow me to work on my pending appeal and caused my typewriter to be damaged and become inoperable in their efforts to prevent me from perfecting a pro se supplemental appeal brief. The brief had been typed up and completed with the exception of minor matters, which Attica C.F. officials knew from having taken custody of my legal papers and storing them in property bags inaccessible to me.

22. Def. Dep. Supt. Scully, during a disciplinary hearing held in or about May-June 1979, stated to me that he and Attica officials "know all about" threats and danger to me at that time. Similarly, Def. Dep. Supt. Feitz of Attica C.F. was made aware of my situation and request for PC during a disciplinary hearing held prior to the Def. Dep Scully hearing.

23. Two other psychiatrists at Attica, Def. Dr. Bissell and one unknown named psychiatrist, made defamatory and known false psychiatric reports to further the goals of the conspiracy and to discredit me and my requests for PC housing. For example, after only speaking to me very briefly and being informed of my request for PC, one of these two psychiatrist Defs. made a written report in which he acknowledged my request for PC but at the same time appears to make efforts to discredit it and recommends my commitment to a mental institution although having no reasonable factual or scientific basis for his action. The other psychiatrist Def. approached me while I was in Attica C.F. satelite mental health unit; he kneeled down on the floor next to me and stated "Once upon a time there was a little boy. And his mother just didn't care." After receiving no response or reaction to his inappropriate and baseless remarks, he still

wrote a psychiatric report recommending my commitment to a mental institution. Neither of these defs. had any reasonable scientific or factual basis for their action and defamatory psychiatric reports recommending my commitment to a mental institution and booth acted to further the goals of the aforesaid conspiracy to deny me PC housing, deny me access to the court to pursue my appeal, and to cause me harm. Stevens v Ritkin, supra; Wisconsin v Constantineau, supra; Gobel v Maricopa County, supra.

24. On April 12, 1979, during the midst of this conspiracy, I was interviewed at Attica C.F. by a Special Agent of the Buffalo FBI office who had been assigned to investigate written complaints I made to FBI officials regarding the actions of Attica C.F. During this interview, I signed forms authorizing the release of my medical records to this FBI Agent who informed me he would investigate this matter.

25. Following the above FBI interview, a hearing was held at Attica C.F. before Wyoming County Supreme Court Justice John S. Conable who dismissed the proceeding after hearing testimony from defs. Dr. Samuels and R.N. Mills (who had instituted a 402 correction law proceeding to commit me to a mental institution through def. Supt. Smith).

26. At the hearing, def. Mills gave known false testimony that she believed I was "delusional" and denied any awareness of any problems with inmates. Yet, on a prior occasion while escorting approx. 7 to 8 civilian men and women visitors through a mental observation unit B-North Gallery at Attica, def. Mills introduced these persons to me by stating: "This is Mr. Welch. He's certainly not a mental patient. He has problems with other inmates." Such statements by def. Mills, made prior to the FBI interview and prior to the 402 correction law proceeding are indicative of the fraud, conspiracy and known false and defamatory action of the defendants taken to deprive me of federally protected constitutional rights and to harm me.

27. In or about May-June 1979, Hon. John T. Elfvin, U.S.D.C., W.D.N.Y., issued orders to DOCS to house me in protective custody under a civil rights complaint I had filed entitled Welch v Smith, et ano., 79-CV-28 OE.

28. In May-June 1979 I completed my pro se supple-mental Appeal brief as well as a civil rights complaint concerning my prison situation which I sent out on a visit with Relatives to be copied and returned to me for filing. When the papers were copied and mailed to me at Attica C.F., these legal papers were returned by mail to my Relatives by Attica officials who Refused to give me the papers and instead transferred me to Auburn C.F. in June 1979.

29. While at Auburn C.F., the acts of conspiracy by DOCS offi-cials continued. Thus, I was not put in PC despite awareness by then DEF. SUPT. ROBERT HENDERSON of the federal court order to house me in PC. My relatives brought my appeal brief with the required amount of copies for submission plus copies of pertinent transcripts which were essential to prove the Double Jeopardy violation to me at Auburn C.F. during a visit. These legal papers were processed and given to me through the facility package room. Included inside the papers was a note which in sum and substance instructed me to not submit copies of the transcripts with my pro se brief and stated the Appellate Division already had copies of the transcripts. This note was purportedly written by a "District Court Clerk" but, according to my Relatives, had not been included in the legal papers they brought. Hence, it is obvious that the facility package room officer put this note among my legal papers in a further effort to prevent effective appellate review of the Double Jeopardy and mis-conduct issues to which the transcripts were sine qua non.

30. In addition, I wrote numerous letter complaints to FBI, the U.S. Dept. of Justice, Federal District Court in Buffalo, New York State Governor Carey, the National Prison Project in Washington, D.C., as well as DOCS officials regarding repeated efforts of Auburn C.F. officials to cause me harm.

31. Another fact relevant to the conspiracy to prevent appellate review of my case is that in or about Jan-Feb. 1979 my assigned appellate counsel, MR. BERNARD SAX, wrote a letter to the Presiding Justice Dillon of the Appellate Division, Fourth Dept., informing him that DEF. JUDGE HANNIGAN had refused to honor his request for the transcripts to prepare an appeal brief on my behalf. MR. SAX asked if the court would consider a summary reversal motion. I filed a pro se motion for release on bail pending appeal based on the refusal to release the trial transcripts.

32. DEF. JUSTICE DOERR, who is one of the Justices who improperly handled my appeal by making findings of misconduct against DEFS. JUDGE HANNIGAN and MICHAEL VIOLANTE in connection with the Double Jeopardy violation while not taking proper action to reverse the conviction and order my discharge, also improperly denied my motion for release on bail pending appeal by order date March 1979, to further the goals of the conspiracy. "(A) conspirator may become a member of a conspiracy without being in it at its inception. He adopts the previous acts of his fellow conspirators when, with knowledge of the conspiracy's existence, he undertakes to further its design" U.S. v Lemm, 680 F2d 1193, 1204 (8th Cir. 1982) cert.den. 459 US 1110, 103 S.Ct. 739 (1983); U.S. v Norton, 846 F2d 521, 525 (8th Cir. 1988)

33. It has been recognized that "(c)onspiracies are by their very nature clandestine. It is unlikely that a plaintiff in a conspiracy case will be able to provide direct evidence of a conspiratorial agreement. Thus, such evidence is not necessary to prove that a civil conspiracy existed" White v Walsh, 649 F2d 560, 561 (8th Cir. 1981); Sparkman v McFarlin, 601 F2d 261, 278 n. 18 (7th Cir. 1979)

34. I filed my pro se supplemental appeal brief with the Appellate Division in July 1979 while confined at Auburn C.F.; and at that time the Fourth Dept. Attorney Grievance Committee had also instituted disciplinary proceedings against DEF. MICHAEL VIOLANTE. In November 1979, the Appellate Division Justices made findings of misconduct and took disciplinary action against both DEFS. HANNIGAN and VIOLANTE. Approx. one week later in November 1979, I was transferred to Clinton C.F.

35. I remained in Clinton C.F. from 1979 (Nov.) until 1982. During the period from 1979 to 1980 several inmates communicated their awareness to me of the events that had occurred with regard to my appeal and the action taken against DEFS. HANNIGAN and VIOLANTE by the Appellate Division Justices. These inmates communicated that the authorities were very angry with me and were intending to retaliate against me. I received communications that my relatives names and addresses had been obtained, some from my property bags, that telephones such as my wife's phone had been tapped by authorities, and that there were plans by the authorities to do me and my relatives harm because of what had taken place re DEFS. HANNIGAN and VIOLANTE. According to the

inmates, some of whom were coconspirators taking part in the conspiracy, the source of their information came from Clinton C.F. correction officers. See Bourjaily v US; infra.

36. In addition, I personally witnessed use of words and conduct by numerous correction officers and staff consistent with the acts of conspiracy such as threats, mostly indirect or implied, that I was going to be killed; repeated acts placing me in mental observation strip cells for numerous days at a time for no apparent reason with the knowledge and approval of, among others, then Def. Supt. Eugene LeFevre, Dep. Supt. Sullivan and other Sergeants and Lieutenants; Regular assaults and physical abuse by officers who were seeking to have me attacked by coconspirator inmates and physically abused and assaulted me when I failed to cooperate with movement to mental observation cells, etc., from 1979 to 1980.

37. In or about 1980, contemporaneously with the communications, or in the wake of such communications, by inmates set forth in paragraph 35, supra, Clinton C.F. officers authorized and approved and directed that I be served with poisoned food as part of the conspiracy to kill me. I was moved forcibly by correction officers, with the knowledge and approval of Def. Supt. LeFevre and Sullivan, from E-Block to Lower H-Block "APPU" where the food served to me was poisoned on a daily basis from 1980 to 1982 when I was transferred to Great Meadow C.F.

38. Upon information and belief, partly based on communications from coconspirators and other inmates as well as coded statements by staff, Clinton C.F. employees, with the knowledge and approval of Def. Supt. LeFevre, Dep. Supt. Sullivan and all sergeants, Lieutenants, officers and staff, were using tape recordings on a daily basis to manufacture evidence which they intended to use to explain my death and attempt to cover up their own complicity in the intended murder. See Bourjaily v U.S., 483 US 171, 107 S.Ct. 2775.

39. As a result of my awareness of the conspiracy acts set forth as well as the apparent numerous efforts by correction officers, inmates and staff to get my participation in the events on tape, and direct and implied verbal and nonverbal threats from the same source that I would be killed if I spoke or did certain things that could be taped, I was forced to remain silent from mid to late 1980 to 1982 when I was transferred out of Clinton C.F. to Great Meadow C.F.

16

40. During the period from mid to late '80 to 1982, on countless dates and occasions, numerous Clinton C.F. staff and inmates made unsuccessful attempts to get me to talk or do something that could be tape recorded in order to consummate the murder plot. When these efforts failed, I was transferred to Great Meadow C.F. in 1982 where I was held in a mental observation cell by DEF. SUPT. JONES and numerous mental health and other staff until a hearing was held before DEF. JUDGE MOYNIHAN who authorized my commitment to Marcy Central New York Psychiatric Center (hereinafter "MARCY CNYPC").

41. While at Great Meadow C.F., both before and after my transfer to and return from Marcy CNYPC, the acts of conspiracy continued, although to a somewhat less intense degree based on my observations and understanding of the events that were occurring (see Fed. Rules of Evidence 701). Thus, DEF. JUDGE MOYNIHAN was made aware of the conspiracy and its goals and when I appeared before him tried to get me to speak on the record by directly addressing me and seeking a response (a method used repeatedly by conspirators at Clinton C.F. as set forth in paragraphs 38-40, supra). He did not assign an attorney to represent me and when I did not respond to his attempt to get me to participate in the proceeding which he knew was part of the conspiracy to kill me, he ordered my commitment to Marcy CNYPC. See also white v Walsh, supra, 649 F2d at 561 (direct evidence of a conspiratorial agreement is not necessary to prove existence of civil conspiracy); Sparkman v McFarlin, supra (same); see also U.S. v Lemm, supra, 680 F2d at 1204 (conspirator may join a conspiracy by adopting prior acts of coconspirators with knowledge of existence of conspiracy and efforts to further its design).

42. While at Great Meadow C.F., prior to being transferred to Marcy CNYPC, the conspirators and Great Meadow C.F. continued to manufacture evidence to attribute some kind of mental illness to me in an effort to cover up the prior defamatory psychiatric reports of DEFS. DR. SAMUELS, BISSELL and R.N. MILLS of Attica C.F., supra, at par. 20-26, and as part of the conspiracy to harm me. Thus, while using tape recordings of my daily activities while held in mental observation cells at Great Meadow C.F., prison authorities

were aware that, + times I would sin, or make remarks in response to music played from built in wall radios in the isolated mental observation cells. Songs began to apparently be played by deliberate design on the radios. Such as songs by "Barbara Strisand" (phonetic) and by a group "Secret Weapon" entitled "Must Be The Music", and other songs in an apparent designed effort to get me to respond. This was borne out by the fact that, when I was transferred to Marcy CNYPC, I was forced to attend "music therapy" classes under threats of use of straight jackets, forced injection with psychiatric drugs and possible death if I did not attend.

43. Upon information and belief, DOCS officials have compiled numerous tape recording and other records pertaining to the above events which will be discoverable pursuant to Fed. Rules Civ. Proc. 26 through 37 in this matter and will disclose the names of numerous other unknown named defendants and their participation in this conspiracy as well as the full names of some of the named defendants and their participation in this conspiracy. This Court is respectfully requested to allow this complaint to go forward as to any unknown name defendants to allow opportunity for discovery to determine their names and identities

44. While at Marcy CNYPC I was forced to take psychiatric medication by injection on numerous occasions against my will by approximately ten unknown named defs. Treatment assistants and nurses who injected me in the buttock area under show of force and threats of use of straight jackets and physical force if I did not comply. Def. Dr. Sue of Marcy CNYPC authorized and prescribed the forced injections with drugs as part of the continued acts of conspiracy to harm me.

45. On several occasions I suffered severe side effects commonly known as "acute dystonia" with symptoms of severe involuntary spasms of my upper body, tongue, throat and eyes and was rendered dysfunctional for substantial periods exceeding an hour each time. I was dragged into a side room by the unknown name treatment assistants on each occasion and kept there until I recuperated. In addition to being part of a conspiracy to harm me, this forcible injection of drug into my body constituted a substantial interference with my liberty and was not necessary since I posed no danger to myself or others. And clearly am not mentally ill.

See Washington v Harper, 494 US ___, 110 S.Ct. 1028 (1990)
Cruzan v Director, Missouri Dept. of Hea. th, 497 US ___
110. S. Ct 2841 (1990). I was told the drugs were haldol + demerol.

46. Further, all of the named Dept. of Correctional Services
and Marcy CNYPC defendants well knew of federal court
orders from Hon. John T. Elfvin for my protective custody
housing and acted in total diskegard for such orders in
the acts of conspiracy, civil rights violations and other
abuses against me.

47. I was again subjected to nonconsensual injection of anti-
psychotic drugs into my body at Great Meadow C.F. after my
return from Marcy CNYPC. This time, Defs. Dr. Foote,
Dr. Glennon, Dr. Koock Jung and Nurse Yule used fraud
and trickery to inject me with "Prolixin" on a periodic
basis while telling me that this was medication for a
blood circulation blockage that Defs. Dr. Foote and Dr.
Glennon were treating me for. While Def. Dr. Foote told
me the name of one of the drugs being administered was
"Prolixin" he did not, nor did anyone, ever inform me
that mental health Def. Dr. Koock Jung had secretly
ordered me injected with "Prolixin" and made a written
mental health report dated December 16, 1982, indicating
his actions while not disclosing this fact to me at all.

48. I only learned of the Def. Dr. Jung December 16, 1982,
mental health document in or about June 2000 when I
received my Great Meadow C.F. medical records through
a Niagara County Court judicial subpoena and the Def.
Dr. Jung report was among such records.

49. According to Def. Dr. Jung's 12/16/82 report, he claims he
was requested by Def. Dr. Glennon to see me and that when
he attempted to interview me, I was mute and uncoopera-
tive as I had been "for the past several years". Def. Dr.
Jung then refers to documents about my alleged "psychotic
behavior, delusions in 1979" (apparently referring to and
adopting the aforementioned defamatory, conspiratorial
documents generated by Def. Dr. Samuels, Dr. Bissell, R.N.
Mills and others from Attica C.F. 1979). Def. Dr. Jung then
states "there was a couple mentions about his paranoid
delusion that people are going to kill. He was excited,
fearful, and apprehensive". He refers to me as having
"paranoid psychotic symptomatology" that "was bearing
probems in 1979 and 1980" and concluded by ordering
injections of "Prolixin Decanoate" 25 mgs. every two weeks.

50. DEF. DR. JUN's 12/16/82 REPORT AT! ACTIONS WERE fairly acts of conspiracy to harm me and attribute a mental illness to me in an effort to try to clear DEFS. DR. SAMUELS, DR. BISSEL, R.N. MILLS and others who were caught red handed plotting to kill me when on APRIL 12, 1979, I signed a release of my medical records to an FBI Agent who obtained the false and conspiratorial psychiatric reports of said defendants revealing their complicity in a plot to kill me at Attica C.F.

51. In fact, it has become an essential part of the conspiracy and one of the primary goals thereof over the years, to try to discredit me and attribute some sort of mental illness to me as part of an effort to try to give credibility to DEFS. DR. SAMUELS, DR. BISSELL, R.N. MILLS and others who were original conspirators caught red handed fabricating records to attribute a mental illness to me when none existed at Attica C.F. in 1979. (see, Ante, at PAR. 19-26)

52. Had I known that I was being secretly administered antipsychotic drugs at Great Meadow C.F. in 1982 as above indicated, I would have made my objections known to being required to take such drugs on that ground alone.

53. Further, during this period at Great Meadow C.F. I had numerous side effects from the drugs injected in my body much similar to the "acute dystonia" symptoms indicated Ante, at PAR. 45, and was rendered speechless at times. I made repeated written and verbal requests to the DEFS. DR. FOOTE, DR. GLENNON, NURSE YULE to discontinue the injections while informing them of the serious side effects I was suffering. The injections continued for a period of time despite my objections; and on one occasion DEF. DR. GLENNON grabbed me by the arm and injected me himself with the drug while stating "I want you to take that medication" and ignoring my objections to continued injections.

54. Although the forced injections of drugs ceased before I was transferred from Great Meadow C.F. back to Clinton C.F. in 1983, I was caused serious harm and pain, both physically and mentally, by the actions of defendants; and the acts of conspiracy and civil rights violations continued on my return to Clinton C.F.

55. Further while in Clinton C.F. in 1980, I was written up on disciplinary charges by numerous unknown name CORRECTION OFFICERS and was found guilty of disciplinary charges by numerous unknown name LIEUTENANTS after disciplinary hearings held in my absence for not cooperating with movement from cell to cell. My lack of cooperation was without any threats or violence on my part and was the only possible means I had available to defend myself against physical harm and death from the acts of defendants to cause me harm during the intense conspiracy.

56. The numerous unknown name DEF. CORRECTION OFFICER and LIEUTENANTS at Clinton C.F. violated my clearly esta-blished constitutional right to defend myself and my life by the only reasonable means available, where they wrote me up and disciplined me for alleged misconduct for not cooperating with their knowing and deliberate acts of conspiracy to harm me. I was disciplined by virtual total loss of good time credits, loss of packages, commissary, etc., by these defendants.

57. Further, since the disciplinary actions were acts of conspiracy and were taken in bad-faith as part of a known conspiracy, they are actionable independent of any constitutional violation that occurred. See Milhouse v Carlson, 652 F2d 371 (3d Cir. 1981); Furtado v Bishop, 604 F2d 80 (1st Cir. 1979), cert. den. 444 US 1035 (1980); Hale v Townley, 45 F3d 914 (5th Cir. 1995); Dwares v City of New York, 985 F2d 94, 100 (2d Cir. 1993); Leon v Murphy, 988 F2d 303, 311 (2d Cir. 1993)

58. During the course of the within conspiracy, it was communicated to me both verbally and by words and conduct of inmates and DOCS employees at Clinton C.F. in 1980-1982, at Great Meadow C.F. in 1982-1983, Auburn C.F. in 1984-1985, and Attica C.F. in 1985-1993, that the conspiracy herein continued to exist and that DOCS officials sought to get me to cooperate with movement from cell to cell, or in leaving my cell, or in filing of court papers discussing the acts of conspiracy so as to enable DOCS officials to explain my death and manufacture a purported defense denying their own complicity.

59. Based on my own personal observations and experiences as a victim of repeated acts of conspiracy and civil rights violations in the prison system, some but not all of which are set forth herein, the DOCS officials were in fact engaged in a continuous conspiracy to harm me; and currently continue to conspire to harm me.

60. I was compelled because of said conspiracy to remain in my cell daily from 1980 to 1993 and not cooperate with movement from cell to cell, prison to prison, etc., as my only available possible defense to protect my life.

61. While at Clinton C.F. in 1983-1984, the pending civil rights complaint WELCH V SMITH, 79-CV-280E (WDNY), supra, was scheduled for pretrial discovery and filing of pretrial statements outlining what the parties intended to prove. As part of the conspiracy, DOCS officials and their attorneys sought to consummate their plot to kill me to eliminate me as a witness in this very serious conspiracy matter. DOCS officials and their attorneys anticipated that I would have to file a pretrial statement at the conclusion of discovery, which had been indicated by Magistrate Judge Maxwell who was presiding over the discovery proceedings; and this would provide the opportunity to consummate the murder of me and to explain and raise defenses to the federal court denying their complicity in the murder.

62. Aware of this murder plot, both from my own observations and experiences theretofore as a victim of the conspiracy as set forth throughout this complaint, and from statements and indications of knowledgeable inmates, I refrained from filing a pretrial statement and sought adjournment of the discovery proceedings. I also filed a motion for appointment of counsel, which Magistrate Maxwell denied, and I appealed the denial to the Second Circuit, at all times being careful not to discuss the merits of the lawsuit or the events that were occurring in the continuous conspiracy. The Second Circuit ruled in essence that an order denying appointment of counsel was not appealable as a "collateral order" before trial or final disposition of the case; and the U.S. Supreme Court denied certiorari, with two Justices dissenting and voting to grant certiorari to resolve a conflict

Among the circuit on the appealability as a collateral order of an order denying appointment of counsel. I acted as pro se counsel at all stages of the appeals, petition for certiorari, etc.

63. In the interim, while the case was being delayed by appeals, I was transferred from Clinton C.F. to Auburn C.F. in 1984 and then to Attica C.F. in 1985.

64. The acts of conspiracy continued at Auburn C.F. and Attica C.F. Thus, immediately upon my arrival at Attica, defs. Dr. Samuels and R.N. Mills had me transferred to Marcy CNYPC in 1985 where I remained for approx. two weeks. DEFS. SUPT. KELLY of Attica C.F. and COMMISSIONER _____ were directly involved in the transfer to Marcy CNYPC and acts of conspiracy and continued the acts of conspiracy substantially as had been occurring.

65. For example, when I was returned from Marcy CNYPC, DEFS. SUPT. WALTER KELLY, DR. SAMUELS, R.N. MILLS, DEP. SUPT. HANS WALKER acting together, authorized, directed and approved my placement on an intermediate care program ("ICP") company with all mentally ill inmates where I was treated as such. While on this ICP company, in or about September 1985, DEFS. SUPT. KELLY, DR. SAMUELS, R.N. MILLS, DEP. SUPT. WALKER and other unknown officials at Attica, directed, authorized and approved as part of a conspiracy to kill me, that DEF. C.O. AHEARN and others would rush into my cell and beat me in an effort to provoke me into a fight. DEF. AHEARN and several unknown name C.O.s rushed into my cell, began punching and knocking me down, handcuffed me and took me to SHU, all without provocation by me. The said Attica C.F. DEFS. KELLY, SAMUELS, MILLS, WALKER and others knew of DEF. AHEARN's actions before, during and after they occurred and did nothing to prevent the beating or take disciplinary action for the misconduct of DEF. AHEARN and others.

66. DEF. SUPT. KELLY, knowing of the conspiracy and the violations of federal court protective custody orders, and being a participant therein, assigned an DEF. unknown name HEARING OFFICER to conduct a disciplinary hearing on charges fabricated by DEF. AHEARN.

I was found guilty and given six months SHU.

67. While in SHU, two FBI Agents toured the SHU under escort by a sergeant. They announced they were from the Dept. of Justice and were interviewing/investigating inmates in the cells about guard beatings. Due to the serious threats and conspiracy against me, I did not talk about my situation. These events occurred in 1985-1986.

68. Following the FBI tour of the SHU, DEF. DEP. SUPT. WALKER reduced my SHU sentence and had me put in A-Block general population where covert and overt acts of conspiracy, assault and civil rights violations were perpetrated/against me by officers and certain inmates in efforts to provoke me to action in order to consummate the murder. For example, on a weekly and sometimes more often basis, groups of corrections officers, often under the direction of DEF. HALL CAPTAIN CARONA and other supervisors, would remove me from my cell, in the guise of doing cell searches or cell bar checks, and would physically abuse, shove, push, etc., to try to provoke me into a fight. On one occasion I was scalled with boiled substance thrown through the cell bars by an inmate who acted in concert with the officers. Numerous other incidents occurred such as inmate coconspirators flooding my cell with water, refusing to serve me with meals in my cell, and countless other acts under the direction and approval of DEF. CARONA, SUPT. KELLY and other coconspirator DOCS officials who knew of, directed and approved the acts of conspiracy to kill me to eliminate me as a witness by any means necessary.

69. The acts of conspiracy continued during a period in 1990 when, as part of the continued conspiracy, the New York State Attorney General's Office, DEF. UNKNOWN NAME ASSISTANT ATTORNEY GENERAL, filed a summary judgment motion in connection with the then pending civil rights lawsuit WELCH V SMITH, 79-CV-280E, supra, seeking to get my participation in the proceedings in order to consummate the conspiracy and attempt to deny DOCS officials' complicity by use of fraud and known false and bad-faith claims of defense. Such fabrication of evidence in which DEF. UNKNOWN NAME ASSISTANT ATTORNEY GENERAL is implicated, constitutes fraud upon the court. Weese v Schukman, 98 F3d 542, 552-553 (10th Cir. 1996); Batista Air Lines, Inc. v Transaction Management, Inc., 98 F3d 640, 642 (CADC 1996)

70. By order dated August 9, 1990, Judge Elfvin dismissed the case WELCH V. SMITH, 79-CV-280E, supra, after granting the defendant's summary judgment motion. Judge Elfvin's order notes that I did not file any opposing papers (which obviously was due to the threats and acts of conspiracy against me) and coercion by defendants)

71. During the period of 1990 events set forth, it had become widely circulated among the inmate populace at Attica C.F. and among DOCS employees, that FBI informants had infiltrated Attica C.F. and had become newly employed in the guise of correction officers and staff for the purpose of secretly investigating this conspiracy. Not only did inmates indicate this, but I also made personal observations in cases of numerous newly employed corrections officers and staff members who gave indication by words, conduct and demeanor that they were FBI informants. Fed. R. Evid. 701.

72. The acts of conspiracy continued and eventually became less intensified, but did not cease. Thus, in 1990, as part of the conspiracy to keep me incarcerated to carry out the murder plot using more covert means due to DOCS officials' apparent awareness of the secret FBI investigation/infiltration, DEF. THREE UNKNOWN PAROLE BOARD MEMBERS denied me parole and held me for 24 months without any valid reason. Again, in or about 1993 while still at Attica, I was denied parole release by DEF. THREE UNKNOWN PAROLE BOARD MEMBERS (II); and again in or about 1995, while at Great Meadow C.F., DEF. THREE UNKNOWN PAROLE BOARD MEMBERS (III) denied me parole. Each time I was held for the maximum 24 months allowed by regulations. Each time the parole commissioner cited my prior criminal record, which only involved one nonviolent, low grade, Class E felony for possession of stolen property in 1976 and other nonfelony misdemeanor offenses from prior to 1976. In addition, in my instant conviction (although tainted from the Double Jeopardy violation discussed, supra) there were no physical injuries to any of the alleged victims). Thus, the parole board defendants had no basis to deny me parole except to further the goals of the conspiracy.

73. On April 25, 1996, I was released on conditional parole after previously taken good time credits were restored. The acts of conspiracy continued, as would be expected, in the City of Niagara Falls, New York and County of Niagara, where they originated with high ranking prior Niagara County Judge Hannigan and Attorney Michael Violante (named as defendants herein). Thus, within some 70 days after my April 25, 1996, release, I was arrested by Defs. Jim Galie, Pat Stack, Paul Pierini, Mark Martinez, Niagara Falls City Police Detectives, based on known false claims of Def. Jim Galie that he saw me throw alleged drugs inside of a bar when, in fact, he did not and sought to either kill me or cause my reimprisonment as part of the continued conspiracy. Def. Jim Galie openly stated in the presence of the other arresting officers that he was going to lie in court and "swear" that he saw me throw drugs. The arresting officers knew of Jim Galie's false claims against me but still detained and arrested me. In fact, Def. Jim Galie's claim of having seen me throw alleged drugs in the bar was totally false and fabricated, was contradicted in part by other officers who were present and admit they did not witness me throw anything, as well as by a bartender who testified before the Niagara County grand jury to the same effect.

74. Although the indictment returned charging me with a drug possession offense in this matter was dismissed by Def. Judge Hannigan by order dated October 3, 1996, for legally insufficient evidence, Def. Judge Hannigan incredibly ruled that he had no jurisdiction to dismiss the parole revocation proceeding because no indictment was pending and, consequently, dismissed my state habeas corpus petition challenging the parole revocation proceeding on illegal arrest, search and seizure grounds in violation of clearly established law requiring New York courts to hold hearings to determine illegal search and seizure claims which are dispositive of pending parole revocation proceedings. See, e.g., People ex rel. Caldwell v NYS Div. of Parole, 123 AD2d 458, 506 NYS2d 761 (2d Dept. 1986); People ex rel. Robertson v NYS Div. of

PAROLE, 67 NY2d 197, 501 NYS2d 634 (1986); People ex rel. Piccarillo v NYS Bd. of Parole, 48 NY2d 76, 421 NYS2d 842 (197 ); People ex rel. Zeigler v Warden, 168 AD2d 353, 562 NYS2d 677 (1 Dept. 1990). The parole violation charges brought against me were based solely on the false arrest (which occurred July 5, 1996) and had DEF. JUDGE HANNIGAN entertained my habeas corpus petition to determine the legality of my arrest as required by law, I clearly would have been entitled to reinstatement to parole supervision as well as suppression of the tainted and false evidence and testimony of the officers as to my illegal arrest. Wong Sun v United States, 371 US 471, 486 (1963); People ex rel. Piccarillo v NYS Bd. of Parole, supra. (prohibiting fruits of illegal search and seizure to be used in parole revocation proceedings to revoke parole and mandating a hearing in the criminal court to determine illegal search and seizure claim as well as adjournment of parole revocation proceeding to allow the court to determine such claim if requested by the parolee).

75. Further, DEFS. JIM GALIE, PAT STACK, PAUL PIERINI pursued these charges against me in parole revocation proceedings, knowing of the lack of merit to DEF. JIM GALIE'S accusation of having seen me throw drugs in the bar and knowing of the lack of probable cause for my July 5, 1996, arrest and knowing of the Oct. 3, 1996, dismissal of the indictment, said defendants gave known false and tainted testimony and thereby caused revocation of my parole in or about _____ 1997 based solely on the said July 5, 1996, illegal arrest. I remained incarcerated continuously from July 5, 1996, to July 15, 1998, based on said parole revocation proceedings.

76. The parole prosecutor, DEF. JUDY BUNDY, and parole hearing officer, DEF. JUDITH CUMMINGS, engaged in acts of conspiracy, civil rights violations and misconduct during this extra judicial conspiracy to further the goals thereof by: 1) denying my timely requests for an adjournment of parole proceedings

to obtain a judicial determination on my illegal arrest, search and seizure claims ; 2) denying me a timely final hearing within 90 days of the July 22, 1996 probable cause ruling despite denying my requests for adjournment re illegal arrest ; 3) denying my request to call witnesses on my behalf ; 4) denying my request to dismiss the parole violation charges on collateral estoppel and res judicata grounds which I based on the October 3, 1996, dismissal of the indictment which was based on, legally insufficient evidence ; 5) denial of my motion to dismiss on illegal arrest, search and seizure grounds ; 6) relying on and presenting known false testimony of the officers purporting to implicate me in the alleged possession and throwing of drugs in a bar ; 7) making unsupportable findings of guilt by a preponderance of the evidence despite the clearly incredible and insufficient evidence of one witness, DEF. JIM GALIE', whose claim was inherently contradictory and discredited by other officers ; 8) conspiring to deny me a fair hearing.

77. DEFS. MARTIN HORN and COMMISSIONER _____ (who signed and authorized and upheld the parole violation findings) Adopted and ratified the illegal and conspiratorial acts of DEFS. BUNDY, CUMMINS, GALIE, STACK and PIERINI and thus joined in the conspiracy.

78. During a July 22, 1996, preliminary parole revocation hearing, which was to determine if there was probable cause to hold me in custody for a final parole revocation hearing or if the parole detainer would be lifted, the hearing officer, DEF. RICHARD LAW, joined in the conspiracy and committed the following acts to further the goals thereof: 1) made a finding of probable cause against me under charge # 1, which charged possession of a "small" amount of "cocaine", i.e., alleged cocaine residue from a glassine bag allegedly found on my person at the police precinct, despite the total lack of any evidence in the record that the glassine bag was tested for the presence of cocaine and the total lack of testimony from the officer who allegedly performed the search and claim to have found such item ; 2) refused to allow me to call DEF. JOHN

GALIE, the police detective who allegedly performed the police station search and allegedly claims to have found such item while, instead, DEF. LAW relied solely on the testimony of DEF. JIM GALIE who had no personal knowledge but was giving recklessly false or intentionally false hearsay; 2) refused to allow me a reasonable request for a short adjournment to secure the testimony of the bar owner who was an eyewitness to the bar events; 3) refused to allow me to call any witness who was not "exculpatory" or to introduce evidence of my work history and means of having legitimately had $531.00 cash on my person when arrested which was relevant to credibility issues and whether I intended to sell drugs as police claim; 4) despite the fact that only charge no. 1 alleging my possession of a "small quantity of cocaine" was presented, which charge was based on alleged cocaine residue from a glassine bag (see subpart 1, supra) DEF. LAW's findings of fact concerned the alleged "large amount" of cocaine allegedly found in the bar; 5) failed to state any reasons for determining that there was probable cause as to charge #1 ("small quantity of cocaine") and failed to make any findings of fact as to charge #1; 6) employing an erroneous standard for determining probable cause by, in his own words, deciding merely if there was probable cause to issue the parole violation warrant. These are only illustrative, not exhaustive, acts of prejudicial conduct, violations of my constitutional rights, and conspiracy to deny me due process rights to a proper and fair preliminary parole revocation hearing. See Morrissey v Brewer, 408 US 471, 92 S. Ct. 2593 (1972)

79. I also presented a state habeas corpus petition to DEF. JUSTICE JACQUILINE KOSHIAN, Niagara County Supreme Court, regarding my illegal arrest claims and requesting that the Division of Parole be prohibited from receiving the fruits of an illegal arrest to revoke my parole. She, too, refused to conduct appropriate hearings on my illegal arrest claims and dismissed my habeas corpus petition. My petition also raised claims of merit re the improper conduct of the preliminary hearing by DEF. LAW as alleged under par. 78, supra. Those claims, too, were dismissed despite the clear meritorious nature thereof which entitled me to

23

restoration to parole supervision.

80. Indeed, pursuant to New York's Civil Practice Law And Rules, Section 7003(c), both DEFS. JUDGE HANNIGAN And JUSTICE KOSHIAN are subject to forfeiture of one thousand dollars to me for failing to comply with mandatory provisions requiring issuance of the writ of habeas corpus (aside from their liability for conspiracy)

81. Similarly, DEF. JUSTICE ANTHONY SHAHEEN, Oneida County Supreme Court, refused to grant habeas corpus relief on substantially the same illegal arrest claims And the challenges herein indicated as to the conduct of the July 22, 1996, preliminary hearing. DEF. JUSTICE SHAHEEN refused to issue a writ of habeas corpus, converted my habeas petition to an Art. 78 proceeding (CPLR Art. 78) And dismissed the proceeding. I was being held at Oneida C.F. in 1997-1998 solely on the parole violation charge And would have been entitled to immediate restoration to parole if successful on the merits of my claims thereby rendering habeas corpus the proper remedy under state law precedents. See People ex rel. Coldwell v NYS Div. of Parole, 123 AD2d 458, 506 NYS2d 761, supra; People ex rel. Piccarillo v NYS Bd. of Parole, 48 NY2d 76, 421 NYS2d 842, supra; People ex rel. Robertson v NYS Div. of Parole, 67 NY2d 197, 501 NYS2d 634, supra; People ex rel. Saafir v Mantello, 163 AD2d 824, 558 NYS2d 356 (4th Dept. 19   ); People ex rel. Walker v Hammock, 78 AD2d 369, 37), 435 NYS2d 410; People ex rel. McGee v Walters, 62 NY2d 317, 476 NYS2d 803 (1984). DEF. JUSTICE SHAHEEN, As is likewise true with DEF. JUSTICE KOSHIAN, knew And was appraised of the October 3, 1996, dismissal of the indictment by DEF. JUDGE HANNIGAN. The deliberate refusal to comply with the mandatory requirement of CPLR 7003(c) renders DEF. JUSTICE SHAHEEN liable for forfeiture of one thousand dollars as well. Moreover, his acts are fairly representative of the design And repeated acts in the conspiracy set forth And renders him liable for damages And other appropriate relief for his extra-judicial acts of conspiracy. See San Filippo v U.S. Trust Co., 737 F2d 246, 254 (2d Cir. 1984), cert. den.

34

470 US 1035, 10 S.Ct. 1408 (1985) ; Jry v Ryan, 999
F.2d 679, 682-683 (2d Cir, 1993)

82. On June 2, 1997, the date I was transferred to NYS
DOCS relative to my July 5, 1996 arrest and the resulting
revocation of parole, I politely requested Niagara County
Jail authorities to contact FBI because of the threats
and danger that existed against my life in DOCS - A jail
Captain, Capt. Payne, was summoned and, when I told
him that I would like to have FBI officials contacted,
he refused to even hear me and ordered security
officers with mace to use force to remove me from the
cell. When the security officers arrived, I informed
them that I would walk cooperatively but they ordered
me to get on the floor (to which I complied) under
threat of mace and violence. Once I complied with
the order to lie on floor, I was handcuffed behind
my back, had a chest belt tightly put around my chest,
my legs were tied with a belt, and I was picked up
and carried by straps in a prone stretcher-like
position to the first floor where I was dressed and
transferred to Wende C.F. This action caused me great
physical pain and discomfort and aggravated a previous
serious medical condition which I have (a blood cir-
culation blockage) and represents a deliberate indif-
ference to known serious threats against my life as
well as continued acts of conspiracy to provoke me
into a fight as part of a conspiracy to kill me. The DEFS.
CAPT. PAYNE and numerous unknown name officers
(who wore masks concealing their identities) acted
unreasonably, sadistically and unnecessarily and
for the very purpose of causing me harm. DEF. SGT.
STICKNEY, as well as DEF. SUPT. CLARK, who were pre-
sent as I was carried out (SGT. STICKNEY) and as
I arrived on first floor (SUPT. CLARK), did nothing
to prevent the perpetration of said acts.

83. Also, during my subsequent 1999-2000 confinement
at Niagara County Jail, a C.O. Payne often refers to the
foregoing incident by stating sarcastically, "I could
have sworn I saw you on the floor gagging".

84. While in ~~Mo hawk~~ C.F. From July 1997 to July 1998, inmates indicated that they were being told that I was "wired" as part of an investigation. On July 18, 1997, a riot broke out in Mohawk C.F. East yard because of the suspicious hanging death of an inmate. At the time of the riot, I (and approx. 60 other inmates) was inside the school building and were nonpartici-pants in the riot. DEF. SGT. HUND took a list of all the names of nonparticipating inmates and assured us that DEF. SUPT. REYNOLDS was immediately informed. Despite the apparent nonparticipation in the riot, DEF. SGT. HUND at first attempted to close the Law Library where I was and announced that we (all inmates) would be going to the very East yard where the riot was occurring. When he received protests to being put in the middle of the riot, we were taken to the other side of the school building to the gym area where we were held.

85. During the aforesaid riot, I was handcuffed behind my back and forced to sit on the floor from approx. 1:00 A.M. to 8:00 A.M. over my repeated objections and complaints that I had high blood pressure and a blood circulation blockage that was being aggravated by such actions. I complained to DEF. DENBIK (Inspector General Investigator), DEF. Security Officer ID Number 8-75 as well as to various captains and other high ranking officials who were present and in position to take appropriate

87. Further, prior to my April 25, 1996, release from incarceration, two persons of my direct family died under suspicious circumstances fairly attributable to acts of conspiracy perpetrated in furtherance of the goals of this conspiracy. During the period from 1990 to 1993, my mother, Mae Ruth Brown, suffered a stroke and was admitted to Niagara Falls Memorial Hospital (in the city where the conspiracy originated and high ranking city and Niagara County officials held the offices and positions of power). According to information I received from relatives and other sources after my release from incarceration, my mother was moved from Niagara Falls Memorial Hospital to Buffalo Millard Filmore Hospital because, among other reasons, she was not being properly treated at Niagara Falls Memorial Hospital. My investigation disclosed to me that the intravenous tubes inserted into my mother had become clogged and solidified while she lay in a coma. After being moved to Buffalo Millard Filmore Hospital, she died, never recovering from her comatose state.

88. While at Attica C.F. (where I was informed of my mother's death) there were numerous statements by inmates and staff, some direct and some implied or by use of coded language, that my mother was killed as part of this conspiracy. Similar such statements were made by the same means at other facilities as well as after my release from incarceration. In fact, it has been widely circulated among the inmate population in New York's prison system as well as in the community outside that my mother was killed as an act of conspiracy in this conspiracy.

89. My investigation has disclosed to me that my brother, Leslie Welch, of Benton Harbor, Mich., was suspiciously struck in a vehicle by a large oil truck and was killed. I reported this as well as the circumstances of my mother's death to FBI officials who indicated the matters would be investigated. According to the information I received, the truck driver survived as would be expected with a truck of the large size used.

90. Further, there had been threats and declarations early on in this conspiracy that my relatives would be harmed in this conspiracy (see, ante, par. 35-39, et seq.)

91. As recently as 2000-2001, corrections officers on several occasions have used coded terms such as "mother f _ _ _ r" while talking to me sarcastically; and terms such as "what" which have coded meaning as referring to my mother's death and that of my brother, respectively.

92. Early on in this conspiracy, DOCS and certain inmate conspirators developed terms such as "all of yous" or "everyone" or "everybody" or references to the "Amityville" murders which involved a murder of a family, or other coded language to refer to the known DOCS conspiracy to kill my family members.

93. The foregoing are only illustrative, not exhaustive, of the secret codes used by DOCS officials and others to refer to their conspiracy against me and my family.

94. Another notable use of a coded threat is DOCS officials' adoption of the phrase "Let me know" which was the end phrase used in a sarcastic letter written to me by former Plattsburg, New York Prisoner Legal Services attorney Robert Kagan in 1979 to 1980 in response to a letter I wrote him stating that the Appellate Division had taken action against def. Judge Hannigan and def. Violante on my appeal. Mr. Kagan's letter "congradulated" me on the reversal of my case which I had erroneously stated occurred, and concluded by stating "if you need any advice or assistance, let me know". Hence, Clinton C.F. officials, knowing the content of my legal mail, coined the phrase "let me know" as a threat to be used as a coded or veiled way of communicating as part of this conspiracy early on. This term has been used countless times since it originated by DOCS officials and others.

28

95. The federal courts generally recognize that "the nature of conspiracies often makes it impossible to provide details at the pleading stage and . . . the pleader should be allowed to resort to the discovery process and not be subject to dismissal of his complaint". 5 C. Wright & A. Miller, Federal Practice & Procedure s. #1233, at 257 (2d Ed. 1990); Brewer v Rockwell Intern. Corp., 40 3d 1119, 1126 (10th Cir. 1994)

96. The acts of conspiracy continued after my July 15, 1998, release from Mohawk C.F. After serving the parole revocation term from my illegal and fraudulent July 5, 1996 arrest. Thus, I was again illegally arrested, indicted and this time fraudulently convicted based on two separate indictments nos. 1999-128 and 1999-051, with material involvement of at least two of the same conspirators involved in my July 5, 1996, illegal arrest and parole revocation, viz., Def. John Galie and Def. Paul Pierini of Niagara Falls City Police Dept.

97. Thus, on March 3, 1999, Defs. Galie and Pierini were present as members of a search team when a February 24, 1999, search warrant issued by Def. Judge Mark Violante (who is the brother of original conspirator Def. Michael Violante, supra, at par. 2-10, et seq.) based on known false and recklessly false statements of affiants Def. William Evans and Def. Peter Cocco made in their search warrant application. All defendants knew of the falsity of the allegations of drug sales which provided the basis for issuing the search warrant and or intentionally or recklessly ignored the falsity thereof.

98. Thus, the search warrant and application contain facially perjurious statements identifying me (Elbert Welch) as having worn "Black Hair" on the dates 1/19/99, 1/21/99, 2/9/99 and 2/17/99, the dates the application alleges confidential informants made cocaine buys from me at two different residences, to wit, 537-7th St., Niag. Falls, N.Y., and 2789 McKoon Ave., Niag. Falls, N.Y. Yet, it was clearly established at the state court hearing and trial, that I wore a clean

shaved or bald and daily during these periods; and that when my hair is grown in it is clearly grey and black with receded hair. It is incontrovertible that I am bald on the top of my head from "male baldness". DEF. PETER COCCO testified at the state court proceedings that the alleged informants said I had black hair and that this was the basis for the black hair statements in the warrant and application. At least one of the informants was said to be an "agent" of the police (allegedly an informant "TPIO" according to the application). These outstanding facially false statements controvert the existence and veracity of the informants as well as call into question the veracity of the affiants as to their alleged observations, etc., and the authenticity of the alleged controlled buys. FRANKS v DELAWARE, 438 US 154, 156, 171-172, 98 S.Ct. 2674, 2684-2685 (1978)

99. The state prosecuting authorities possess a CLARION Hotel receipt which was seized during execution of the search warrant which bears my name and shows that I resided at the CLARION Hotel on February 9, 1999. This controverts the allegations of the search warrant application that I sold cocaine to informant agent "TPIO" on February 9, 1999, from the 537-7th Street residence.

100. On February 9, 1999, noone resided at 537-7th Street and it was impossible for the agent informant to have entered those premises or to have made buy of cocaine. All of the property and contents of the house had been packed and was prepared for moving to a new residence of 2789 McKoon Ave. And I was residing at the CLARION Hotel. This controverts the claims of the affiants that they observed informant agent "TPIO" enter such residence and calls into question the veracity of the affiant and their informants and the authenticity of the alleged controlled buys in general.

101. The warrant application sets forth six separate alleged informants referred to as "RPWI", "TPIO", "TTI" and "three separate confidential informants who did state that Elbert Welch did reside at ~~and~~ 537-7th street . . . but has since moved to 2789 McKoon Avenue". Despite this reference to a total of "six" informants, both affiants DEF. EVANS and DEF. COCCO testified under oath in the State Court proceedings that there was only a total of "three" informants involved. These contradictory statements taint the warrant and application therefore and call into question the existence of the informants, the veracity of the affiants, and the authenticity of the events including the alleged controlled buys set forth in the warrant application. See FRANKS V DELAWARE, supra.

102. In furtherance of the conspiracy, DEF. PIERINI and DEF. COCCO fabricated claims that they gave me Miranda warnings and they, together with DEF. EVANS, DEF. MIKE MESSINA and DEF. JOHN GALIE gave known false testimony which contradicted each other on material issues related to fabricated claims that I confessed to owning drugs and money allegedly found in the residence.

103. In furtherance of the conspiracy which had me as a target, I was the only person out of four adults present that was arrested on MARCH 3, 1999, despite the officers' claim that they found the largest amount of cocaine on a floor in close proximity to the other three parties in a lower bedroom where they were present while I was not present in such room.

104. DEFS. EVANS and MARK DRIESS falsely reported the amount and denominations of bills found in a safe (claiming a total of some 1,170 bills were seized) while stealing portions of the money and not seizing a large amount of coins that were present in the same area where the bills were. DEF. EVANS and DRIESS also falsely reported finding a gun, papers with my name on them, a razor blade

31

drugs and oth... items inside a saft. and gave known false testimony during state court hearings and trial of the criminal case re indictment 1999-128.

105. The search warrant was also overbroad in that it directed seizure of: "any moneys, written articles, ledgers, documents or papers that tend to show sale and/or possession of cocaine and other controlled substances"; and "any... property that tend to show that... (Elbert Welch) resides at and has control over said (residence)"; and "cocaine other controlled substances". Acting arbitrarily and unreasonably under the overbroad search warrant, def. Evans, Driess, Cocco, Messina and others seized receipts, pharmacy receipts, cleaners receipts, rental agreement receipts, photos, a police capable scanner, two scales, a razor blade, a knife, a sword, numerous social security benefits cards, a letter to Annette Rolands, a casio organizer, a quantity of food stamps, and papers with other persons' names on them (i.e., a library card, driver's licences, a Tops card). None of these items was particularized in the warrant; and none was per se criminal or contraband. The officer had no probable cause to seize these items and acted arbitrarily in doing so.

106. The defs. Evans, Cocco, Driess and other officers executing the warrant admit they left behind a large amount of coins (hundreds of dollars) which were in the same area of the safe where the bills were. Defs. Evans and Cocco testified that they "didn't want to be bothered" with the coins and just "chose not to" seize them. This violated the direct terms of the warrant to seize "any moneys" since the defs. seized bills from the same area and had no rational basis to seize bills but not coins. Thus, while I maintain that the warrant and application were tainted and that no probable cause existed to seize the bills in currency, the officers' own version of the events (although falsified) shows that they acted unreasonably in seizing bills from the safe but not coins.

107. The defendant officers, who were Niagara County Sheriff Investigators (DEFS. EVANS, COCCO, DRIESS, MESSINA) and Niagara Falls City Police Detectives (DEFS. JOHN GALIE, PAUL PIERINI) also admitted during state court proceedings that they did not seize a box of legal papers with my name on them which were in the residence when the warrant was executed. These documents and written articles clearly were within the broad terms of the warrant which directed the seizure of: "ANY WRITTEN ARTICLES, LEDGERS, DOCUMENTS, PAPERS, OR PROPERTY THAT TEND TO SHOW THAT THE ABOVE NAMED PARTY (ELBERT WELCH) RESIDES AT AND HAS CONTROL OVER SAID STRUCTURE". The arbitrary failure to seize the legal papers with my name on the, while seizing other receipts, etc., which had my name thereon, was unreasonable and unconstitutional.

108. Further, the warrant application was defective because it failed to disclose the basis of knowledge for the alleged claims of alleged informants that Elbert Welch resided at the two residences (537-7th Street and 2789 McKoon Ave.) from which the warrant application falsely states cocaine buys were made on four separate dates. The affiants also controverted the application which alleges that "three separate confidential informants . . . did state that Elbert Welch did reside at 537 7th Street . . . but has since moved to 2789 McKoon Avenue" when the affiants flatly testified under oath that only three confidential informants were involved. (See par. 101, ante). Thus, the warrant application is defective in that it fails to make a showing of probable cause that I resided at and sold drugs from said residences.

109. Further, the issuing judge, DEF. JUDGE MARK VIOLANTE, failed to make proper inquiry to determine that a reliable basis existed for issuing the said warrant. Thus, according to testimony of the officers in the state court criminal proceedings, a written decision by the trial judge and the warrant application itself, only one informant gave sworn

testimony before DEF. JUDGE VIOLANTE on the warrant application, which was made on February 24, 1999. Yet, the application/affidavit of the affiants DEF. Evans and COCCO refers to a total of "six" separate informants who allegedly were relied on; and alleges four separate alleged controlled cocaine buys with only one of the fabricated controlled buys having been alleged to have been made by the informant who testified (allegedly) before the issuing judge DEF. JUDGE VIOLANTE. In addition, the search warrant affiants, DEF. EVANS and COCCO, both conceded that they had not observed me personally and had not known me on the dates of the fabricated controlled buys and, therefore, could not confirm any criminal conduct on my part. In addition, DEF. JUDGE VIOLANTE had a motive to want to take revenge against me for having caused the discipline of his brother, DEF. MICHAEL VIOLANTE, and acted pursuant to that motive in issuing the search warrant herein by intentionally and/or recklessly not making the proper inquiry to determine if a reliable basis for issuing such warrant existed. See Illinois v Gates,      US     , S.Ct.      (19    ) (Applying the totality of the circumstances test)

110. The conspirators herein were synchronized in time with New York State Police Investigator conspirators DEFS. JIMMIE PHELPS, BRENDA ROBERTS, GARY COLON, JAMES TALFORD, CLINTON CALLOWAY and Niag. Falls City Police Detectives DEF. LT. MOMS, PAUL PIERINI, SCOTT DALLAVIA, AND JOHN GALIE who were all participants in the fabrication and documenting of a nonexistent drug transaction which these defendants falsely claim took place between me and DEF. PHELPS on February 5, 1999, at the 537-7th street residence.

111. Thus, on February 24, 1999, DEF. JUDGE VIOLANTE issued the tainted SEARCH WARRANT based on known false statements of DEFS. EVANS and COCCO (and others) while on the same date, DEF. PHELPS and DEF. PIERINI gave known false testimony before a NIAGARA County GRAND JURY regarding the fabricated February 5, 1999, drug sale to DEF. PHELPS.

112. Then, on MARCH 3, 1999, the defendants executed the tainted February 24, 1999, SEARCH WARRANT; while on MARCH 4, 1999, a sealed drug indictment was filed in NIAGARA County Court against me based on the known false GRAND JURY testimony of DEFS. PHELPS and PIERINI given February 24, 1999. I have been incarcerated continuously since my MARCH 3, 1999, ARREST.

113. Facts which demonstrate the known falsity and conspiratorial NATURE of the conspirators' false CLAIM that I sold cocaine to DEF. PHELPS on February 5, 1999, are the following:

A. out of five alleged surveillance team officers (viz., DEFS. ROBERTS, TALFORD, COLON, CALLOWAY and PIERINI) not one of them was able to identify me, my residence, or my car in connection with the false 2/5/99 alleged drug transaction during their pretrial and trial testimony

B. A TINA ABRAMS (who is the alleged informant that DEF. PHELPS falsely claimed introduced him to me on 2/5/99 and that surveillance team members claim was with DEF. PHELPS on such date) testified at a MARCH 30, 2000 PRETRIAL HEARING that she had no recollection of any such events

C. After having not provided a surveillance log sheet to me or the prosecutor (DEF. ADA CLAUDE JEORG who admitted he had not previously been provided with such surveillance log) the surveillance team members, for the first time produced a surveillance log on MARCH 10,

35

2000 (over a year after filing of the indictment on March 4, 1999) which has all appearance of having been patently tailored to meet the exigencies of the case.

D. At trial, Def. Phelps significantly changed his pretrial hearing testimony given on October 15, 1999, in an attempt to conform it to the suspect surveillance log and was severely impeached by high contradictions and inconsistencies as to times, places, people, and the like.

E. Def. Phelps also claims in his testimony that he met this alleged drug seller in a bar, had not previously known him but was introduced by informant Tina Abrams, that he followed the seller to his 7th street residence in his separate car, and that the seller had "low hair" on his head. Yet, he incredibly was: unable to give any details about the alleged bar, people inside, description, etc.; could not describe the car he allegedly followed or state where the seller parked his car, etc.; could not describe any details about the inside of the residence and referred to a nonexistent "back bedroom" which obviously does not exist in the 537-7th street residence where he claims falsely that a drug sale occurred; and the overwhelming credible evidence showed that I daily wore a clean shaved or bald head which went uncontradicted by the prosecution.

The foregoing are only some of the salient facts which demonstrate the known falsity of Def. Phelps' claim that he bought cocaine from me on February 5, 1999, and are not intended to be an exhaustive list of the salient facts. In addition, the FBI was involved in an independent investigation of this false February 5, 1999, conspiratorial event as well as the general conspiracy in this matter, I intend to subpoena FBI witnesses and documents in the trial hereof.

36

114. DEF. JUDGE JAMES PUNCH AND DEF. ASSISTANT DISTRICT ATTORNEY CLAUDE JEORG were the presiding judge and prosecutor in both cases (indictment 1999-128 and 1999-051). Both were requested to **RECUSE** themselves in a pro se motion filed by me dated MAY 8, 2000, and both declined to do so. Both defendants filed answers to my RECUSAL motion in which they in effect admit to having had extrajudicial contact with the FBI about the cases and FBI investigation that was ongoing while DEF. JUDGE PUNCH merely claimed his contacts were not "improper" and that he was not "acting in cooperation with the United States Attorney's office"; and DEF. ADA JEORG admitted extrajudicial FBI contacts while denying that he was a member of the conspiracy to illegally imprison or harm me and denying he was acting in cooperation with the "United States Attorney's office". Neither DEF. PUNCH NOR ADA JEORG denied acting under the direction of FBI Agents.

115. The state court record provides overwhelming support showing that both DEF. JUDGE PUNCH and DEF. ADA JEORG engaged in extrajudicial acts of conspiracy to illegally imprison and harm me by deliberately prejudicing my right to fair hearings and a fair trial to insure my conviction and imprisonment in both of the two cases (indictments 1999-128 and 1999-051). Both DEF. JUDGE PUNCH and ADA JEORG knew from their extrajudicial FBI contacts and from other sources that both of these cases were filled with falsehoods and police misconduct and were the focus of FBI investigations. They improperly allowed themselves to be influenced in handling the two cases and acted in concert in opposing and denying all of my pro se motions to suppress or preclude evidence, to dismiss the indictment on various grounds, and for other relief, even though the defendants knew my motions had merit.

116. For example, in addition to being informed of my innocence through FBI extrajudicial contacts, DEFS. JUDGE PUNCH and ADA JEORG were aware from pretrial hearings and trials held under the two cases of the illegality of the search warrant issued by DEF. JUDGE VIOLANTE and the illegal search and seizure conducted thereunder (see, Ante, PAR. 96-109); and were aware of the incredible and contradictory and false claims of a February 5, 1999, drug sale to DEF. PHELPS (see, Ante, PAR. 110-113). These issues were raised during pretrial suppression hearings both in motions to preclude DEF. PHELPS' identification testimony due to the prosecutor's failure to give a statutorily mandated pretrial notice of intention to offer such identification testimony (see, New York's CPL 710.30(b); People v Newball, 76 NY2d 587, 561 NYS2d 898 (1990); People v Garofolo, 44 AD2d 86, 353 NYS2d 500; People v Rodriquez, 79 NY2d 445, 450-453, 583 NYS2d 814 (1992)); and in motions for trial order of dismissal due to the People's failure to make a prima facie case (see CPL 70.10; People v Sabella, 35 NY2d 158, 359 NYS2d 100 (1974)) and failure to establish guilt beyond a reasonable doubt as required by law (see People v Cleague, 22 NY2d 363, 365-366, 292 NYS2d 861, 862-863) with respect to indictment 1999-051). **With** respect to indictment 1999-128, a written motion was filed, and a hearing held, raising illegal search and seizure, know use of false statements to obtain the search warrant, lack of probable cause for the search warrant, falsified claims of having given me Miranda warning and that I thereafter made verbal admissions, that ADA Jeorg improperly denied my right to request the Grand Jury to call FBI Agent witnesses to testify, and other issues of merit. All of these motions were opposed by DEF JEORG and denied by DEF. JUDGE PUNCH as part of the extra-judicial conspiracy herein even though defendants knew my motions had merit. All of the tainted evidence was received in evidence and orchestrated by the defendants to insure my conviction.

38

117. Other deliberately prejudicial conduct which reveals the total disregard for my rights as a defendant in a criminal prosecution are DEF. JUDGE PUROHIS actions in: 1) Refusing to allow me to present FBI documents in my possession and my own testimony as to the conspiracy and FBI investigation while repeatedly disparaging my attempts to present FBI documents and testimony as to my conspiracy defense in both cases (indictments 1999-051 and 1999-128); 2) blocking my efforts, both at pretrial suppression hearings and trials in the two cases, to present my conspiracy defense and FBI documents; 3) allowing his extrajudicial FBI contact to influence him to make rulings that would not be on the merits of the cases; 4) apparently agreeing with DEF. ADA JEORG to assist in ensuring my conviction in the two cases by deliberately prejudicing my rights before the trial juries as he repeatedly did by improper comments, erroneous rulings on my motions as pro se counsel throughout the trial and pretrial proceedings; 5) denying my motion to impose sanctions on the prosecution for turning over to the DEA for forfeiture over seven thousand dollars seized from me and my residence on March 3, 1999, during execution of the search warrant herein without reserving a portion of those funds to enable me to retain counsel of my own choice; 6) refusing to assign new counsel and forcing me to defend pro se at the hearings and trials despite being apprised of the assigned counsel's failure to investigate or prepare my conspiracy defense and forcing me to choose between accepting incompetent representation by assigned counsel or defending pro se without making any inquiry of counsel regarding my non-frivolous complaint.

118. In addition, both DEF. JUDGE PUNCH and DEF. ADA JEORG were aware that Buffalo and Niagara Falls, New York FBI Agents had been subpoenaed to testify by me regarding the conspiracy under indictment 1999-051 and that the FBI offices declined to produce witnesses or documentary evidence and stated in writing that they were prohibited from doing so by federal law, specifically referring to 28 C.F.R. 16-21 et seq., and United States ex rel. Touhy v Ragan,        US Neither DEF. JUDGE PUNCH nor ADA JEORG took any action to enforce the subpoenas despite the clear implications of my rights under the sixth amendment to compulsory process of witnesses and my due process right to a fair trial under the fourteenth Amendment; and such defendants violated my right to counsel of my own choice and to the assistance of reasonably competent counsel while forcing me to accept services of deliberately unprofessional counsel who had been assigned or to defend pro se as I previously indicate in violation of my state and federal constitutional rights. Hence, I was improperly required to defend pro se in both cases without a valid waiver of my right to counsel.

119. Other deliberately prejudicial conduct to insure my conviction under indictment 1999-051 was: the prosecutor used his peremptory challenges to exclude the sole African-American juror summoned to the jury box and DEF. JUDGE PUNCH sanctioned this discriminatory conduct by overruling my timely and appropriate objections thereto and forcing me to be tried by an all white jury in violation of my equal Protection rights; DEF. JUDGE PUNCH improperly denied my motions for mistrials due to jury misconduct wherein multiple sworn jurors admitted disobeying the judge's orders not to read newsarticles about the case and were exposed to a lengthy news article which was of a prejudicial nature and, on

40

A separate occasion, a juror revealed, after being sworn and the other prospective jurors had been discharged, that he was a friend to one of the alleged surveillance team officers; and the defendants opposed and improperly denied motions to set aside the jury verdict on this and the other grounds of merit pointed out supra, which I filed pursuant to New York's CPL 330.30.

120. Similarly, Def. Judge Punch and ADA Jeorg acted in concert to deliberately prejudice my rights to insure my conviction and imprisonment under indictment 1999-128 by further acts of opposing and denying my timely challenge to the entire jury panel which contained only 3 African-Americans out of 74 jurors despite submission of documentary evidence and statistics from a Supreme Court investigation of the jury system which disclosed unfair and disproportionately small amounts of African Americans on jury panels in western New York and my motion papers set forth facts showing a long history and pattern and practice of such conduct in Niagara County; the prosecutor again used his peremptory challenges to exclude one of the African-Americans in a racially discriminatory manner with the result that I was tried by a predominantly white jury comprising 10 Caucasions and 2 African Americans over my objection; Def. Judge Punch, over my objections and motions to dismiss during trial, allowed the jury to render a verdict based on incompetent expert testimony from a forensic chemist as to his testing and conclusions that the substances in question were cocaine (see, e.g., People v Branton, 67 AD2d 664, 412 NYS2d 35 (2d Dept. 1979); People v Miller, 57 AD2d 668, 393 NYS2d 679); Def. Judge Punch denied my motions to dismiss the indictment based on numerous instances of improper and prejudicial conduct of Def. ADA Jeorg in presenting this case to the Grand Jury such as presenting incompetent and irrelevant testimony from a Mark Simmons who claimed, without a time frame or any specific dates, that he had gone to my residence 15 to 20 times to get "dope", misleading Grand Jurors as to my request

41

to CALL FBI Agent witnesses by eliciting testimony from the DEFS. EVANS, COCCO that no FBI Agents assisted them in the investigation and telling Grand Jurors that I had no right to CALL FBI witnesses despite clearly established law giving defendants the right to request relevant witnesses and authorizing the Grand Jury to CALL or subpoena such witnesses (see, e.g., CPL 190.50 (6); People v Stepteau, 81 NY2d 799, 595 NYS2d 371 (1993); People v Evans, 79 NY2d 407, 583 NYS2d 385)), threatening to bring out the underlying details of my prior record if I testified to a conspiracy claim before the grand jury thereby preventing me from exercing my clearly established right to testify and present my defense to the grand jury (CPL 190.50 (5) + (6); People v Stepteau, supra; People v Evans, supra)

121. DEFS. JUDGE PUNCH and ADA JEORG engaged in the foregoing and numerous other acts of improper and prejudicial conduct as part of the conspiracy to deprive me of constitutional and statutory rights and to ensure my unconstitutional conviction and imprisonment pursuant to this extrajudicial conspiracy.

122. After committing the above (and numerous other) unconstitutional, extrajudicial acts against me, on July 17, 2000, DEF. JUDGE PUNCH, acting in covent with DEF. ADA JEORG who recommended the maximum sentence, imposed prison terms totaling fourteen (14) to forty-two (42) years imprisonment (i.e., sentences totaling seven to twenty-one years imprisonment on each of the two cases to run consecutive to each other)

123. While in the Niagara County Jail pending trial and sentencing on the above two cases, acts of conspiracy and civil rights violations endemic to this conspiracy were perpetrated against me by Niagara County Jail authorities. Thus, for example, DEF. DR. JAMES HONENSEE and DR. ASSISTANT DEANNA PATTERSON were at least deliberately indifferent in treating me for a blood circulation blockage which they knew or had reason to believe exists. Both these defendants were repeatedly informed by me during the period from March 1999 to August 2000, that I was

42

having serious problems with high blood pressure, breathing, tightness in the chest, numbness in my legs, abdominal pain, etc., from a blood circulation blockage. I informed these defendants that I had been treated for this blockage at Great Meadow C.F. in 1982-1983 and signed an authorization for the release of my medical records. I also informed the defendants that I was being treated at Millard Filmore Hospital, Buffalo, New York during 1999 just prior to my arrest, for a condition which arose from the blockage, i.e., swollen feet and legs. Although these defendants obtained my Millard Filmore Hospital records which show that I was diagnosed with a condition known as plus two edema based on my swollen feet (which still existed when defendants examined me); and despite the fact that the symptoms I complained of to defendant are well known indicator of possible serious conditions such as stroke, heart problems, etc., the defendants deliberately refused to provide me with appropriate treatment for my known serious medical condition.

124. In fact, despite not having obtained my 1982 Great Meadow C.F. medical records relating to my treatment for the blockage of which defendants were informed, both DEF. DR. HONENSEE and DEF. NURSE PRACTITIONER DEANNA PATTERSON, over my repeated objections, insisted that I have "hypertyroidism" and prescribed "PTU" pills while insisting that I should take them for one or two years to control my thyroid. According to my understanding and belief, if I had taken the "PTU" (propythiuracil) pills, which are iodine based, this likely would have caused me irreparable physical injury or death. I refused to take the PTU pills when they were brought to me on serveral occasions by nurses and eventually the prescription was cancelled. In the interim, the defendants continued to deliberately ignore and refuse to provide medical assistance for the blockage and serious symptoms such as breathing, blood circulation, tightness in chest, numbness, pain, etc., that I was experiencing.

43

125. During the same period of time, the DEFS. DR. HOHENSEE and NURSE PRACTITIONER PATTERSON, without any reasonable basis in fact, and without any reasonable scientific basis, referred me to "mental health" for alleged "panic attacks" and documented in medical records which I have reviewed, known false and baseless allegations that I have "anxiety" attacks. This obviously is another clear act of conspiracy and feble attempt to help support the known false and defamatory claims of her coconspirator DEF. DR. SAMUELS (and others) who was an original conspirator who was caught red handed by FBI Agent on April 12, 1979, at Attica C.F. Fabricating mental health records falsely stating I have "schizophrenia" and that I "find it quite anxiety provoking to deal with new and/or ambiguous stimuli" (see, ante, par. 19-26). THE DEFS. DR. HOHENSEE and NURSE PRACTITIONER PATTERSON have made known false documents stating that I have an "ANXIETY DISORDER" OR "SOMATOZATION DISORDER" to further the goals of the conspiracy.

126. On or about August 18, 1999, Niagara County Jail Mental Health official, DEF. DR. SUSAN WAYTAK, interviewed me and has made documents related to such very brief interview which are being kept and maintained by Niagara County Jail officials pursuant to the goals of the conspiracy to falsely attribute a mental disorder to me and to assist in the cover up of the continued conspiracy to kill me and to defraud the federal government. During this very brief interview I requested that no mental health file be kept or maintained regarding me since no basis therefor existed. DEF. WAYTAK assured me that no file or records were kept or maintained. Yet, my medical records include such file and records, some of which I have recently reviewed.

127. In a related pending case (Welch v Hohensee, et ano. 00-CV-0208S (WDNY)) both DEFS. DR. HOHENSEE and PATTERSON have filed sworn discovery responses in which they make perjured claims that I complained to them of "ANXIETY" and "INCREASED ANXIETY" and that I had "HYPERVENTILATED" when, in fact, I made no such complaints to them. These known false statements, among others, are clearly endemic to and fairly representative of this conspiracy.

44

128. In Further ce of the goals of th conspiracy herein asserted, on July 8, 1999, approx. 3:00 p.m., when my final parole revocation hearing had been completed, I was put in a holding cell #3 alone by Def. Parole officer (P.O.) Anderson as an act of harassment and conspiracy. The officers on duty at this time told me I would be taken to my housing unit (M-10) after shift change. When the shift changed, the 3 pm to 11 pm shift officers, Def. Tim Blackley, Gary Maye, Rotolo, Sgt. Greenwald and Capt. Fichtinger forced me to remain in holding cell #3 until 11 pm. When I politely inquired to Def. Maye about why I was not being taken to my housing unit with the numerous other groups of inmates being transported, while I was being deliberately overlooked, Def. Maye became abusive and began browbeating me and trying to provoke me into disciplinary action by verbal abuse. It was not until 11 pm (some 8 hours) that I was transported "alone" through the halls by Defs. Blackley and Maye who were obviously trying to provoke me into disciplinary action, though they were unsuccessful in doing so. These acts are endemic of acts of conspiracy that have repeated occurred in this conspiracy

129. When I complained in writing on July 9, 1999, Def. Dep. Supt. Saxton replied, in writing, stating: "The 3-11 IPC officers were extremely busy on the evening in question and simply did not have the time to have you moved in a timely manner that you desired." This claim was patently false and absurd by my own eyewitness observation that numerous groups of inmates were being transported while I was deliberately overlooked and then transported "alone" by the very officers who tried to provoke me into physical or disciplinary action in this very unusual manner. Further, Def. Rotolo at a later date told me he had "orders" not to move me; and inmate trustees in the area earlier told me that this was being done deliberately by parole authorities.

130. My final parole revocation hearing held before DEF. HEARING OFFICER (H.O.) GEORGE TRIMPER and DEF. PAROLE PROSECUTOR ALPINA TAYLOR on July 8, 1999, was permeated with deliberate misconduct, acts of conspiracy and unconstitutional conduct to further the goals of this conspiracy committed by DEF. H.O. TRIMPER, DEF. TAYLOR and their sole witness, DEF. EVANS, supra (of Niag. Co. Sheriff Dept.). For example, DEF. TAYLOR opposed my request to adjourn the final hearing to allow the courts to determine my claims of illegal search and seizure, and DEF. TRIMPER denied my request for such adjournment, despite the timeliness of my request and clearly established law mandating the granting of such an adjournment and prohibiting the Division of Parole from revoking parole based on illegally seized evidence. See, e.g., People ex rel. Piccarillo v NYS Bd. of Parole, supra, 48 NY2d 76, 421 NYS2d 842. The parole revocation proceeding was instituted based solely on the allegations regarding seizure of evidence under the tainted February 24, 1999, search warrant which was executed March 3, 1999 (see, ante, par. 97-109 et seq.). Thus, had my claims of illegal search and seizure been successful (and they clearly have merit) I would have been entitled to restoration to parole supervision.

131. The DEF. H.O. TRIMPER and DEF. TAYLOR opposed and denied my request for a one day or short adjournment to obtain assignment of counsel from the county courts to represent me in the parole revocation hearing despite being informed that I was scheduled to appear in court on July 9, 1999, in the criminal case and could well have obtained assigned counsel. Each defendant was informed that I was previously held not eligible for assigned counsel by the court and public defender due to seizure of over seven thousand dollars on execution of the search warrant at my residence on March 3, 1999, and that there had been a recent change of circumstances wherein the Niagara County Court assigned counsel to represent me in the criminal case and hence would likely assign could to assist me in the parole hearing. Yet, defendants refused to allow a short adjournment and forced me to

46

defend pro se, a clear violation of my due process rights. See Matter of Beattie v NYS Bd. of Parole, 39 NY2d 445, 384 NYS2d 397; People ex rel. Matthews v Div. of Parole, 58 NY2d 196, 201, 460 NYS2d 746 (1983); People ex rel. Brown v Smith, 115 AD2d 255, 496 NYS2d 123 (4th Dept. 1986); People ex rel. Cleveland v NYS Div. of Parole, 117 Misc.2d ____, 459 NYS2d 242, Appeal dismissed 110 AD2d 671, 487 NYS2d 400

132. DEF. TRIMPER and TAYLOR denied me meaningful cross-examination of DEF. EVANS, who was the sole witness called by the Division of Parole; and improperly denied my request to call police witnesses who were present and took part in executing the search warrant.

133. DEF. H.O. TRIMPER and DEF. TAYLOR presented and relied on clearly insufficient evidence to revoke my parole as follows:

    A. Inv. EVANS (DEF. EVANS, supra) was the sole witness and he did not testify to any analysis of the alleged cocaine allegedly found on my person thus requiring dismissal of parole violation charge # one.

    B. No witness testified to any analysis of alleged cocaine allegedly found in the confines of my residence thus requiring dismissal of charge # two.

    C. Inv. Evans' testimony that he merely "field tested" alleged cocaine allegedly found in a "safe" in the residence was insufficient to support charge # three.

    D. Inv. Evans gave patent hearsay testimony that a member of Niag-County Forensic Laboratory tested a handgun and found it operable without any testimony from such forensic member was insufficient to support charge # four.

    E. The complete absence of any testimony that "ammunition" was found in residence requires dismissal of charge # five.

47

None of the five separate parole violation charges was supported by a preponderance of the evidence as required under regulations before parole may be revoked. See New York's Executive Law, #259-i, subd. 3 (f)(viii) - (ix); U.S. Const. Amend. 14; Morris-sey v Brewer, 408 U.S. 471, 92 S.Ct 2593 (197 )

134. The DEF. H.O. TRIMPER and DEF. TAYLOR deliberately deprived me of due process and a fair hearing to further the goals of this conspiracy by committing the following acts:

A. DEF. TAYLOR threw down her parole files and walked out of the parole hearing room while shouting "This is bulls——" in a manner clearly indicating that she was quitting her job if she did not get her way with the result that the DEF. H.O. TRIMPER denied my requests to call certain police officers as witnesses.

B. DEF. H.O. TRIMPER improperly interrupted and terminated my cross-examination of the sole witness, DEF. EVANS, thereby depriving me of full and fair opportunity to present my defense and cross-examine adverse witnesses.

C. DEF. H.O. TRIMPER improperly allowed DEF. TAYLOR to discuss and rely on a 1996 parole violation determination which is and was then under review in federal court habeas corpus and civil rights proceedings (WELCH V REYNOLDS, 96-CV-1068 (FJS) AND WELCH V GALIE et al., 96-CV-05835, Northern and Western District Courts, respectively) for constitutional infirmities

D. DEF. H.O. TRIMPER allowed DEF. EVANS' testimony regarding involuntary (and partly fabricated) conversations with me which were coerced by police abuse, threats by use of a K-9 dog against me and a then pregnant fiancee

E. DEF. TRIMPER relied on hearsay testimony from DEF. EVANS as to alleged testing of a gun performed by a forensic investigator who did not testify in person.

F. DEF. TAYLOR, DEF. EVANS AND DEF. TRIMPER presented known false evidence through testimony of DEF. EVANS, who testified that the "WEAPON WAS submitted to the NIAGARA County FORENSIC LABORAtory AND it WAS operable", whereas a "FIREARMS EXAMINATION Result Sheet" dated 5-6-99 by Inv. M. SHAW of NIAGARA County FORENSIC LABORATORY, states that "As submitted, the Jenning pistol is not functional. It is unable to chamber A CARTridge due to the presence of A metal protrusion at the mouth of the chamber" AND that "Upon submission Attempts at operability failed due to the presence of A metal burr Located at the chamber entrance At 12 o'clock". I received the Inv. M. Shaw documents AND thus became AWARE of the falsity of DEF. EVANS' testimony only After my final hearing had been completed And After my Administrative parole appeal had been perfeated. DEF. EVANS' wilful false testimony is imputed to the State as part of the parole prosecution team. Freeman v Georgia, 599 F2d 65, 67 (5th Cir. 1979) cert denied, 444 US 1013, 100 S. Ct. 661 (1980); Giglio v U.S., 405 U.S. 150 (1972); Napue v Illinois, 360 US 264 (1959); People v Savvides 1 NY2d 554 (1956)

G. DEF. H.O. TRIMPER Also Received in evidence A hearsay felony complaint document signed by DEFS. COCCO, PIERINI, DRIESS, MESSINA, GALIE, and others who took part in the ARREST And Relied on same, over my objection, while denying me the right to confront AND cross-examine such officers As well As the forensic Lab member in violation of my due process rights. See People ex rel. McGee v Walters, 62 NY2d 317, 476 NYS2d 803 (1984); New York's McKinney's Executive Law, #259-i, subd.-3(f)(v); Morrissey v Brewer, supra, 408 US 471, 92 S. Ct 2593.

H. The DEF. TRIMPER improperly overruled my constitutional ex post facto claim regarding use of newly enacted parole provisions of Jan. 1997 which required mandatory minimum 15 months punishment for Alleged parole violators who were placed under category one such as me

even though no such mandatory minimum punishment existed under parole rules and laws in effect in 1977-1978 when I was charged and convicted on my instant parole offense. At least one New York State Supreme Court has declared the use of the new parole provisions to be unconstitutional ex post facto laws. See People ex rel. ~~Commissioner~~ Smith v Greiner, ___ Misc.2d ___, 674 NYS2d 588 (Westchester Co. Sup. Ct. 1998)

135. The preliminary parole revocation hearing officer, DEF. H.O. LIMIWA POMERLEAU, and P.O. JOHN MCNAUGHT, over my objections and request for an adjournment solely on the basis to allow the courts to resolve the illegal search and seizure claims, proceeded with the preliminary revocation hearing and made a probable cause determination against me based solely on the evidence allegedly seized under the tainted search warrant, in violation of my clearly established constitutional rights. People ex rel. Piccarillo v NYS Bd. of Parole, supra, 48 NY2d 76, 421 NYS2d 842.

136. Further, DEF. POMERLEAU violated my due process right to a prompt preliminary hearing by granting an unrequested adjournment from March 29, 1999 to April 12, 1999 which, when combined with the period from March 4, 1999 to March 15, 1999 (the period that elapsed from service of the parole violation charges before my first appearance for a preliminary hearing) is a total of 25 days attributable to the Division of Parole. See New York's McKinney's Executive Law, #259-i(3)(c)(i). My clear and explicit request to adjourn to allow the courts to resolve the illegal search and seizure claims were not honored and, hence, the delays attributable to the Division of Parole entitled me to restoration to parole status. Yet, my requests for dismissal and restoration to parole were denied and I was held in custody continuously by the Division of Parole to further the goals of the conspiracy to illegally imprison and harm me.

137. Over the years since the 1980s and continuing up to an including the year 2002 as recent as June 2002, there have been widespread uses of both overt and coded language  by numerous TV personalities as well as radio station personalities which indicate their knowledge and involvement in the events herein. For example, TV personalities such as NBC's Katie Couric, Matt Lauer, Ann Curry, Solodad O'Brian, former Briant Gumble(who changed over to Channel 8 "Early Show" in recent years), Al Roker and many others of the "Today Show"; personalities such as Lynn White, Linda Church, Sakanya Christian, Linda Lopez,  and may others of WB11's TV morning news' ; numerous sportscasters of ESPN TV station; Buffalo's Channel 7 TV personalities such as Susan Banks, Keith Radford, Kathleen Laten, Peter Jennings and many others; WBLK radio station's Magic Man, Break of Dawn, Terry Davis, D. J. Hooker, Lou St. James, Debbie Simms and many others; Rochester's WDKX radio station's Mike Pazz, Tom, Terry Davis and many others have at times made open and overt statements and used coded language to inform me that they had knowledge of the ongoing conspiracy and also had been informed of my whereabouts and then current situations. For example, Buffalo's WBLK radio personalities and Channel 7 TV personalities, among many others, aforementioned regularly made statements and comments over the air during the period of March 1999 through August 2000 while I was confined at the Niagara County Jail to indicate that they were aware of and being informed secretly of the events surrounding my March 3,1999, arrest and prosecution as well as my daily activities while in the jail during that period. Similarly, the Rochester WDKX radio personalities during the time period from approximately 1987 to 1993 while I was confined at Attica C. F. informed me over the air that they had been secretly made aware of the conspiracy against me and of my daily activities while confined to my cell at Attica. Similarly, the aforesaid TV personalities from WB11, Channel2's "Today Show" personalities aforementioned and many others as recent as 2001 through 2002 have informed me of their secret awareness of my situation and daily events that occur with me in prison. These persons also indicate that they are communicating with FBI sources about this matter.

138. I have made efforts through the federal freedom of information act (5 USC  552    ) to obtain disclosure of the above information and other information within the possession of FBI officials  obtained during their investigation of thgi conspiracy. My requests were denied by Washington, D. C. Department of Justice sources who stated, among other things, that my requests involved third party state and local law enforcement officers and were not disclosable  as they woul;d constitute an unwarranted invasion of privacy under 5 USC §552(b)(7)(c)

139. I intend to submit requests for admissions, interrogatories and requests for production of documents to the TV corporation defendants regarding their knowledge and participation in the within conspiracy and communication with FBI sources relative thereto. I also intend to subpoena FBI sources and records regarding this matter and expect that FBI sources will confirm the existencce of the aforesaid conspiracies and communications from said TV and radio personality sources. I also intend to use other discovery devices and legal machinery to obtain the information from FBI sources

if it becomes necess__y. In this regard, I note _at federal courts generally recognize that "the nature of conspiracies voften makes it impossible to provide details at the pleading stage. . . and. . .the pleader should be allowed to resort to the discovery process and not be subject to dismissal of his complaint" 5 C. Wright & A. Miller, Federal Practice & Procedures, §1233, at 257 (2d Ed. 1990); Brewer v Rockwell Intern Corp., 40 F.3d 1119, 1126 (10th Cir. 1994). The aforesaid TV and radio sources have clearly expressed their communication with FBI sources about the said conspiracy and it appears that by use of appropriate discovery and or other machinery I will be able to provide details to fully substantiate my claims.

140. Likewise, with respect to defendants Oprah Winfrey and Bill Cosby, they have also indicated over the air that they have had communications with FBI sources regarding their involvement in the conspiracy and events herein. It is my understanding and awareness from being the victim of the conspiracy over the years, that many outside persons were solicited to participate in the conspiracy to discredit its existence by making it seem incredible due to the multiple and widespread participants. Although not original conspirators, the multiple outside parties became involved in an effort to discredit the existence of the conspiracy by making it seem incredible and to assist thereby in a cover up.

141. Other defendants who have stated their awareness of my situation on the air and have stated they have provided information to FBI sources are Regis Philbin and Kelly Rippa of Regis & Kelly Show broadcasted on Channel 2. Both Regis and Kelly indicate they have communicated with FBI sources in this matter. They stated on the air that they are informing and didn't care what anyone else says. They talk in coded and overt language daily about this conspiracy.

142. Further, pursuant to the conspiracy to kill me and to disinherit me and prevent me from recovering the multiple millionns in damages from this conspiracy, Niagara County defendants Family Court Judge Paul Crapsi and Niagara County Social Services workers Jane McDonough (Supervisor), Curtis W. Davis (caseworker), Sharon Calabrese (Acting Commissioner), Linda Gibbons (supervisor) and Diane Miller (caseworker), after becoming involved in taking custody of my daughter, Alize Mae Welch DOB 8/6/99, removed her from her home without consent or approval based on allegation of child neglect solely against the mother on 2/5/00, and thereafter did not serve me with notice of the removal of my daughter and of my right to apply for her return as required under N.Y.Family Court Act §1024(b)(iii) & 1028 despite their knowledge of my confinement at the Niagara County Jail and the fact that I had been served on 11 11/24/99 or thereabouts with a "Paternity Petition" (docket §P-1289-1999) which named me as Alize's father; the defendants made no inquiry as required under Family Court Act §1017 into the availability and suitability of relatives of my daughter as custodians or foster care parents; the defendants placed my daughter in a foster care home and made findings of neglect against the mother while refusing to allow me to participate in the proceedings on the issue of custody of my daughter in violation of clearly established statutory and constitutional law entitling me to participate in the proceedings Family Court Act §1055, Coban v Mohammed, 441 US 380, Quillion v Walcott, 434 US 246, 25 ; Stanley v Illinois, 405 US 645. It was only after a final order dated 9/5/00 entitled an "order of fact-finding

and disposition" against the mother was made by defendant Judge Crapsi placing my daughter in foster care with total strangers and non-family members that I was subsequently allowed to be participate in the proceedings. Defendant Judge Crapsi and his codefendant conspirators after learning that I had filed legal action against them subsequently relocated my daughter out of state to Atlanta,Georgia over my objections and despite being informed of the existence of a conspiracy against me and my family members and that it was not in my daughter's best interest to be relocated out of state. These defendants initially intended to permanently place my daughter in foster care with stranger as part of the conspiracy to kill me and to disinherit me from the multiple millions of dollars recoverable from this conspiracy and to prevent me from freely and fully testifying in court as to this conspiracy. Defendants changed their course and ultimately relocated my daughter to Atlanta, Georgia with an adult sibling, Pamela Jessie, only after learing of the federal court legal action and other legal action taken by me. To date, my daughter remains relocated out of state against her best interests due to the acts of conspiracy of the defendants..

143. It is also asserted that a "conspiracy once formed continues until the object of it has been accomplished unless abandoned short of an overt act, or broken up by the arrest of the participants". McDonald v United States,89 F.3d 128, 133 (8th Cir.) cert. denied 301 US 697, 57 S. Ct. 925 (1937); United States v Northern Imp. Co. 814 F.2d 540, 541-542 (8th Cir. 1987). Further, evidence that persons acted togethjer to further their personal bias may suffice to demonstrate conspiracy,see Garza v City of Omaka,814 F.2d 553, 557 (8th Cir, 1987); and a conspiracy need not be proved by direct evidence and a common scheme or plan may be inferred from circumstantial evidence. Glasser v United States, 315 US 60, 80; United States v Turner,528 F.22d 143, 162 (9th Cir. 1975) cert. denied sub nom. Lewis v United States,423 US 996, 96 S. Ct. 426. It is also settled that a person can be liable for conspiracy because he provides a central service to an illicit venture, see United States v Balimana,623 F.2d 1366,1368 (9th Cir.) cert. denied 449 US 1038, 101 S. Ct. 617 (1980); and that all conspirators need not know each other or the extent of the conspiracy's reach. Hayes v United States , 329 F.2d 209,213 (8th Cir. 1964; United States v Slaughter,128 F.3d 623, 630 (6th Cir. 1997).

144. In addition, I have recently been diagnosed with hepatitis C in April 2002. This virus was deliberately interjected at some point  in this conspiracy by one or more conspirators. I note that while at Niagara County Jail defendants Dr. Hohensee and Dr. Assistant Patterson twice had blood samples taken from me: on 5/10/99 and 6/15/99. The inter-community Memorial Hospital has generated and manufactured false medical documents claiming that I have a low TSH level and the my WBC (White Blood Cell) count was low. Both of these claims were knowingly falsified in apparent attempts to deliberately cause me to become ill but were thwarted when I refused to allow any further blood drawing  by the said defendants  while at Niagara County Jail. Recent blood tests at Clinton C. F. Annex show that my TSH level and WBC are normal, contrary to the false claims of defendants and nInter-Community

Memorial Hospital. . .ther, at all times in my ..st before my
March 1999 to August 2000 confinement at Niagara County Jail, I
have never had a low or abnormal TSH level or thyroid problem or
WBC problem. Defendants' known false claims to the contrary are
indicative of conspiracy and a pattern consistent with the goals
of the conspiracy herein set forth. According to information
obtained during my research in this matter, taking PTU medication
that defendants prescribed to me for a period of one or two years
as they suggested would have caused me serious physical injury or
death particularly since I have no thyroid problem. Defendants
had prescribed 200 milligrams per day of PTU medication. Also,
according to my research, a low WBC is indicative of HIV (which I
certainly do not have). Recent testing at Clinton C. F. Annex in
April 2002 proved negative results for HIV. Defendants' known false
documentation of a false claim that my WBC was low is a strong
indication of that they were planning to inject me with the HIV virus
but were thwarted in doing so when I refused to allow the continued
drawing of blood from me after the 6/15/99 drawing by defendants
at the Niagara County Jail.

145. The assertions made herein are not intended to represent
a complete or exhaustive list of all conspirators or all goals and
acts committed pursuant to the goals of the conspiracy set forth.
Annexed hereto are numerous exhibits which show some, but not all,
of the numerous efforts of DOCS conspirators to, inter alia, force
, intimidate and threaten me into cooperating with their violation
of the federal court orders for my protective custody housing
aforementioned by repeatedly writing disciplinary misbehavior
reports against me for my refusal to cooperate with the numerous
conspiratorial efforts to have me killed by cooperating with cell
to cell movement, showers movement, etc.; repeatedly referring me
to mental health conspirators when I refused to cooperate; falsely
attributing mental illness to me; refusing to provide proper
medical care despite clear indications of serious medical condition;
and which show that the respective Superintendents, Lieutenants,
Sergeants, corrections officers and mental health officials of the
respective facilities were put directly on notice and were fully
aware of these occurrences. The names of some of the said conspirators
appear as defendants on the caption of this complaint based on
their personal participation in said conspiracy The names of some
of the said conspirators and the dates of reports,etc., respectively,
which document their participation in said conspiracy, are  the
following: Great Meadow C. F.: C. O. T.E. Matteson, report dated
5/12/82 and psyche evaluation referral; C. O. Prayer, report 6/29/82,
C. O. Bump, report 9/21/82; Dept Supt. Eisenschmidt, memos dated
2/1/82 and 3/2/82 ; C. O. Dubrey, Lt.Winch       C. O. Griffith;
Sgt. Copeland, report 11/11/82; C. O. Blaise, report 10/26/82; C.O.
Dunster; C.O. Goldsmith, report 11/1/82;and of Clinton C. F.: R.
Fountain, report 8/323/83; C. O. Facteau, report 1/10/82; C.O.
Pescia, report 12/3/79; C.O. D.Malark, report 11/16/79; C.O. Eleeh,
report 3/18/80; Lt. Kavanaugh, report 3/19/80, emergency referral
to mental health;,Lt. Rivers, report 10/5/81; Lt. Reneditti,
report 3/17/80; Lt. Way; C. O. Kriplin; C.O. Frenyea; Dr. S. Reyes,
MD, Psychiatrist-Director;                              ; and
of Attica C. F.: Lt. R. Henneberg, report 8/21/85; Sgt. D. Starka;
C. O. Ahearn; C. O. Corcoran; Dep. Supt. Hans Walker, report
3/12/86; C. O. Fraser, report 7/18/90; Lt. Kihl, report 11/7/90.
These documented occurrences and many more represent defendants'
knowing participation in the within conspiracy and efforts to harm
me.

54

146. Deefendant Niagara County Court Clerk Wayne Jagow, acting
to further the goals of the conspiracy to keep me confined illegally
and to obstruct justice in state courts, has unreasonably delayed
providing me with a complete copy of the trial transcript and
record on appeal under indictments 1999-051 and 1999-128 and has
thereby prevented me from perfecting my direct appeals. I am pro se
appellate counsel in both appeals and must uiunder appellate court
rules file a certified copy of the complete trial transcript and
an appendix containing pretrial motion papers, exhibits, etc.,in
order to perfect my appeals. Def, Wayne Jagow was put directly on
notice on or about September 18,2000, by order of the Appellate
Division, 4th Dept., that I had been granted leave to conduct the
appeals pro se and that his office was to provide me with a free
transcript of the triual and record on appeal. As of today, I hav
not been rprovided with pretrial motion papers, etc., which are
essential tn perfection of the appeals. Moreover, Def, Wayne
Jagow and the appropriate Court stenographers had been put on
notice of my complaints regarding the failure to provide me with
a complete copy of the record on appeal by my motion papers for
summary reversal filed in or about January 2001. Despite the elapse
of more than eighteen (18) months since the filing of my summary
reversal motion, I still have not been provided with a complete
record on appeal. I have also submitted written demands and requests
as recent as 2002 for the needed pretrial papers which to date
have not been honored This hinders me from perfecting my state
court appeals and is manffestly conduct consistent with and
indicative of the design and goals of the within conspiracy. U.S.
v Lemm, supra;, 680 F.2d 1193, 1204; White v Walsh,supra, 649 F.2d
at 561

147. The repeated acts of conspiracy perpetrated against me
placew me in imminent danger of serious physical injury and death.
Based on these facts, I submit that I should be granted leave to
proceed in forma pauperis in this matter even though I have
accumulated three strikes under the 1996 PLRA (28 USC §1915).

CLAIMS

148. I reassert the foregoing facts as though fully set forth
herein to support my claims;

FIRST CAUSE OF ACTION

149. Defendants conspired to kill me by any means and to cover
up their complicity to prevent me from testifying in federal
court proceedings. 42 USC §1985(2)

SECOND CAUSE OF ACTION

150. Defendants conspired to kill me and to cover up their
complicity as an act of retaliation for my having testified in or
attended federal court judicial proceedings. 42 USC §1985(2)

THIRD CAUSE OF ACTION

151. Defendants conspired to and did abuse me and violate my
civil rights while being a majority of white persons motivated in part

by racial discriminatory animus against the blac.. minority plaintiff to deny him equal protection of the laws. 42 USC §1985(3)(first part.

### FOURTH CAUSE OF ACTION

152. Defendants conspired top prevent my release from prison to allow more opportunity to consummate the goals of the conspiracy. 42 USC §1885(2)

### FIFTH CAUSE OF ACTION

153. Defendants conspired to cover up the complicity of DOCS officials and others involved in this conspiracy while being a majority of white persons motivated in part by racial discriminatory animus to deny me equal protection of the laws. 42 USC §1985(3) (first part).

### SIXTH CAUSE OF ACTION

154. Defendants conspired to falsely attribute mental illness to me in order to discredit me and to deny me protective custody. 42 USC §1985(3) (first part, being partly motivated by racial discriminatory animus)to deny me equal protection of the laws)

### SEVENTH CAUSE OF ACTION

155. Defendants conspired to and did obstruct justice in the state courts by their actions in repeatedly writing baseless disciplinary reports, psychiatric referrals, etc., and use of threats, intimidation and force thereby prohibiting me from using state court remedies to challenge their actions. 42 USC §1985(2) (second part)

### EIGHTH CAUSE OF ACTION

156. Defendants conspired to and did prevent me fromm freely and fully testifying in federal court proceedings by use of threats, intimidation, force, disciplinary write-ups, psychiatric referrals, etc.   42 USC §1985(2)(first part)

### NINTH CAUSE OF ACTION

157. Defendants conspired to prevent my release from prison to allow more opportunity to consummate the goals of the conspiracy while being a majority of white persons motivated in part by racial discriminatory animus to deny me equal protection of the laws. 42 USC §1985(3).(first part)

### TENTH CAUSE OF ACTION

158. Defendants conspired to deny me protective custody housing to further the goals of the conspiracy. 42 USC #1983.

### ELEVENTH CAUSE OF ACTION

159. Defendants conspired to deny me protective custody housing to further the goals of the conspiracy while being a majority of

white persons motiv ed in part by racial discr inatory animus.
to deny me equal pr ection of the laws. 42 USC ₃1985(3).

### TWELVTH CAUSE OF ACTION

160. Defendants conspired to deny me protective custody housing
to further the goals of the conspiracy to prevent me from testifying
in or attending federal court judicial proceedings. 42 USC §1985(2).

### THIRTEENTH CAUSE OF ACTION

161.DDefendants conspired to retaliate against me for having
provided statements and evidence to FBI sources and federal court
authorities regarding DOCS officials' complicity in this conspiracy.
42 USC §1985(2)(fistr part)

### FOURTEENTH CAUSE OF ACTION

162. Defendants conspired to retaliate against me for having
provided statements and evidence to federal officials while being
a majority of white persons motivated in part by racial discriminatory
animus to deny me equal protection of the laws. 42 USC §1985(3)
(first part)

### FIFTEENTH CAUSE OF ACTION

163.Defendants comapired to and did make deliberately arranged
tape recordings and records of my activities which DOCS officials
sought to use as evidence to attempt to deny their complicity in
the conspiracy. 42 USC §1985(2).

### SIXTEENTH CAUSE OF ACTION

164. Defendants conspired to and did make deliberately arranged
tape recordings and records of my activities which DOCS officials
sought to use as evidence to attempt to deny their complicity in
the conspiracy while beinmg a majority of white conspirators
motivated in part by racial discriminatory animus against this
black minority plaintiff. 42 USC §1985(3)(first part)

### SEVENTEENTH CAUSE OF ACTION

165. Defendants conspired to falsely attribute suicide to me
by fabricated means to facilitate the conspiracy to kill me to
further the goals of the conspiracy to prevent me from testifying
in federal court proceedings. 42 USC §1985(2)

### EIGHTEENTH CAUSE OF ACTION

166. Defendants conspired to and did illegally arrest and
reimprison me after I was released from prison in 1996 and 1998
or to kill me and otherwise accomplish the goals of the conspiracy
to prevent me from testifying in federal court proceedings.
42 USC §1985(2).

### NINETEENTH CAUSE OF ACTION

167. Defendants conspired to and did illegally arrest and
reimprison me after I was released from prison in 1996 and 1998

or to kill me and otherwise accomplish the goals of the conspiracy
while being a majority of white persons motivated in part by a
racial discriminatory animus against this black minority plaintiff
to deny me equal protection of the laws. 242 USC §1985(3)(part
one)

### TWENTIETH CAUSE OF ACTION

168. Defendants conspited to and did conceal findings of
miscxonduct made by members of the Appellate Diuision,4th Dept.,
against Niagara County Judge Hannigan and attorney Michael Violante
and to avoid reversing my state criminal conviction on double
jeopardy grounds under indictments 5946 & 5954A which reversal
would have been consistent with the findings ofg misconduct and
violation of my double jeopardy rights. Such defendants are a
majority white persons motivated in part by racial discriminatory
animus to deny me equal protection of the laws. 42 USC §1985(3)
(first part)

### TWENTY-FIRST CAUSE OF ACTION

169. Defendants conspired to and did conceal findings of
misconduct made by members of the Appellate Division,4th Dept.,
against Niagara County Judge Hannigan and attorney Michael Violante
and to avoid  reversing my state criminal conviction on double
jeopardy grounds under indictments 5946 & 5946A to further the
goals of the conspiracy to prevent me from freely and fully
testifying in or attending federal judicial proceedings. 42 USC
§1985(2)(first part)

### TWENTY-SECOND CAUSE OF ACTION

170. Defendants conspired to cause me serious or fatal illness
to retaLIate against me for testifying ino or attending federal
court proceedings. 42 USC §1985(2).

### TWENTY-THIRD CAUSE OF ACTION

171. Defendants conspired to cause me serious or fatal illness
based in part on racial discriminatory motives to deny me equal
protection of the laws. 42 USC §1985(3)(first part)

### TWENTY-FOURTH CAUSE OF ACTION

172. Defendants conspired to prevent me from defending myself
against physical attack, assau;lt and death threats as part of
a conspiracy top prevent me from testifying in or attending
federal court proceedings. 42 USC §1985(2)(first part).

### TWENTY-FIFTH CAUSE OF ACTION

173. Defendants conspired to prevent me from defending myself
against physical attack, assault and death threats aß part of
a conspiracy to deny me equal protection of the laws while acting
on racial discriminatory anim;ß, in part, 42 USC §1985(3)(first
part)

### TWENTY-SIXTH CAUSE OF ACTION

174. Defendants conspired to and did cause the death of my family members as an act of retaliation against me for having provided testimony and evidence to the federal court. 42 USC Z1985 (2)(first part)

### TWENTY-SEVENTH CAUSE OF ACTION

175. Defendants conspired to and did cause the death of my family members as an act of retaliation for my having cause the state court appellate division to take disciplinary action against Def. Hannigan and Violante while acting in part on racial discriminatory animus to obstruct justice in state court. 42 USC #1985 (2)(part two)

### TWENTY-EIGHTH CAUSE OF ACTION

176. Defendants conspired to and did cause the death of my family members as an act of retaliation motivated in part by a racial discriminatory animus to deny me equal protection of the laws. 42 USC §1985(3)(first part); Hampton v Hanrahan, 600 F.2d 600

### TWENTY-NINTH CAUSE OF ACTION

177. Defendants conspired to and did hinder me from perfecting my state court criminal appeals under indictments 1999-051 and 1999-128 and thereby extended my incarceration while acting in part on racial discriminatory animus and to deny me equal protection of the laws, 42 USC §1985(3)(first part)

### THIRTIETH  CAUSE OF ACTION

178. Defendants conspired to and did obstruct justice in state court by hindering me from perfecting my state court criminal appeals under indictments 1999-051 and 11999-128 while acting in part on racial discriminatory animus to deny me equal protection of the laws. 42 USC §1985(2)(second part)

### THIRTY-FIRST CAUSE OF ACTION

179. Defendants conspired to prevent me from testifying in federal court or attending same or to retaliate against me for having done so, by hindering perfection of my state court criminal appeals under indictments 1999-051 and 1999-128 in order to extend my incarceration to further the goals of such conspiracy. 42 USC §1985(2)(part one)

### THIRTY-SECOND CAUISE OF ACTION

180. Defendants neglected to prevent the known conspiracy set forth in this complaint after having knowledge of wrongs about conspired to be done which were about to be committed. 42 USC §1986.

### THIRTY-THIRD CAUSE OF ACTION

181. Defendants conspired to and did deny me adequate and

sufficient wholesome and nutritious food for substantal periods
of time  and thereby caused me to drastically lose weight and  to
suffer  greatly while pursuing the goals of the conspiracy to
obstruct justice in the federal courts. 42 USC §1985(2)(first part)

### THIRTY-FOURTH CAUSE OF ACTION

182. Defendants conspired to and did deny me adequate and
sufficient  wholesome and nutritious food for substantial periods
of time and thereby caused me to drastically lose weight and to
suffer greatly while acting partly on racial discriminatory animus
and to deny me equal protection of the laws. 42 USC §1985(3)(first
part)

### THIRTY-FIFTH CAUSE OF ACTION

183. Defendants  conspired to make my three year old daughter
a ward of the state as part of the conspiracy to kill me and to
disinherit me and my family members from the multi-millions of
dollars recoverable by me from this massive conspiracy while acting
in part to retaliate against me for having testified in or attended
federal court proceedings and/or to retaliate against me for
having caused the discipline of Niagara County Judge Hannigan and
Michael Violantew. 42 USC §1985(2)(first and second part involving
obstruction of justice in state and federal courts)

### THIRTY-SIXTH CAUSE OF ACTION

184. Defendants by their misconduct have waived or forfeited
any statute of limitations or exhaustion of administrative or
state court remedies defenses that might otherwise apply to a
42 USC §1983 claim and are liable for their acts of conspiracy to
violate my civil rights and to kill me pursuant to 42 USC §1983.

### THIRTY-SEVENTH CAUSE OF ACTION

185. Defendants deprived me of equal rights enjoyed by white
citizens in violation of 42 USC §1981(a).

RELIEF SOUGHT

1. one hundred million dollars compensatory and one hundred million dollars punitive damages against each named person defendant in his/her individual capacity;

2. two hundred million dollars compensatory and two hundred million dollars punitive damages against each named corporate and municipal defendant;

3. injunctive relief against continued acts of conspiracy by the multiple defendants, both temporary and permanent resataining orders;

4. intervention by this court in any and all state court proceedings concerning plaintiff's challenge to his illegal incarceration pursuant to the doctrine of YOUNGER V HARRIS,401 US 37, particularly my pending state court appeals of my criminal convictions under Niagara County Court indictments 1999-051 and 1999-128, pending before the Appellate Division,4th Dept.;

5. restraining orders enjoining the state and the other named defendants herein from continuing to physically restrain me under the tainted convictions, both present and past convictions under indictments numbered 1999-051, 1999-128, 5946 and 5946A, which are being illicitly used by conspirators to carry outr acts of conspiracy in clear bad faith by state actors and those acting un under color of state or local law;

6. order directing all defendants to produce any and all records in their possession or control before this court for examination and possible destruction for fraud and conspiracy as well as for possible other appropriate equitable relief in my favor. The mental health defendants herein were requested by me in writing in 2001 to expunge all mental health records pertaining to me but all have refused to do so and still maintain such records. Also, the Appellate Division, 4th Dept., members have been requested to disclose the records concerning myt convictions and the disciplinary action taken by them against Niagara County Judge Hannigan and attorney Michael Violante regarding indictments 5946 and 5946-A but have decline to disclose such records or to reverse my conviction and discharge me on double jeopardy grounds.

7. grant an order or subpoena directing FBI and U.S. Dept. of Justice sources to produce any and all information in their possession regarding this conspiracy to violate my civil rights and to kill me and my family members.

8. grant leave to proceed in forma pauperis herein even if this Court determines that I have accumulated three strikes under the 1996 PLRA (28 USC §1915(g)) since I am presently and was at the time of the events in my vcomplaint, in imminent danger of serious physical injury or death by the conspirators ands their repeated acts and efforts to consummate the goals of the conspiracy as shown by my complaint which discloses and ongoing conspiracy to kill me and to violate my civilr rights.

9. grant such other and further relief as may be deemed just proper and equitable.

10. due to my incarceration and indigent status, grant an order directing that sufficient copies of the complaint be made by some authorized person and provided to the U. S. Marshals' service for  service on the numerous named defendants.Or that I be allowed to pay a small  fee to have the required amount ofd copies made for service by the U. S. Marshal on the defendants.

JURY TRIAL IS DEMANDED                    *Elbert Welch*

                                          Elbert Welch #00-B-1648
                                          Plaintiff Pro Se

I DECLARE UNDER PENALT   OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON: *August 12* ,2002.

## Exhaustion of Administrative Remedies

According to **42 U.S.C. § 1997e(a)**, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Did you grieve and/or appeal this claim:      Yes_____   No_____

    If your answer is yes, state the result:_____.

    Did you appeal that decision:   Yes_____   No_____

    If your answer is yes, state the result:_____.

        *Attach any documents which indicate that you have exhausted your administrative remedies regarding this claim.*

    If your answer is no, state why you did not: _____

_____

**If you have additional claims, use the above format to set them out on additional sheets of paper.**

## 6. RELIEF SOUGHT

*Summarize the relief requested by you in each statement of claim above.*

~~SEE ATTACHED SHEET FOR RELIEF SOUGHT~~_____

_____

_____

Do you want a jury trial? Yes_XX_ No_____

## I declare under penalty of perjury that the foregoing is true and correct.

Executed on _August 12 2002_____
                        (date)

. **NOTE:** *Each plaintiff must sign this complaint and must also sign all subsequent papers filed with the Court.*

*Elbert Welch*_____

_____

_____

              Signature(s) of Plaintiff(s)

STATE OF NEW YORK – DEPARTMENT OF CORRECTIONAL SERVICES

CLINTON
Facility

## INMATE MISBEHAVIOR REPORT

1) Name of Inmate _Welch_ _A._ No. _760567_ Cell _E-3-6_
       (Last)            (First)

2) Location of Incident _E-Block, E-3 Company_ Date _8-22-83_ Time _Approximately 8:00 a.m._

3) Rule Violation (s) _106.10, disobey a direct order; 6.17, Breakfast meal Mandatory (Monday thru Friday)_

4) Description of Incident _On the above Time and date, I opened Welch's cell (E-3-6) for Breakfast meal. He did not come out. I went to his cell and ordered to go to chow even if he doesn't eat. He Refused to do so. I closed his cell and took the rest of the company to chow. This has been a constant problem with Welch, every time you open his cell he does not want to come out._

_8-22-83_     _R. Saunders_     _Correction Officer._
Date      Signature of Person Making Report      Title

5) Was more than one inmate involved?    Yes _____ No __X__

6) If yes, give name and number of other inmates: _____

7) Was inmate locked in cell as a result of this incident? Yes __X__ No _____ or

   Was inmate locked in other Housing Unit?    Yes _____ No _____

8) If yes, (a) Housing Unit or present confinement _____ Cell _____

     (b) Authorized by _____

9) Was physical force used by you?   Yes _____ No __X__ (If yes, file Form 2105)

10) Endorsements of other employee witnesses (if any)

   SIGNATURES: 1. _____    2. _____

DISTRIBUTION:    SERVICE UNIT    DISCIPLINARY FILE    D.S.S.

# GREAT MEADOW
## DUPLICATE

August 5, 1982

Dr. Foote, FHSD
R. Duell, Prin. Steno.

Elbert Welch   76-C-567
(Memo from Sup't Jones - 8-2-82).

Here is another note from inmate Welch; in this one
he goes into more detail about his complaints.

Prin. Steno.

/red

cc:  File

att.

From: Mr. Elbert Welch 760567        August  , 1982
      C-1-28

To: Superintendent E.W. Jones:

The following information should help in prescribing medicine per my request;
I have all the symptoms of angina and hypertension. I get shortness of breath
spasmodic suffocation, fits, pains in certain areas and general breathing pro
-blems.

I would not request medication if I didn't think I required it.

I have indicated a reluctance to have an EKG or radiation but my symptoms are
demonstrated, and I respectfully ask my request be honored.

CC: Dr. Foote

CC: Elbert Welch, Personal File        Elbert Welch



From: Mr. Elbert Welch
   C-1-28  760567

Augus. ?, 1982

Superintendent E.W. Jones:

I respectfully ask you to personally see that I get the medicine that I requested since I have not received it and I am in serious need of same.

I have made my medical need known to several Correction Officers as well as to several members of the medical staff. Despite my repeated requests for medication since 7/10/82 I have not received any.

CC: Hospital Administrator

CC: Doctor Foote

CC: Elbert Welch, Personal File

Respectfully

Elbert Welch

---

**Memo**

TO:

Dr. Foote - FHSD

8-10-82

FROM: E.W. Jones, Superintendent

( ) For Your Information    ( ) For Reply
( ) Prepare Reply for My Signature    ( ) Review
( ) Necessary Action    ( ) Signature
( ) For Your Files    ( ) Approval
( ) Note and Return    ( ) Please Return
( ) Comment or Recommendation    ( ) As Requested
( ) Per Conversation    ( ) Note & See Me
( ) Photo-copies of each page

Remarks:

Re: Elbert Welch 76-C-567

Another note from inmate
concerning medication.

att.



From: Mr. Elbert Welch
     C-1-28   760567                    August 11, 1982

  Dr. Eldridge, M.D.:

  If there is any medication that you would prescribe for me based upon the
description of the symptoms I gave you until such time as an evaluation is
made of my 8/10/82 examination I would be thankful.


Enclosure: Dr. Eldridge

C: Superintendent E.W. Jones,
  Great Meadow Corr. Fac.

C: Elbert Welch, Personal File

Dr Forte is to
reply to Supt
on previous notes
from this inmate

Elbert Welch

Hold for reply
CRW

G.M. - 40

STATE OF NE    ORK · DEPARTMENT OF CORRECTIONA    ERV    S ·

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*

DATE_____August 17, 1982____

TO:
FROM:    Dr. Foote - FHSD
         C.R. Winch, Acting Sup't

SUBJECT:     Elbert Welch   76-C-567

Attached note is for your information and appropriate action.

Acting Superintendent

CRW/red
cc:

att.

Fro  : Mr. Elbert Welch 76C56    C-1-28                 ust 15, 1982

To: Superintendent  , Jones:

I continue to have problems breathing and spasms of suffocation and a need for medication.

I believe that I am getting an inadequate flow of blood and oxygen to the brain and other body parts.

CC: Dr. Eldridge                        Respectfully,

CC: Hospital Administrator               Elbert Welch

CC: Elbert Welch, Personal File

G.M. - 40

STATE OF NEW     DEPARTMENT OF CORRECTIONAL     CES

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*

DATE      August 23, 1982

TO:       Elbert Welch   76-C-567   B-1-27
FROM:     C.R. Winch, Acting Superintendent

SUBJECT:      Your Note of 8-21-82


        Dr. Foote and hospital staff are aware of

your notes to me concerning your medical treatment, and I am

sure you are receiving treatment commensurate with your needs.

                        Acting Superintendent


CRW/red
cc:  Dr. Foote w/att.
     File

From: [illegible]   [illegible]                    August 21, 1982
      B-1-27          76L567

To: Superintendent E.W. Jones

I wrote to you for aid in obtaining a prescription for
hypertension or anticoagulation and describing my symptoms
I have since reported separate instances of suffering to
your medical staff and C.O.'s and I've made requests
daily for a prescription.

I again request your aid in obtaining a prescription for med-
icine.

cc: Elbert Welch, Personnel File                  Elbert Welch

G.M. - 40

## STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

## GREAT MEADOW CORRECTIONAL FACILITY

### INTERDEPARTMENTAL COMMUNICATION

DATE_____February 1, 1982_____

TO:      Cell Hall Control
FROM:    Office of Deputy Sup't-Security

SUBJECT:  Albert Welch   76-C-567

On Wednesday, February 10, 1982 subject inmate is to be taken to the Glens Falls Hospital CT Dept., for a CT scan (skull films w/sella & chest x-rays) at 1:30 pm.   Corr Officer R.J. Rathbun will be in charge and Corr Officer J. Pochard will drive the 48 Gray Van.   They are to leave the facility about 12:30 pm.

You are to see that the inmate is processed, dressed in clean facility clothing and in readiness.   Search Papers are to be executed.

Inmate's Commitment will be available from the Principal Clerk.   MEDICAL RECORDS WILL ACCOMPANY INMATE TO HIS APPOINTMENT.

_W. Eirnschmidt_
Deputy Sup't-Security

pw
cc:  Lobby/Arsenal/▮▮▮▮▮▮▮/Steward/
Chart Office/Chart Sgt/NLunt/Hospital/
Dep Sup't-Adm/File

G.M. - 40

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*

DATE___March 2, 1982_____

TO:      Cell Hall Control
FROM:    Office of Deputy Sup't-Security

SUBJECT:    78-B-767 Michael Davis          76-B-567 Albert Welch

On Wednesday, March 3, 1982 subject inmates are to be taken to the Glens Falls
Hospital, Mental Health Unit, GF fo-see Dr. Wasser&Faruki at 11:00 am.   Corr
Officer M Gonzalez will Be in charge and Corr Officer L.T.Platts will drive the 49 Blue
Van.   They are to leave the facility about 10:00 am.   W.Stoddard will assist

You are to see that the inmate is processed, dressed in clean facility clothing
and in readiness.   Search Papers are to be executed.

Inmate's Commitment will be available from the Principal Clerk.   MEDICAL RECORDS
WILL ACCOMPANY INMATES TO THEIR APPOINTMENT.

pw
cc:  Lobby/Arsenal/Prin Clerk/Steward/
Chart Office/Chart Sgt/NLunt/Hospital/
Dep Sup't-Adm/File-2

Deputy Sup't-Security

G.M. - 40

STATE OF NEW Y .K - DEPARTMENT OF CORRECTIONAL S /ICES

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*

DATE  ~~XXXX~~ August 2, 1982

TO:        Dr. Foote - Hospital
FROM:      E.W. Jones, Superintendent

SUBJECT:        Elbert Welch   76-C-567

Attached is note from subject inmate.  Kindly
advise me as to his statements about a prescription.

Superintendent

EWJ/red
cc:

Att.

---

From: Mr. Elbert Welch 76C5                          July 29,1982
      C-1-28

To: Superintendent E.W. Jones:

I have made several requests for a prescription for medicine to treat an
illness that I have. I have made the requests through Dr. Foot, P/A. Ted
Nesmith and others from the medical staff, all to no avail.

After an examination by a physician at your facility approx. Feb. 1982, it
was resolved that I needed medication and same was offered to me by the ex-
amining physician at a later date. Based upon the examining physician's
decision and medical report I request a prescription to treat my physical
illness which I am certain is a blockage, as I have indicated.

Although the physician's medical report may be confidential, I do have an
essential medical need for the prescription and I ask you respectfully to
see that I get it.

CC: Elbert Welch, Personal File

                        Elbert Welch

From: Mr. Elbert Welch  76050            July 27,1982
     C-1-28

TO: Doctor Foot, M.d.:

    I have a blockage that I have requested medication for from you 7/23/82
and I have not received it. I have damaged my spine and I do have an es-
sential medical need as a result of that.
    I was previously examined by a physician at G.M.C.F. who subsequently of-
fered medication to me. The Superintendent should be aware of that examin-
ation.

CC: Superintendent E.W. Jones,
    C.M.C.F.

                                       Elbert Welch

CC: Elbert Welch, Personal File



Deputy Supt. Scully

Donald T. Schmid, Psychologist II     February 27, 1979

76-C-567   Welch

Adjustment Comm. (1)
Service Unit     (1)
Parole          (3)
Inmate MHU File (1)

Contact was made with Inmate Welch in the Observation Unit this A. M. He impressed as being well oriented and in good contact. He did not present any overt psychotic manifestations. He readily admitted that he set a fire and more recently abused himself physically, both as means of insure his getting out of the protection company. At this time he is considered to be a malingerer. He is therefore, discharged from observation to the general population this day.

DTS/jap

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*

DATE_____September 14, 1982_____

TO:           Deputy Sup't for Security
FROM:         E.W. Jones, Superintendent

SUBJECT:      Albert Welch - 76-C-567

Attached is copy of IVP Co. Review Form on this inmate.

Kindly comply with my indication that this inmate was to be released to population and enter the intensive counseling group.

Superintendent

EWJ/red
cc:  C. Thompson
     G. Schroeder
     File

att.

· G.M. - 40

STATE OF NEW   RK - DEPARTMENT OF CORRECTIONAL   RVICES

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*

DATE____ March 2, 1982 _____

TO:          Office of the Deputy Supt., of Security
FROM:        Office of the Inmate Records Coordinator, II

SUBJECT:     Outside Medical Appointment

Permission is granted for you to schedule the following-named inmate
for a medical appointment as indicated:

Wednesday - 3/3/82 - Welch - 76-C-567 - Glens Falls Hospital
                                        Mental Health Unit- 11:00 a.m.
                                        Drs. Wasser & Faruki


                              *Lorraine Mihulka*
                              Principal Clerk


lmm

cc:     Service Unit
        Steward
        File

188

# STATE OF NEW  RK -- DEPARTMENT OF CORRE  NAL SERVICES

## CLINTON CORRECTIONAL FACILITY

### Interdepartmental Communication

**Date** May 14, 1980

**From:** S. Reyes, M.D., Psychiatrist-Director-MHSU

**To:** John Miner, Sergeant

**Subject:** WELCH, Albert - 76 C 567

The above-named inmate has been followed up in our Out Patient Clinic.
He is not able to make it in population because of his desire to be
left alone.

It is my recommendation that he be placed in protective custody.

S. Reyes, M.D.
Psychiatrist
Director-MHSU

SR/kg

G.M. - 40

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SE. /ICES

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*



DATE _____March 5,1982_____

TO: W.E. EISENSCHMIDT, DEP. SUPT.-SECURITY

FROM: *OFFICE OF THE IRC,II*

SUBJECT: *PRELIMINARY SANITY HEARING:*

*Hon. Thomas G. Moynihan, Warren County Judge,will conduct a Preliminary Sanity Hearing at this facility on Monday, March 8,1982 at 10:00 A.M.in the matter of the commitment of the following inmates to the Central New York Psychiatric Center:*

*Albert Welch       76-C-567*
*Michael Davis     78-B-767*

*The Conference Roon will be used for this hearing.*

*M.M.MATTOON, IRC.II*

mt
CC:Lobby
   S.U.
   Cell Hall
   Chart Sgt.
   Parole
   Mental Hygiene
   Steward
   Hosp.
   File



MAR 1982 RECEIVED SERVICE UNIT

FORM 2151 (REV. 12/76)
(251-A)

S. of New York – Department of Correctional Ser s

Clinton
(Facility)

## INMATE MISBEHAVIOR REPORT
## TO SUPERINTENDENT

1) Name of Inmate _Welch_ No. _76C567_ Cell _E 1/16_
   Last                    First

2) Location of Incident _Hosp 1(OBS)_ Date _3-28-80_ Time _11:00 pm_

3) Description _Violation of Rules 1.75 (interference with employee in performance of duty) 1.90 (Disobeying a direct order + 2.30 (Threats)_

_Upon Dr. Reyes's arrival in OBST she requested that Inmate Welch (76C567) be brought from his cell to the interview area. Going to Inmate Welch's cell with Officer Durkee I told Welch that Dr. Reyes wanted to interview him and to come with us. He refused_

4) Was more than one inmate involved?                Yes ☐   No ☒

5) If yes, give name and number of other inmates (where known) and describe role played by subject inmate _____

6) Was inmate locked in cell?                          Yes ☒   No ☐
   If yes, authorized by _____

7) Was inmate locked in other housing unit?           Yes ☐   No ☒
   If Yes (a) housing unit of present confinement _____ Cell _____
        (b) authorized by _____

8) Was physical force used by you?                    Yes ☐   No ☒
   (If answer is yes, also file Form 2104 – Use of Force)

_____  CO
Signature of Person Making Report   Title

9) Endorsements of other
   employee witnesses
   (if any)          Date: _3-28-80_

_____  _____
Signature            Title

(No. of Supplementary Sheets _1_ )

_____  _____
Signature            Title

DISTRIBUTION: Original – Facility Central File. Copy 1 – Service Unit. Copy 2 – extra, for Commissioner if needed

FORM 2152 (9/75)
(251-AS)

State  New York – Department of Correctional Servic

## CLINTON Correction
(Facility)

## SUPPLEMENTARY SHEET FOR INMATE
### MISBEHAVIOR REPORT

Name of Inmate  Welch                    No. 76C567   Cell  E 1/16

saying "You don't Know about me, I won't go anywhere with you unless you use Force." I explained To Welch That There were no inmates around and he had To see Dr. Reyes. Finally he did comply with my orders and went out To see Dr. Reyes. Dr. Reyes interviewed This inmate and said That he was To be returned To E 1/16. At This Time Welch stated over and over, "I won't move any where without being Forced, I'm not Leaving here and returning To E Block. Nobody can make me go and I won't Leave."

At about 12:30 pm Sgt. Winch entered OBS I and Told Welch (76C567) To get dressed. He refused and Tried To argue with The Sgt. Finally Welch did comply with These orders and got dressed and left The unit. Welch (76C567) returned To E Block without Further incident.

3-28-80
Date

Signature of person making report

CO
Title

_____
Signature

_____
Title

ENDORSEMENT OF OTHER EMPLOYEE
WITNESSES (if any)

_____
Signature

_____
Title

_____
Signature

_____
Title

Instructions:   (a) Use this form to supplement information furnished on Form 2151, if needed and for supervisory officer's investigations I
(b) Additional and any confidential comments may be indicated on this form.
(c) Names and numbers of inmate witnesses should be entered on this form.
(d) Recommendations, if any, may be entered on this form.

DISTRIBUTION:  Original – Facility Central File,  Copy 1 – Service Unit,  Copy 2 – extra, for Commissioner if needed

C.M. - 40

STATE OF NEW    K - DEPARTMENT OF CORRECTIONAL S    VICES

GREAT MEADOW CORRECTIONAL FACILITY

*INTERDEPARTMENTAL COMMUNICATION*

DATE ___August 3, 1982___

TO:      Elbert Welch, 76-C-567    C-1-28
FROM:    E.W. Jones, Superintendnt

SUBJECT:        Your note of 8-2-82 and 7-29-82 (both received 8-3-82).

    I received a note from you on August 2, 1982 - concerning
a prescription.  Dr. Foote is to respond to me concerning the
matter.  When I have received his reply you will receive an
answer from me.

Superintendent

EWJ/red
cc:

July 5, 1982

From: Mr. Elbert Welch 76056
/ 0-1-28

To: Superintendent E.W. Jones:

I have made several requests for a prescription for medicine to treat an illness that I have. I have made the requests through Dr. Foot, P.A. Ted Nesmith and others from the medical staff, all to no avail.

After an examination by a physician at your facility approx. Feb. 1982, it was resolved that I needed medication and same was offered to me by the examining physician at a later date. Based upon the examining physician's decision and medical report I request a prescription to treat my physical illness which I am certain is a blockage, as I have indicated.

Although the physician's medical report may be confidential, I do have an essential medical need for the prescription and I ask you respectfully to see that I get it.

CC: Elbert Welch, Personal File

Elbert Welch

From: Mr. Elbert Welch 76056

August 2, 1982

To: Superintendent E.W. Jones:

Enclosed is a copy of a memo I wrote to you concerning an essential medical request that I have not received.

Again, I have an essential need for the medication I requested and I've been making such requests since approx. July 10, 1982.

CC: Elbert Welch, Personal File



Elbert Welch

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES   PAGE
SUPERINTENDENT   HEARING DISPOSITION RENDERED

ATTICA GEN      AMENDED DISPOSITION      TAPE NUMBER ........................

DIN:  76C0567  NAME:  WELCH, ALBERT                    CELL:  0A-10-03

INCIDENT DATE & TIME:  07/18/90     07:00 AM   TIER 3

REVIEW DATE:           07/19/90               BY:  LT   E.S.MALENSKI

DELIVERY DATE & TIME:  07/19/90     11:07 AM  BY:  CO   C.HOBBS

HEARING DATE & TIME:   07 / 23 / 90   12:53 PM   BY:   HO   J. Kihl

| CHARGE NUMBER | DESCRIPTION OF CHARGES | REPORTED BY | DISPOSITION |
|---|---|---|---|
| 106.10 | REFUSING DIRECT ORDER | CO   R. FRASER | G |
| 2.14 | URINALYSIS TESTING VIOLATION | | G |

| PENALTY CODE | DESCRIPTION | PENALTY MO DAYS | START DATE | RELEASE DATE | SUSPEND MO DAYS | DEFERRED MO DAYS | RESTITUTION $$$ . ¢¢ |
|---|---|---|---|---|---|---|---|
| G000 | Phone | 90 | 7/23/90 | 10/21/90 | | | |
| E000 | Packages | 90 | 7/23/90 | 10/21/90 | | | |
| F000 | Commissary | 90 | 7/23/90 | 10/21/90 | | | |
| X000 | Clothing | 90 | 7/23/90 | 10/21/90 | | | |
| Z000 | Permit | 90 | 7/23/90 | 10/21/90 | | | |
| H000 | Good Time | 06 | | | | | |

... SUCCESSFUL PRINT COMPLETION ...

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES   PAGE
SUPE INTENDENT  HEARING DISPOSITION RENDERED

OFFICE OF:                                    TAPE NUMBER

DIN:  7460567  NAME:  WELCH, ALBERT                       CELL:  GA-10-00

INCIDENT DATE & TIME:  07/18/90      07:00 AM    TIER 3

REVIEW DATE:           07/19/90              BY:  LT   E.S.MALENSKI

DELIVERY DATE & TIME:  07/19/90      11:07 AM   BY:  CO   C.MOSBO

HEARING DATE & TIME:  7/23/90 12:53pm   BY: IDHO  J. KIHL

| CHARGE NUMBER | DESCRIPTION OF CHARGES | REPORTED BY | DISPOSITION |
|---|---|---|---|
| 106.10 | REFUSING DIRECT ORDER | CO  R. FRASER | Guilty |
| 0.14 | URINALYSIS TESTING VIOLATION | | Guilty |

| PENALTY CODE | DESCRIPTION | PENALTY MO DAYS | START DATE | RELEASE DATE | SUSPEND MO DAYS | DEFERRED MO DAYS | RESTITUTIO $$$ , ¢¢ |
|---|---|---|---|---|---|---|---|
| B 000 | Keeplock | 90 | | | | | |
| G 000 | Loss of Phone | 90 | 7/23/90 | 10/22/90 | | | |
| E 000 | Loss of Packages | 90 | 7/23/90 | 10/22/90 | | | |
| F 000 | Loss of Comm | 90 | 7/23/90 | 10/22/90 | | | |
| X 000 | Loss of Pers Clothing | 90 | 7/29/90 | 10/02/90 | | | |
| Z 000 | Loss of Permit Items | 90 | 7/23/90 | 10/22/90 | | | |
| H 0.. | Good Time | 6 months | | | | | |

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES
ATTICA GENERAL
HEARING RECORD SHEET

REVIEW OFFICER  LT   E.S.MALENSKI
REVIEW DATE      07/19/90
TIER  3

1) NAME WELCH, ALBERT              DIN 76C0567 CELL LOCATION DA-10-038
2) INCIDENT DATE  07/18/90      INCIDENT TIME  07:00 AM
3) INMATE  WAS  CONFINED
4) INMATE WAS NOT  RELEASED
5) SERVING OFFICER CO   C.HOBBS
   SERVING DATE 07/19/90          SERVING TIME  11:07 AM
6) ASSISTANT NAME _____ none _____
7) INTERVIEW DATE __/__/__        INTERVIEW TIME ___:___ ___
8) EXTENSION NUMBER _____ (IF APPLICABLE)
9) IF APPLICABLE, CHECK REQUIRED DRUG TESTING FORMS PROVIDED TO INMATE
   PURSUANT TO DIRECTIVE 4937 OR 4938
      TEST REQUEST FORMS _____  TEST PROCEDURE FORMS _____
      TEST RESULT FORMS _____  APPENDIX C _____  OTHER (SPECIFY) _____
10) INMATE __is__ ENGLISH SPEAKING
    A) IF NOT, WERE CHARGES TRANSLATED AND SERVED TO INMATE? _____
    B) INTERPRETOR AT HEARING _____
11) HEARING BEGIN:DATE 7/23/90 TIME 12⁵³pm END:DATE 7/23/90 TIME 1²ᵗpm
12) CHARGES: SPECIFY INMATE'S PLEA TO THE CHARGES CONSIDERED AT THE HEARING

| CHARGE NUMBER | DESCRIPTION OF CHARGES | REPORTED BY | INMATE'S PLEA |
|---|---|---|---|
| 106.10 | REFUSING DIRECT ORDER | CO  R. FRASER | Not Guilty |
| 180.14 | URINALYSIS TESTING VIOLATION | CO  R. FRASER | Not Guilty |

SIGNATURE OF INMATE  Refused to attend
   DATE 7/23/90        TIME 12⁵⁵pm  J. Kihl DHO

13) WITNESSES:  IF NONE REQUESTED, CHECK HERE _____ ✓
    A)   REQUESTED BY INMATE              TESTIFIED          IN INMATE'S PRESENCE
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____
    B)   REQUESTED BY HEARING OFFICER     TESTIFIED          IN INMATE'S PRESENCE
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____
    _____             Y____ N____         Y____ N____

★NOTE★  IF ANY WITNESS IS DENIED OR IF A REQUESTED WITNESS TESTIFIES OUTSIDE
   THE PRESENCE OF THE INMATE CHARGED, AND/OR THE INMATE IS NOT PERMITTED
   TO REVIEW TESTIMONY OF SUCH WITNESS, FORM 2176 EXPLAINING THE REASON
   FOR THAT DETERMINATION MUST BE GIVEN TO THE INMATE AND INCLUDED AS
   PART OF THE RECORD.

HEARING OFFICER SIGNATURE:  J. Kihl F DHO

STATE OF NEW YORK · DEPARTMENT OF CORRECTIONAL SERVICES

ATTICA _____ CORRECTIONAL FACILITY

HEARING DISPOSITION RENDERED FORM

INMATE NAME ___ WELCH, Albert ___   DIN • __ 76-C-567 __   HEARING DATE _7/23/90_

A. STATEMENT OF EVIDENCE RELIED UPON: Written test of CO FRASER 8:00AM.
You refused a direct order to produce a URINE 8am,
Over a 3 hour period in violation of the central office
Random Drug Test Program. (see Rpt)

You Refused to attend hearing and offered no Ref nor
explanation — However there is sufficient evid
of Guilt to both charges based on the written Re___

B. REASONS FOR DISPOSITION:

Refusing a direct order to submit a URINE sample
over a 3 hour period in violation of the Central
Office Drug test program is very serious and
will not be tolerated

C. SPECIAL INSTRUCTION ON VISITATION OR CORRESPONDENCE RESTRICTIONS, REFERRALS OR
SPECIAL EVENT LOSS:

I HAVE RECEIVED A COPY OF THIS HEARING DISPOSITION DATED: __7/23/90__

_____          Refused to attend 7/23/90        8:25AM
Hearing Officer Signature             Inmate Signature         Date & Time Received

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING APPEAL PROCEDURES  KLC I O H8

_____ For Tier II Hearings - Appeal to Superintendent within 72 hours.

___✓___ For Tier III Hearings - Appeal to Commissioner within 30 days.

I CO _____ informed inmate Welch the ___
_____ his appeal Rights on 7-23-90 at  8:25

FORM 2171.A (REV. 9/82)

STATE ~~NEW YORK~~ – DEPARTMENT OF CORRECTIONA~~L~~ ~~SE~~RVICES

ATTICA CORRECTIONAL

Facility

*1 OF 1 FAN 56*

*REQUEST FOR URINALY IS ATTACHED*

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate **WELCH**          No. **76C567** Cell **10|38**
   (Last)                    (First)

2) Location of Incident **38 CELL 10 COMPANY** Date **7-18-90** Time **7°°Am** *APPROXIMATELY*

3) Rule Violation (s) (**180.14**) **INMATES SHALL COMPLY WITH GIVING**

4) ~~Description of Incident~~ **A URINE SAMPLE WHEN ORDERED TO DO SO.**
   (**106.10**) **DIRECT ORDER** **4) DESCRIPTION OF INCIDENT:**

On the above date and approximate time, I
C.O. R. Fraser, approached Inmate Welch's cell
and informed him he was to submit to a
Urinalysis, he was also informed that the
Urinalysis is a random selection by Albany
Program Computer. Inmate Welch looked at
me as I spoke, but did not reply what so
ever. Inmate Welch was given (4) four direct
orders to comply with submitting a specimen.
All at approximately, 7°°Am, 8°°Am, 9°°Am And 10°°Am.

**7-18-90** **R. Fraser** (**FRASER**)          **CORRECTION OFFICER**

Date          Signature of Person Making Report          Title

**NOTE: Fold back Page 2 on dotted line before completing below.**

5) Was more than one inmate involved?      Yes _____   No **X** _____

6) If yes, give name and number of other inmates: **N/A** _____

7) Was inmate locked in cell as a result of this incident?   Yes **✓**   No _____ or

   Was inmate locked in other Housing Unit?      Yes _____ No _____

8) If yes, (a) Housing Unit or present confinement **N/A** _____ Cell _____

   (b) Authorized by _____

9) Was physical force used by you?   Yes _____   No **X** _____ (If yes, file Form 2105)

10) Endorsements of other employee witnesses (if any)

   SIGNATURES:  1. _____          2. _____

**DISTRIBUTION:**      **SERVICE UNIT**      **DISCIPLINARY FILE**      **D.S.S.**

STATE OF NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES

**REQUEST FOR URINALYSIS TEST**

FACILITY ___ATTICA CORRECTIONAL FACILITY___

INMATE NAME _____Welch_____  76C-0567   TEST # _____

NUMBER _____  CELL __10/38__

REQUEST MADE BY ___LIEUTENANT D. LEBARON___

DATE __July 18-90__

AGENT(S) SUSPECTED (IF ANY) __UNKNOWN__

CIRCUMSTANCES LEADING TO REQUEST __RANDOM SELECTION BY ALBANY PROGRAM COMPUTER__

_____

_____   •

TEST APPROVED BY ___LIEUTENANT D. LEBARON___

DATE __July 18-90__

INMATE TOLD THE UNDERLYING REASON WHY HE IS BEING ORDERED TO SUBMIT A URINE SPECIMEN (CIRCLE ONE: ~~SUSPICION XXXXXXXXXXX~~ (RANDOM)

BY ___C.W. R. Fraser___ (FRASER)   DATE __7-18-90__ TIME __7⁰⁰AM__

HAS INMATE TAKEN MEDICATION RECENTLY (YES OR NO) SPECIFY __N/A__

INMATE ORDERED TO SUBMIT SPECIMEN: @ 7⁰⁰AM, @ 8⁰⁰AM, @ 9⁰⁰AM, @ 10⁰⁰AM DATE __7-18-90__ TIME __7⁰⁰AM__

SPECIMEN WITNESSED AND OBTAINED BY __N/A__   DATE _____ TIME _____

DOES INMATE WILLFULLY REFUSE TO SUBMIT SPECIMEN (YES) OR NO)   DATE _____ TIME _____

DOES INMATE CLAIM TO BE UNABLE TO SUBMIT SPECIMEN? (YES OR (NO) DATE __7-18-90__ TIME __7⁰⁰AM__

IF INMATE CLAIMS TO BE UNABLE TO SUBMIT SPECIMEN, HAS INMATE BEEN GIVEN AT LEAST THREE HOURS TO SUBMIT SPECIMEN (YES OR NO) NOTIFIED 7⁰⁰AM, 8⁰⁰AM, 9⁰⁰AM, 10⁰⁰AM

SPECIMEN TESTED BY (1ST TEST) _____ DATE _____ TIME _____

RESULTS _____ DATE _____ TIME _____

SPECIMEN TESTED BY (2ND TEST) _____ DATE _____ TIME _____

RESULTS _____ DATE _____ TIME _____

CHAIN OF CUSTODY (STARTING WITH STAFF OBTAINING SPECIMEN, ATTACH ADDITIONAL PAGES IF NECESSARY)

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

FROM _____ TO_____ DATE _____ TIME _____

This form is to be filled out __COMPLETELY__. It is to accompany the specimen until the specimen is tested. If the specimen is positive, a __MISBEHAVIOR REPORT__ shall be written.

# ATTICA CORRECTIONAL FACILITY
## ASSISTANT SELECTION FORM

In accordance with the provisions of Part 251C, Chapter V, you are entitled to an assistant from a list established at your facility to assist you in connection with charges of misbehavior on _July 18, 1990_. PLEASE CHOOSE THREE NAMES from the list below and number them in order of your preference.

The right to select an assistant has been explained to me and

( ) I wish to choose one of the following:

*NO RESPONSE*

(✓) I __WAIVE__ my rights to select an assistant.



( ) D. Hojnicki, CO

( ) L. Breton, CO

( ) R. Korytkowski, CO

( ) P. Manno, CO

( ) R. Connors, CO

( ) J. DiChristina, CO       ( ) L. Nowinski, CO

( ) J. Phillips, CO

( ) R. Fraser, CO            ( ) J. Pustulka, CO

( ) W. Glendinning, CO       ( ) H. Weber, CO

( ) M. Weisedel, CO

INMATE'S __76C567__   X R.T.S. *(refused to sign to any questions)*   __JUL 19 1990__

Number          Signature                    Date

OFFICER'S SIGNATURE: _C. Avila_

CO WITNESS SIGNATURE (if applicable): _D. Pixley C.O._

T. Pixley

1594-87 (A)

NEW YORK STATE
DEPARTMENT OF CORRECTIONAL SERVICES
ATTICA CORRECTIONAL FACILITY

INMATE REFUSAL TO ATTEND TIER DISCIPLINARY HEARING
TIER I/II/III

TO: Hearing Officer

FROM: WELCH, Albert (Name) 76-C-577 (Number) 10-38 (Cell)

DATE:

SUBJECT: I REFUSE TO ATTEND MY TIER HEARING: (I) (II) (III)
ON Report OF 7-18-90

$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$

I refuse to attend my hearing due to the following reason(s):

Inmate Refused Response to Any question
Further Advised him No Response would Be Consider a Refusal

Inmate Signature

K. Burkard / W. [illegible] CO.
Officer Witness

FORM 2171.A (REV. 9/82)

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

## Attica Correctional
Facility

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate **Welch**      No. **76C567**   Cell **10-38**
   (Last)                (First)                        Approximately

2) Location of Incident **A-Block 10-38 cell**     Date **10-14-90** Time **9:30 P.M**

3) Rule Violation (s) **(106.10) Direct Order (100.11) Inmates shall not assault**

4) ~~Description of Incident~~ **or attempt to inflict bodily harm upon any staff member (113.10) weapon (107.10) Inmates shall not physically interfere with an employee at any time.**

4) Description of incident    On the above and time, inmate Welch (76C567) disobeyed several direct orders to be moved for observation, by myself and Lt. James. Chemical agents were then employed by Lt. James, Inmate Welch had barricaded himself in his cell by pushing his desk legs through the bars. I officer Horvatits was attempting to push the desk free with my baton when the said inmate grabbed it and wrestled it away from me breaking the baton thong. The inmate then started swinging it violently at the officers who were trying to push the desk free from the bars. Officer Countermine then

**10-14-90**     K. Horvatts **K. Horvatits**         **Correction Officer**
Date        Signature of Person Making Report           Title

**NOTE: Fold back Page 2 on dotted line before completing below.**

5) Was more than one inmate involved?    Yes _____   No **X**

6) if yes, give name and number of other inmates: _____

_____

7) Was inmate locked in cell as a result of this incident?   Yes _____ No _____ or

Was inmate locked in other Housing Unit?    Yes **X**    No _____

8) If yes, (a) Housing Unit or present confinement **BN**    Cell **6**

     (b) Authorized by **Lt. James**

9) Was physical force used by you?   Yes **X**    No _____ (if yes, file Form 2105)

10) Endorsements of other employee witnesses (if any)

SIGNATURES:   1. R. Dzyrul C.O.      2. _____
           R. Torpokowski                 W. Tkowsp.

DISTRIBUTION:    SERVICE UNIT     DISCIPLINARY FILE    DSS

Pg 2 of 2

Form 2180 (3/83)

ate of New York – Department of Correctional Serv

Attica Correctional
(Facility)

SUPPLEMENTARY SHEET FOR INMATE
MISBEHAVIOR REPORT

Name of Inmate  Welch                    No. 76C 567   Cell  10-38

grabbed the baton and pulled it away from the inmate. Officers
Cauglin, Tomporowski, Witkorski, Countermine, and myself
then entered the cell, as the inmate continued to struggle
violently, and applied mechanical restraints to the inmate.
Inmate Welch was then escorted to BN-6.

| | | |
|---|---|---|
| 10-14-90 | K. Howath   K. Horvatits | Correction Officer |
| Date | Signature of person making report | Title |
| | R. Jagl   R. Tomporowski | C.O. |
| | Signature | Title |
| **ENDORSEMENTS OF OTHER EMPLOYEE** | An Witrich | CO |
| **WITNESSES (if any)** | Signature    Witkowski | Title |

Instructions:    (a) Use this form to supplement information furnished on Form 2171A, if needed and for supervisory officers' investigations.

Form 2173 (Rev. 9/82)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

## CLINTON CORRECTIONAL FACILITY

### SUPERINTENDENT'S HEARING DISPOSITION RENDERED

INMATE NAME: __WELCH, ALBERT__    NO: __76C567__   CELL: __E 3/6__

Based on Formal Charge(s) dated: __8-22-83__   which were delivered by: __G. DE CELLE   C.O.__

on: __8/23/83__ Time: __10:26 A__ Hearing conducted by: __D. McGuire__   Date: __8/24/83__ Time: __10:10 Am__

NOT GUILTY OF: _____

GUILTY OF: __106.10 Disobeying a direct order__
__6.17 missing mandatory meals.__

PENALTY IMPOSED: __14 days Keeplock no commis, packages or__
__telephone.__    ~~Release of~~   Release from K.L. on September 5, 1983

STATEMENT OF EVIDENCE RELIED UPON:

(1) Findings, evidence relied upon:

C.O. R. Fountain's report stating that inmate Welch refuses to leave his cell for mandatory meals even when given direct order to do. Officer La Fountain reports that this is a chronic problem. Verbal testimony by C.O. La Bone that when he went to pick up Welch he would not leave his cell & would not respond to

(2) Reasons for disposition, penalty imposed: any questions.

Inmate Welch must follow orders given by staff & cooperate with the routines of the facility

\* Block Officer should consider OBS referral if inmate continues with this misconduct

I have received a copy of this hearing disposition dated: _____

__D. A. McGuire__   /  __refuses to attend hearing__   /  _____
Hearing Officer's Signature   /  Inmates Signature   /  Date and Time Received

You are hereby notified that you may appeal in writing to the Commissioner in connection with this matter within 30 days of receipt of this disposition.

DISTRIBUTION:   DIRECTOR OF SPECIAL HOUSING   SERVICE UNIT   DISCIPLINARY OFFICE   INMATE   D.S.S.

__Head Clerk__

FORM 2172 (10/82)          STATE   NEW YORK - DEPARTMENT OF CORRECTIONA   SERVICES

*Clinton*

## CORRECTIONAL FACILITY
## HEARING RECORD SHEET

I.   VIOL. HEARING _____
II.  DISCIP. HEARING _____
III. SUPT. HEARING ____✓____
REVIEW DATE *8-23-83*
REVIEW OFFICER *W. R. Babb*

1) INMATE NAME *A. Welch*          I.D. NO. *76C527*          CELL LOCATION *E-3-6*

2) DATE OF REPORT *8-77-83* BY *R. Fountain* WAS INMATE CONFINED? YES *✓* NO ___ DATE *8-23-83*

3) INMATE RELEASED PRIOR TO HEARING? *No* YES ___ DATE _____ TIME ___ BY _____

4) FORMAL CHARGES SERVED BY *G Decelle   Co*          DATE *8/23/83* TIME *10:26 Am*

5) ASSISTANT ASSIGNED: _____ *None requested* _____          DATE _____ TIME _____

6) HEARING COMMENCED: DATE *8-24-83* TIME *11:10 AM*   COMPLETED: DATE *8-14-83* TIME *11:20 Am*

7) IF CONCLUDED MORE THAN FOURTEEN DAYS FROM DATE OF MISBEHAVIOR REPORT, EXPLAIN THE UNUSUAL OR EMERGENCY SITUATION REQUIRING THE DELAY, AND THE DATE THE COMMISSIONER APPROVED OF THE DELAY ON FORM 2177.

8) CHARGES:   SPECIFY WHAT IS ADMITTED, DENIED, OR DISMISSED BY REVIEW OFFICER:

*106.10 Disobeying a direct order — Not Guilty   Refuses to attend*

*6.17 refusing to attend mandatory meals. — Not Guilty   "*

SIGNATURE OF INMATE _____ DATE _____ TIME _____

9) ASSISTANT INTERVIEWED INMATE, DATE _____ TIME _____ ASSISTANT SIGN _____

10) WITNESSES REQUESTED BY INMATE          10A) WITNESSES INTERVIEWED OR COMMENTS

1) *None*                                   1) _____

2) _____                               2) _____

3) _____                               3) _____

4) _____                               4) _____

11) WAS WITNESS INTERVIEWED IN PRESENCE OF INMATE CHARGED?                          YES _____ NO _____
IF NO, WAS REASON FOR DENIAL  (FORM 2176) GIVEN TO INMATE?                         YES _____ NO _____
WAS INMATE CHARGED PERMITTED TO REVIEW TESTIMONY OF WITNESSES?                     YES _____ NO _____
IF NO, WAS REASON FOR DENIAL (FORM 2176) GIVEN TO INMATE?                          YES _____ NO _____

12) DISPOSITION: *14 days Keeplock no pkgs., commis. or telephone release on 9/5/83*

HEARING OFFICER:   SIGN. *D. M. Spire*                          DATE *8-24-83*

COPY ATTACHED TO ALL HEARING DISPOSITION SHEETS

Inmate went to obso on 10/14/90
Inmate transferred to CNYPC on 10/16/90
Inmate returned to facility f/CNYPC on 11/2/90
to obso
Inmate released f/obso on 11/2/90 to 10/18.


START HEARING:        11/8/90
COMPLETE HEARING:     11/15/90

Form 252-A
G.M.561-Sec.

State of New York — Department of Correctional Services

# GREAT MEADOW CORRECTIONAL FACILITY

## ADJUSTMENT COMMITTEE REPORT

1) Name of Inmate _Welch, Albert_ No. _76C567_

2) Report under review made by _T. E. Matteson, CO_ Date _5/12/82_

3) Comments on review of report and inmate file _Viol. of rules: 1.90_

_____

_____

_____

_____

_____, corr osc _____5/13/82
Signature of Committee Member                                Date

4) Inmate's explanation _____

_____

_____

_____

_____

5) Further investigation made   ☐ No   ☒ Yes   (Attach Form 252AS)

6) Disposition   ☐ Deferred Action   ☒ Action   ☐ Recommendation

(Specify) _Recommend Psych evaluation_
_Reappear after investigation_

_____

7) Where action deferred, specify duration of deferral _____

and whether officers directed to forward future comments   ☐ Yes   ☒ No

8) Is inmate to appear again   ☐ No   ☒ Yes   Date _after investigation_

(on reappearances use Form 252B)

9) Where inmate was locked in cell or in special housing unit prior to disposition specify length of time to date
_1 day_

10) Does present disposition necessitate automatic review   ☒ No   ☐ Yes

_____        _____        _5/13/82_
Signature of Chairman                    Title                            Date

_R. Raymond_                                  _cc_                       _5/13/82_

Form 251-A
G.M. — No. 564



## STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

### TO SUPERINTENDENT

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate _Welch, Albert_     No.*76C 567* Cell *E8-15*
        Last          First

2) Location of Incident *E8-15 Cell* _____ Date *5/12/82* Time *12 ¹⁰ Pm*

3) Description *Inmate Welch is in Violation of the following — 1.90 Refusing a direct order. On the Above date and time Inmate Welch refused a direct order to go to the noon meal. Inmate Welch does not respond to anything said to him, ~~totally~~ Inmate recieved notice of Report #135894*

4) Was more than one inmate involved?          Yes_____ No___✗___

5) If yes, give name and number of other inmates (where known) and describe role played by
   subject inmate _____
   _____
   _____

6) Was inmate locked in cell?                        Yes ✗  No ■
6a) Was inmate locked in cell on previous charge?     Yes____ No ✗
7) Was inmate locked in other housing unit?           Yes____ No ✗

   If yes    (A) housing unit of present confinement _____ Cell _____

            (B) authorized by _____

8) Was physical force used by you?                Yes_____ No ___✗___

   (If answer is yes, also file form 251-D)
                    *T.C. Matteson*                        *C.O.*
   Signature of Person Making Report                        Title

9) Endorsements of other
   employee witnesses (if any)    Date: *5/12/82*
   *C.O.W. Perry*                        *C.O.*
        Signature                        Title

   _____            _____
        Signature                        Title

                                    No. of
                                    Supplementary
                                    Sheets  *(-0-)*

STATE OF NEW R.. — DEPARTMENT OF CORRECTION ..RVICES

# GREAT MEADOW CORRECTIONAL FACILITY

## TO SUPERINTENDENT

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate _Welch_ _Albert_    No. _76C567_ Cell _E-8-4_
   Last        First

2) Location of Incident _E-8 gallery_    Date _6/29/72_ Time _11:00 A.M._ Approx.

3) Description _Violation: 1.55 failure to attend adjustment committee 1.90 refuse to obey direct order. On the above date at approx. 11:00 A.M.; I (C.O.W. Prayer) was picking up inmates for adj. committee. When I went to pick up Inmate Welch 76 C 567 cell I told Inmate Welch "to get ready for adj. comm. Inmate Welch did not respond verbally. I again told inmate_

4) Was more than one inmate involved?    Yes_____ No _✓_

5) If yes, give name and number of other inmates (where known) and describe role played by subject inmate _____

   _____

   _____

6) Was inmate locked in cell?    Yes _✓_ No_____
6a) Was inmate locked in cell on previous charge?    Yes _✓_ No_____
7) Was inmate locked in other housing unit?    Yes_____ No _✓_

   If yes  (A) housing unit of present confinement _____ Cell _____

          (B) authorized by _____

8) Was physical force used by you?    Yes_____ No _✓_

   (If answer is yes, also file form 251-D)

   _Wm Prayer_                          _C.O._
   Signature of Person Making Report        Title

9) Endorsements of other

   employee witnesses (if any)    Date: _____

   _____      _____
   Signature                      Title

   _____      _____              No. of
   Signature                      Title                    Supplementary
                                                           Sheets   (_1_)

Form 251-AS

G. M. — No. 563

SEC.

State of New York - Department of Correctional Services

## G.___AT MEADOW CORRECTIONAL FACILITY

### SUPPLEMENTARY SHEET FOR INMATE
### MISBEHAVIOR REPORT

Name of Inmate _Welsh, Albert_ No. _76C567_ Cell _E8-4_

"to get ready for adj. comm." Inmate Welch
did not respond again; but shook his head in
a negative manner. Inmate was given
notice of report.

_6/29/82_ _Wm Praux_ _C.O._
Date    Signature of person making report    Title

Signature    Title

**Endorsements of other employee**
Witness (if any)

Signature    Title

Signature    Title

Instruction: (a) Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b) Additional and any confidential comments may be indicated on this form.
(c) Names and numbers of inmate witnesses should be entered on this form.
(d) Recommendations, if any, may be entered on this form.

Form—251-A
G.M. — No. 564

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

TO SUPERINTENDENT

INMATE MISBEHAVIOR REPORT

OK
mw
(2)

1) Name of Inmate __Welch__ __Albert__ No.__76C567__ Cell __C-3-17__
                       Last                First

2) Location of Incident __C-3-17__ Date __9/21/82__ Approx Time __10 AM__

3) Description Inmate Welch #76C567 was in violation of the following rules 106.10 (refusing to obey a direct order) 181.11 (Refusing to attend the adjustment committee) I C/O K Bump, while escorting inmates for adj. comm., ordered inmate Welch several times to step out of his cell in order to be escorted to the

4) Was more than one inmate involved?      Yes_____ No__✓__

5) If yes, give name and number of other inmates (where known) and describe role played by subject inmate_____

_____

_____

6) Was inmate locked in cell?                         Yes__✓__ No_____
6a) Was inmate locked in cell on previous charge?     Yes__✓__ No_____
7) Was inmate locked in other housing unit?         Yes_____ No__✓__

If yes     (A) housing unit of present confinement _____ Cell _____

            (B) authorized by _____

8) Was physical force used by you?         Yes_____ No__✓__

    (If answer is yes, also file form 251-D)

                      K Bump c/o
         Signature of Person Making Report            Title

9) Endorsements of other

employee witnesses (if any)      Date:_____

_____      _____
       Signature                   Title

_____      _____
       Signature                   Title

No. of
Supplementary
Sheets   (one)

FORM 2151 (REV. 12/76)
(251-A)

S_ of New York – Department of Correctional Se _es

_Clinton Correctional (Main)_
(Facility)

## INMATE MISBEHAVIOR REPORT
## TO SUPERINTENDENT

1) Name of Inmate _Welch_      _Albert_      No. 76C576 Cell _E1-16_
              Last              First

2) Location of Incident _E Block - 1 Company_   Date _3-18-80_ Time _appox. 6:00 P.M._

3) Description _In violation of rules 3.00 & 3.20 & 3.30,12_
_On the above date at appox. 6:00 P.M. inmate Welch_
_76C576 refused to come to the bath house for his_
_weekly mandatory shower. Welch claimed that he_
_was on protection status and that he didn't have_
_to leave the block. Upon checking with the block_
_officers, this was found to be untrue._

4) Was more than one inmate involved?                    Yes ☐    No ☒

5) If yes, give name and number of other inmates (where
   known) and describe role played by subject inmate _____

6) Was inmate locked in cell?                            Yes ☐    No ☒

   If yes, authorized by _____

7) Was inmate locked in other housing unit?             Yes ☐    No ☒

   If Yes (a) housing unit of present confinement _____ Cell _____

      (b) authorized by _____

8) Was physical force used by you?                      Yes ☐    No ☒
   (If answer is yes, also file Form 2104 – Use of Force)

_Will Glech_                                      _C.o._
Signature of Person Making Report                   Title

9) Endorsements of other
   employee witnesses        Date: _3-18-80_
   (if any)

_____          _____
     Signature                          Title

                                    (No. of Supplementary Sheets ___0___)

_____          _____
     Signature                          Title

Form 253
Sec.

STATE OF NEW YORK—DEPARTMENT OF CORRECTIONAL SERVICES

## GREAT MEADOW CORRECTIONAL FACILITY

### SUPERINTENDENT'S PROCEEDING
### REPORT TO COMMISSIONER
(For Automatic Review Dispositions)

1) Name of Inmate     Albert Welch     HELD IN ABSENTIA     76-C-567

No.

2) Date of Disposition of Charge     O-ctober 1,1982

3) Disposition Ordered     30 Days Keeplock in Cell from 9-20-82 (rel.date 10-20-82)
One Hour exercise daily. Recommend psychiatric Therapy.

4) Time Already Spent in Confinement or Other Disciplinary Action Taken in This Matter Prior to this Disposition
(specify)     12 days from 9-20-82

5) Summary of Evidence     On 9-20-21-82, inmate Welch 76-C-567 was reported for violations
of rules: Charge #1) 106.10 Refusing to obey a direct order. Charge #2) 106.10;
Refusing to obey a direct order and 181.11 refusing to attend the Adjustment Commit
(SEE ATTACHED FORMAL CHARGE OF 9-23-82).

WITNESS STATEMENT: See attached Form 253 Supplement.
REPORTS CONSIDERED: (2) Misbehavior reports of 9-20-21-82 by C.O. Sokol and Bump,
Adjustment Committee report of 9-22-82 (Held in absentia), Formal Charge of 9-23-82
by Sgt.R.Hamlin, Notice & Assistance of R.Raymond, Corr.Counslr.

REASON FOR DISPOSITION: Refusing a direct order and refusing to attend Adjustment
Committee is a very serious charge and cannot be tolerated in a facility.

6) Inmate's Explanation

FIRST HEARING HELD ON 9-24-82: Inmate refused to attend. Held in absentia.

SECOND HEARING HELD ON 10-1-82: Inmate remained mute. -But gave his I,D.cd to
to hearing officer. Held in absentia. Automatic denial.

| | | |
|---|---|---|
| B. Bailey Signature | Hearing Officer | 10-1-82 |
| | Title | Date |

## NOTICE TO INMATE

The foregoing report has been sent to the Commissioner of Correction today concerning the disposition ordered
in the Superintendent's Proceeding on the charge against you dated    Formal Charge of 9-23-82

You are hereby notified that the Commissioner of Correction will review this disposition and that you may
communicate in writing to the Commissioner in connection with this matter.

Form 252-A
G.M.561-Sec.

State of New York — Department of Correctional Services

# GREAT MEADOW CORRECTIONAL FACILITY

## ADJUSTMENT COMMITTEE REPORT

1) Name of Inmate _WELch. ALBeRT_ No. _76-C567_

2) Report under review made by _CO. R. Beck_ Date _10-26-82_

3) Comments on review of report and inmate file _106.10, 109.12 ~ Rules + Regulation_
_Refuzal To obey orde._

_Edward Dur_
_W. Kruger - C.O._ _10-27-82_
Signature of Committee Member Date

4) Inmate's explanation _Would Not give AN ExPLANATION when asked._

5) Further investigation made ☒ No ☐ Yes (Attach Form 252AS)

6) Disposition ☐ Deferred Action ☒ Action ☐ Recommendation
(Specify) _5 DAys K/L, FRom 10-2682, 30 DAys. Loss_
_of recreation. added, referral to foc. Hosp_
_FOR psychiatric evaluation. No Rec To start 10-31-82_

7) Where action deferred, specify duration of deferral _____
and whether officers directed to forward future comments ☐ Yes ☒ No

8) Is inmate to appear again ☒ No ☐ Yes Date _____
(on reappearances use Form 252B)

9) Where inmate was locked in cell or in special housing unit prior to disposition specify length of time to date
_1 DAY_

10) Does present disposition necessitate automatic review ☒ No ☐ Yes

_C. A. Taylor_ _Lt._ _10-27-82_
Signature of Chairman Title Date

Form 253-X
Sec.

State of New York — Department of Correctional Services

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPERINTENDENT'S PROCEEDING

## FORMAL CHARGE

To: _____ ALBERT WELCH _____ No. 76-C-567 Cell C-3-17

You are hereby notified that the Superintendent has directed that a formal charge be filed against

you to be considered and determined at a Superintendent's proceeding to be held on _____

before _____ for the following misbehavior: You are

(date)

hereby charged with committing the acts set forth below. You may make any statement you wish on your own
behalf and no statement made by you may be used against you over your objections in any criminal proceeding which
may be brought against you. You may, if you wish, remain silent. If you remain silent, no inference against you may
be drawn by the fact that you chose to remain silent. Any charges against you must be supported by substantial
evidence. You may review Chapters 5 and 6 prior to a Superintendent's Proceeding. Inmate shall be permitted to call
witnesses on his behalf, provided that so doing does not jeopardize Institutional safety or Correctional goals.

Charge #1:—Violation of Rules 106.10 Refusing to Obey a Direct Order.

On 9/20/82 at approximately 7:45 A.M. Officer N. Sokol states he was escorting C-3 Com-
pany to the Mess Hall and he ordered you to go to the Mess Hall and you refused to come
out of your cell C-3-17. Officer Sokol told you it was mandatory to go and you still
refused to leave and stated, "I will remain silent." Officer Sokol states this is the
second time you have refused to leave your cell.

Charge #2:—Violation of Rules 106.10 Refusing to Obey a Direct Order and 181.11 Refusing
to Attend the Adjustment Committee.

On 9/21/82 at approximately 10:00 A.M. Officer K. Bump states he ordered you several time
to come out of your cell C-3-17 to go to the Adjustment Committee and you refused to comp
with the orders. You were told that this was a violation of Rules and you still refused
to come out of your cell.

You are further notified that _____ Robert Raymond, Correction Counselor (selected for you)
has been designated to furnish assistance to you in this matter. (name and title)

_____               _____               9/23/82
Signature of Person Preparing Charge          Title                      Date

## INVOLUNTARY PROTECTION COMPANY REVIEW FORM

*Initial Review To Be Completed 60 Days After Entry By Correction Counselor And Every 30 Days Thereafter*

1) Inmate Name _Welch, Albert   16C567_ ✓

2) Date Entered Involuntary Protection: _7/9/82_

3) Date of Review: _9/1/82_

4) Attitude and Relationship with Inmates:   Excellent _____   Average _X_   Poor _____

Specify _____

_____

5) Attitude and Relationship with Staff: Excellent _____   Average _X_   Poor _____

Specify _Has been uncooperative in past about refusing to attend disciplinary proceedings._

6) Number of Misbehavior Reports while in Involuntary Protection: _none_
Number of Superintendent's Proceedings while in Involuntary Protection: _none_

7) Willingness to Commit to Follow Rules and Regulations: _yes_
Willingness to Commit to Program Participation: _yes_

Recommendation - Correction Counselor

Specify _It would seem, with unisexual custodial record indicated above that this inmate would be ready for regular functioning in general population. His psychiatric report considers, however, that she is very apathetic. He might be able to function if he has support and continuous counseling and psychiatric counseling._

_____ Kevin Thompson
Signature

Recommendation - Security Unit Supervisor

Specify _I CONCUR WITH COUNSELOR THOMPSON'S RECOMMENDATION._

_____

_____

_____

_____ W. Race SGT.
Signature

Review by Deputy Superintendent of Security or Program Services:

_Recommend try in General Population_

_____
Signature

Review and Action by Superintendent:

_Move to Population tenter in Intensive Counseling group_

_____
Signature

Superintendent -White, Service Unit -Pink, Deputy Security -Yellow, Commissioner -Green

C3/17

Form 252-A
G.M.561-Sec.

State of New York — Department of Correctional Services

## GREAT MEADOW CORRECTIONAL FACILITY

### ADJUSTMENT COMMITTEE REPORT

1) Name of Inmate __Welch, Albert__ No. __76 C 567__

2) Report under review made by __Sokol   C/O__ Date __9/17/82__

3) Comments on review of report and inmate file _____
__CO 6010__

_Raymond  cc_  __9/18/82__
Signature of Committee Member   Date

4) Inmate's explanation __Refused to Attend Adj. Comm.__

5) Further investigation made  ☒ No   ☐ Yes   (Attach Form 252AS)

6) Disposition  ☐ Deferred Action  ☒ Action  ☐ Recommendation
(Specify) __Held in Absentia, Time Served, Rel from__
__K/L this report__

7) Where action deferred, specify duration of deferral _____
and whether officers directed to forward future comments  ☐ Yes  ☒ No

8) Is inmate to appear again  ☒ No   ☐ Yes   Date _____
(on reappearances use Form 252B)

9) Where inmate was locked in cell or in special housing unit prior to disposition specify length of time to date
__1 day__

10) Does present disposition necessitate automatic review  ☒ No   ☐ Yes

_____   _L/t_   __9/18/82__
Signature of Chairman   Title   Date

Form 251
G.M. — No. 564

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

### TO SUPERINTENDENT

### INMATE MISBEHAVIOR REPORT



1) Name of Inmate __Welch, Albert__    No. __76-C-567__  Cell __C-3-17__
   Last                        First

2) Location of Incident __C-3-17 cell__    Date __9/20/82__ Time __7:45 A.__ (Approx.)

3) Description __Violation: 106.10 Refusal to obey a direct order;__
__On the above date & approx. time, As I, C.O.19-Sokol,__
__was escorting C-3 co. off of the gallery to the mess hall__
__for the morning morning meal, I ordered inmate__
__Welch, Albert #76-C-567 (C-3-17) to accompany the__
__rest of the men, & he refused. This is the second time__

4) Was more than one inmate involved?    Yes _____ No __X__

5) If yes, give name and number of other inmates (where known) and describe role played by
   subject inmate _____
   _____
   _____
   _____

6) Was inmate locked in cell?    Yes __X__ No _____
6a) Was inmate locked in cell on previous charge?    Yes _____ No __X__
7) Was inmate locked in other housing unit?    Yes _____ No __X__

   If yes    (A) housing unit of present confinement _____ Cell _____

             (B) authorized by _____

8) Was physical force used by you?    Yes _____ No __X__

   (If answer is yes, also file form 251-D)

   _____    __C.O.__
   Signature of Person Making Report        Title

9) Endorsements of other
   employee witnesses (if any)    Date: _____

   _____    _____
   Signature                           Title

   _____    _____
   Signature                           Title

No. of
Supplementary
Sheets ( 1 )

Form 251-AS

3. M. — No. 563

New York - Department of Correctional Service

SEC.

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPPLEMENTARY SHEET FOR INMATE
## MISBEHAVIOR REPORT

Name of Inmate  Welch, Albert          No. 76-6567  Cell  C-3-17

inmate welch has refused to leave his cell.
I explained that the morning & noon meals
were mandatory during the week, inmate
welch seemed to understand, but still refused
when I asked why, inmate welch said "I will
remain silent".

A notice of report was issued &
attached.

---

9/20/02
/ Date

Signature of person making report

C.O.
Title

Signature                                    Title

Endorsements of other employee
Witnesses (if any)

Signature                                    Title

Signature                                    Title

Instruction:  (a)  Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
              (b)  Additional and any confidential comments may be indicated on this form.
              (c)  Names and numbers of inmate witnesses should be entered on this form.
              (d)  Recommendations, if any, may be entered on this form.

Form 251-AS.

G. M. — No. 563

SEC.

For New York - Department of Correctional Servic.

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPPLEMENTARY SHEET FOR INMATE
## MISBEHAVIOR REPORT

Name of Inmate _Welch, Robert_ No. _76 C 567_ Cell _C-3-17_

adj. Comm. Welch stood at his cell entrance
with his arms crossed and refused
several times my order to come out
of his cell. I explained to Welch that
his refusal would mean another ticket
for not going. Welch just stood there
and wouldn't move

Inmate given notice of report

9/21/82
Date

H. Bump
Signature of person making report

C/O
Title

_____
Signature

_____
Title

**Endorsements of other employee**
**Witnesses (if any)**

_____
Signature

_____
Title

_____
Signature

_____
Title

Instruction: (a) Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b) Additional and any confidential comments may be indicated on this form.
(c) Names and numbers of inmate witnesses should be entered on this form.
(d) Recommendations, if any, may be entered on this form.

Form 304.3 (Side A)
(1/74)

State of New York - Department of Correctional Services

Attica Correctional Facility

NOTICE TO INMATE
SPECIAL HOUSING PROTECTIVE ADMISSION CONSIDERATION

Original Admission___x__ Retention_____ (Check one)

To:__Welch, Elbert_____ _____ Date:__5-15-79__
    (inmate's name)       (#)

    The following information leads the staff of this facility to
believe that protective admission to a special housing unit is necessary
in your case.  (Summary of information or inmate reasons for requesting
protective admission)

    *Inmate fears that if he were
to remain in general population physical
harm would come to him.*

    If you wish to consent to voluntary protective admission to a
special housing unit, please sign in the appropriate space on the
reverse of this form.

    If you do not wish to consent to protective admission to a special
housing unit, please provide the Interviewer with any statement you wish
to make concerning the above information.  You may also present immedi-
ately in writing any explanation or information which you want to be
considered by the Superintendent in regard to this matter.  Any
statement you make may not be used against you in a criminal proceeding.

    The Superintendent will review the above information and any
statement you wish to submit and make a determination concerning your
assignment.  You will be notified.

_____
Signature          Title

Distribution:
    Original - Inmate
    Copy 1   - Commissioner
    Copy 2   - Institution File

Form 1016   EV 9/73

## STATE OF NEW YORK–DEPARTMENT OF CORRECTIONAL SERVICES

### MEMORANDUM

4|

TO:   WELCH, Albert   76-C-567   10-3

DATE:   March 12, 1986

FROM:   Hans Walker, Deputy Supt. Security   *H. Walker*

SUBJECT:   EARLY RELEASE FROM SHU

After a complete review of your record, I have decided to release you from SHU on March 12, 1986.  The remainder of your SHU sentence will be served in cell confinement in general population.  You will be released from keeplock status on March 30, 1986.

HW:dk
cc:  Head Clerk
     Service Unit
     "A" Block
     D. Selsky/Albany
     file (2)

51 (REV. 12/76)
—51—A)

State — New York — Department of Correctional Service

## Clinton

(Facility)

### INMATE MISBEHAVIOR REPORT
### TO SUPERINTENDENT

1) Name of Inmate **Welch**          No. **76C567** Cell **LH1/38**
   Last                        First

2) Location of Incident **LH1-38 cell**       Date **1/10/82** Time **app 12:50 PM**

3) Description **1.90, 21.10 Refusing mandatory shower**
On 1/10/82 at approximately 12:50 PM inmate
Welch came out for his mandatory shower
but refused to take it when CO H. Turner
got him to the shower. Welch was lead
back to his cell by CO Turner and locked
in without incident. Welch was notified
of this report 1/10/82.

4) Was more than one inmate involved?          Yes ☐   No ☑

5) If yes, give name and number of other inmates (where
   known) and describe role played by subject inmate _____

6) Was inmate locked in cell?          Yes ☐   No ☑
   If yes, authorized by _____

7) Was inmate locked in other housing unit?          Yes ☐   No ☑
   If Yes (a) housing unit of present confinement _____ Cell _____
        (b) authorized by _____

8) Was physical force used by you?          Yes ☐   No ☑
   (If answer is yes, also file Form 2104 — Use of Force)

9) Endorsements of other          *James E Facheau*          **CO**
   employee witnesses          Signature of Person Making Report          Title
   (if any)
                    Date: **1/10/82**

_____          _____
   Signature                        Title

_____          _____
   Signature                        Title

   (No. of Supplementary Sheets ___O___ )

Form 2151   261-A                                                                    CA 159

## STATE OF NEW YORK–DEPARTMENT OF CORRECTIONAL SERVICES

Clinton
(Facility)

## INMATE MISBEHAVIOR REPORT TO SUPERINTENDENT

1.) Name ___Welch, Albert___ No. 76C567 Cell 22
            Last        First

2.) Location of Incident ___Unit 14___ Date 12/16/79 Time 17:30 PM

3.) Description ___K.L. for refusing a direct order to take shower – IT's Mandatory to shower in Unit 14 on Sundays – 3.20 – 1.90 3.20.6 –___

4.) Was more than one inmate involved?        Yes ☐     No ☑

5.) If yes, give name and number of other inmates (where known) and describe role played by subject inmate: _____

6.) Was inmate locked in cell?        Yes ☐     No ☑

7.) Was inmate locked in other housing unit?        Yes ☐     No ☐
    If yes, (a) housing unit of present confinement _____ Cell _____
            (b) authorized by _____

8.) Was physical force used by you?        Yes ☐     No ☑
    (If answer is yes, also file Form 2104--Use of Force)

___A Brin___       ___C-O___
     Signature of Person Making Report       Title

9.) Endorsements of other employee witnesses (if any)    Date: ___12/16/79___

_____     _____
    Signature            Title

                     (No. of supplementary sheets _____)

_____     _____
    Signature            Title

FORM 2104.1 (REV. 2/77)

STATE OF NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES

## USE OF FORCE (CONT'D)

### PART B – PHYSICAL EXAMINATION/TREATMENT REPORT (TYPE OR PRINT)

1. INMATE'S NAME (LAST, FIRST, MIDDLE INITIAL)

WELCH, E.

2. DEPT. ID NO.

76-C-561

3. EXAMINER'S NAME AND TITLE

Paulette Hale, R.N., Nurse II

4. EXAMINATION TIME AND DATE

11/12/79 - Approximately 4:00 P.M.

5. MEDICAL REPORT – DESCRIBE EXTENT OF INJURY AND TREATMENT PROVIDED.

Inmate Welch examined or initial by Judith Burnah, R.N., Mental Hygiene Nurse.

Inmate Welch stated that he "had pains in the back of his head" and "bruises on his groin". Ms. Burnah examined the inmate as a Gross Visual Exam. She stated that she did not note any bruising or swelling on the back of Welch's head. She stated that she did not note any swelling in the groin, but did note two very small abrasions in the groin area. She stated that Welch announced in a very loud voice that he demanded "Medical Attention". She notified Paulette Hale, R.N., I.P.C., and Mrs Hale stated that Welch be sent to the I.P.C.. Sgt. E. Carter telephoned the I.P.C. and stated Welch refused treatment stating: "there's nothing wrong with me".

6. SIGNATURE OF EXAMINER (TITLE AND DATE)

*Paulette Hale, RN     Nurse II*

### PART C – REVIEW AND EVALUATION BY SUPERINTENDENT (TYPE OR PRINT)

EVALUATION

SUPERINTENDENT'S SIGNATURE AND DATE

ORIGINAL          SUPERINTENDENT
CANARY            INMATE'S FILE AT FACILITY
PINK              COMMISSIONER
GOLDENROD         DEPUTY COMMISSIONER FOR CORRECTIONAL FACILITIES

Form 2151    251-A

CA 169

STATE OF NEW YORK--DEPARTMENT OF CORRECTIONAL SERVICES

Clinton Corr Fac (Main)
(Facility)

## INMATE MISBEHAVIOR REPORT TO SUPERINTENDENT

LF-1/35

1.) Name __Welch,__ Last __albert__ First   No. __76 C 567__  Cell __11/16/79__

2.) Location of Incident __LF-Block Cage Area__  Date __11/16/79__  Time __approx. 940 AM__

3.) Description __1.55, 1.75, + 1.90 at approximately 9 40 AM on 11/16/79 inmate Welch 76C567 refused to go before the adjustment panel. Welch insisted, "that it was not mandatory that he go to the adjustment panel." Welch was informed by me and C.O. Terry Aubin that it was mandatory that he appear. Welch still refused and was notified that another KL report would be filed against him. Welch was also given a notice of report copy.__

4.) Was more than one inmate involved?                    Yes ☐    No ☒

5.) If yes, give name and number of other inmates (where known) and describe role played by subject inmate: _____

_____

_____

6.) Was inmate locked in cell? __inmate already KL status__    Yes ☒    No ☐

7.) Was inmate locked in other housing unit?                Yes ☐    No ☒
    If yes,  (a) housing unit of present confinement _____  Cell _____

              (b) authorized by __Reviewed + concurred in / accordance with Chapter V, Section 251.6 at _____

8.) Was physical force used by you?  __Reviewed + concurred in accordance with Section 251.6 at__    Yes ☐    No ☒
    (If answer is yes, also file Form 2154—Use of Force)

__David Malark__
Signature of Person Making Report          __C.O.__  Title

9.) Endorsements of other employee witnesses (if any)        Date: __11/16/79__

_____  Signature              __CO__  Title

__M Blaire__  Signature                        __C.O.__  Title

(No. of supplementary sheets __O__)

FACILITY CENTRAL FILE

I C 18

C A 183

STATE OF NEW YORK

DEPARTMENT OF CORRECTION

## CLINTON CORRECTIONAL FACILITY

### MENTAL HYGIENE DEPARTMENT

### EMERGENCY REFERRAL

1. **Describe any unusual statement of patient**

Refuses to leave cell. Does not want any contact with inmates or employees

2. **Give any unusual action of patient** appears to be completely withdrawn from all activities. Refuses to Participate in any program

3. **Describe emotional state, excited or depressed, etc.**

completely withdrawn. Keeps entirely to himself

4. **Anything suggesting suicide or violence** thinks all other inmates are after him.

Inmate's Name WELCH, Albert   Number 76 C 567   Cell E-1-16

Date 3-19-80

Reported by T. Kavanaugh C.O.

*This type of referral is to be used by any civilian or security personnel who suspects that an inmate's behavior warrants immediate psychiatric evaluation.*

Distribution:
|  |  |
|---|---|
| Deputy Sullivan | (2) |
| Service Unit | (1) |
| Central File | (1) |
| Mental Hygiene | (1) |

SUPPLEMENTAL WORK SHEET
SUPERINTENDENT'S PROCEEDING

WITNESSES INTERVIEWED

RE: ALBERT WELCH

INMATE'S NAME

DIN NO. 76-C-567

NAME OF WITNESS: D. Palmer          TITLE: Corr. Officer

DATE INTERVIEWED: 9/24/82

SUMMARY OF STATEMENT: States today he went to Welch's cell C-3-17 and told him to get ready to go to Supt. Proc. and he refused to attend. Told inmate it could be held without him and he still refused to attend.

NAME OF WITNESS: D. Hallburne          TITLE: Corr. Officer

DATE INTERVIEWED: 9/24/82

SUMMARY OF STATEMENT: States today he went to C-3-17 cell with Officer D. Palmer to escort inmate Welch to Supt. Proc. and he refused to attend. Inmate was told that the Proceeding could be held without him and he still refused to attend.

NAME OF WITNESS: Nick Soron          TITLE: Corr Officer

DATE INTERVIEWED: 9/27/82

SUMMARY OF STATEMENT: On Sept 20, I was escorting Charlie 3 Co to Mess Hall which is my normal Job. I take the Company to the Mess Hall every morning. This particular morning, Inmate Welch got dressed at the door to his cell. When the cell opened, he did not come out. He kept taking down Off Cell. When I reopened the Cell and Dead Inmate Welch to Come out, with the rest of the Comp refused. This is Not the 1st time it happened, I ask him why he refused. He state he refused to rec

SUPPLEMENTAL WORK SHEET
SUPERINTENDENT'S PROCEEDING

WITNESSES INTERVIEWED

RE: ALBERT WELCH
INMATE'S NAME

DIN NO. 76C967

NAME OF WITNESS: KINNETH BUMP      TITLE: CORR Office

DATE INTERVIEWED: 9-30

SUMMARY OF STATEMENT: 9-21-82 I WAS Escorting officer for ADJustme
Comittee. I Went To inmate welchs cell C-3-
AND TOLD Him To GET DRESSED FOR ADJusment Committee
HE Complied. WHEN His GATE WAS OPENED HE
STOOD A COUPLE STEPS INSIDE His cell WITH His
Arms CROSSED & would Not come out of His cell
HE WAS TOLD IT COULD BE HELD WITHOUT Him HE SHOOK

NAME OF WITNESS: His HEAD           TITLE:

DATE INTERVIEWED: NO           AND STILL REFUSED

SUMMARY OF STATEMENT: AFTER A GIAN BEING ORDERED OUT
of HIS CELL

NAME OF WITNESS:           TITLE:

DATE INTERVIEWED:

SUMMARY OF STATEMENT:

Form 253-B
G. M. — No. 568          Sta   f New York — Department of Correction:   ervices
    Sec.

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPERINTENDENT'S PROCEEDING
## RECORD SHEET                    HELD IN ABSENTIA

1) Name of Inmate____ALBERT WELCH_____ No.__76-C-567_____ Cell_C-3-17_____

2) Date Charge Made___9-20-21-82_____  Date 1st Interview:   1) 9-24-82
                                             Date 2nd Interview:_____2)_10-1-82_____

3) Inmate ☐ Admits Charge ☒ Denies Charge ☐ Admits acceptable variation of charge

   (specify) _____

   _Held in absentia Denial_
   _automatic_

                        Signature of Inmate                    No.

4) Witnesses Interviewed
      D. Palmer              Corr.Officer           K. Bump          Corr.Officer
   --------------------   -----------------   ----------------   -------------------
         Name                  Title               Name               Title
      N. Sokol                Corr.Officer        D. Hillbourne     Corr.Officer
   --------------------   -----------------   ----------------   -------------------
         Name                  Title           Memo of K. Bump       Title
                        2 Mishbehavior reports of Of 9-20-21-82 by Corr.Officer Sokol

5) Reports Considered_____
      and Bump Formal Charge of 9-23-82 by Sgt.Hamlin, Adj.Comm. rept. of 9-22-82 Held
      in Absentia] Notice & Assistance of R.Raymond Corr.Counslr. of 9-22-82____

6) Second Interview, Inmate ☐ Admits Charge  ☐ Denies Charge  ☐ Admits acceptable variation
   of Charge  specify

7) Charge xxxx Affirmed  ☐ Dismissed  ☐ Varied and affirmed as follows _____
                        1) B. Bailey,hearing officer, Sgt. Hamlin, C.O. palmer & Hillbo
   Present At Proceedings: _____
                        2) B. Bailey,Hearing Officer Sgt.Hamlin, C.O. Denno and Davenaugh
   --------------------------------------------------------------------------

8) Action by adjustment committee to date on this matter (enter cumulative confinement and loss of
   privileges) ____12 dys from 9-20-82_____

9) Disposition Ordered:_____30 Days Keeplock in Cell from 9-20-82 (rel.date 10-20-82
                        One Hour exercise daily  Recommend psychiatric Therapy

   --------------------------------------------------------------------------

   _P.Burdell Bailey_____  ___Hearing Officer__    ____10-1-82_____
        Signature                    Title                   Date

        B. Bailey

Form 251-A
G.M. — No. 564

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

### TO SUPERINTENDENT

INMATE MISBEHAVIOR REPORT

1) Name of Inmate **Welch          Albert**          No. **76C567**   Cell **A-8-12**
                   Last               First

2) Location of Incident **A-8-12**          Date **5-24-82** Time **approx 12:30**

3) Description **Violation 1.90 (refusing to obey a direct order). At above time and date, while pushing out A-8 company for the noon meal. Inmate Welch (76C567) remained in his cell. I (co. myde Told inmate That the noon meal was mandatory. The inmate just stared at the floor and shook his head. Inmate was given notice of report.**

4) Was more than one inmate involved?          Yes_____   No ✓

5) If yes, give name and number of other inmates (where known) and describe role played by
subject inmate _____

_____

_____

6) Was inmate locked in cell?          Yes ✓ No_____
6a) Was inmate locked in cell on previous charge?          Yes_____ No ✓
7) Was inmate locked in other housing unit?          Yes_____ No ✓

If yes     (A) housing unit of present confinement _____ Cell _____

          (B) authorized by _____

8) Was physical force used by you?          Yes_____   No ✓

(If answer is yes, also file form 251-D)

_____          **C.O.**
Signature of Person Making Report          Title

9) Endorsements of other

employee witnesses (if any)     Date: _____

_____          _____
Signature          Title

_____          _____
Signature          Title

No. of
Supplementary
Sheets     ( _____ )

Form 251-A
G.M. — No. 564

*9/15*

## STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

### TO SUPERINTENDENT

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate **Welch** **Albert** No. **76C567** Cell **E 8-15**
   Last      First

2) Location of Incident **E-8 Gallery** Date **5-18-82** Time **7:55 AM**

3) Description **Inmate Welch #76C567 is in violation of the following rule 1.90 - refusing a direct order.**

   **On the above time and date, while locking out E-8 gallery for break I came to E8-15, Welch's cell. Inmate Welch was sitting on his bed and I ordered inmate Welch out of his cell to go to break fast. Inm Welch didn't comply and again I ordered Welch to come out for breakfast, and again no compliance. Welch #76C567 was given a notice of repor**

4) Was more than one inmate involved?                 Yes _____  No __✓__

5) If yes, give name and number of other inmates (where known) and describe role played by

   subject inmate _____

   _____

   _____

   _____

6) Was inmate locked in cell?                                    Yes __✓__ No _____
6a) Was inmate locked in cell on previous charge?                Yes _____ No __✓__
7) Was inmate locked in other housing unit?                      Yes _____ No __✓__

   If yes   (A) housing unit of present confinement _____ Cell _____

            (B) authorized by _____

8) Was physical force used by you?                     Yes _____  No __✓__

   (If answer is yes, also file form 251-D)

   _____          _____
   Signature of Person Making Report              Title **C O.**

9) Endorsements of other

   employee witnesses (if any)        Date: _____

   _____          _____
   Signature                              Title

   _____          _____
   Signature                              Title

                                          No. of
                                          Supplementary
                                          Sheets  ( **Ø** )

FORM 2154 (8/75)
(252-A)

State   New York – Department of Correctional Services

E-3-10

*Clinton Carr*

(Facility)

## ADJUSTMENT COMMITTEE REPORT

1) Name of Inmate _Welch, Albert_ No. _76C567_

2) Report under review made by _Dickson   Co_ Date _3-14-80_

3) Comments on review of report and inmate file _(5) reports in 80_

_A Roberts Co    D Debyah_ _3-17-80_

Signature of Committee Member                                    Date

4) Inmate's explanation _refused to appear before Adj. Comm._

5) Further investigation made  [✗] No  [ ] Yes   (Attach Form 2155 – Supplement to Adjustment Committee Report)

6) Disposition  [ ] Deferred Action  [ ] Action  [✗] Recommendation
(Specify) _~~~ recommend be placed in limit Priv._

7) Where action deferred, specify duration of deferral _____
and whether officers directed to forward future comments  [ ] Yes  [ ] No

8) Is inmate to appear again  [✗] No  [ ] Yes   Date _____
(on reappearance use Form 2156 – Adjustment Committee Reappearance Report)

9) Where inmate was locked in cell or in special housing unit prior to disposition specify length of time to date
_3 days_

10) Does present disposition necessitate automatic review  [✗] No  [ ] Yes

Signature of Chairman                    Title                    Date _3-17-80_

**FACILITY CENTRAL FILE**

FORM 2154 (8/75)
(252—A)

Sto   f New York — Department of Correctional   vices

H-1/7

## Clinton Correctional Facility (APPU)
(Facility)

### ADJUSTMENT COMMITTEE REPORT

1) Name of Inmate _____ **WELCH** _____ No. **76-C-567**

2) Report under review made by _____ **Kriplin, C.O.** _____ Date **10/4/81**

3) Comments on review of report and inmate file _____

_____
_____
_____
_____

*K.E. Newell* c.o.
Signature of Committee Member

**10/5/81**
Date

4) Inmate's explanation _____

_____
_____
_____
_____

5) Further investigation made ☐ No ☐ Yes (Attach Form 2155 – Supplement to Adjustment Committee Report)

6) Disposition ☐ Deferred Action ☐ Action ☐ Recommendation

(Specify) _____ *refused to attend adj. panel* _____

7) Where action deferred, specify duration of deferral _____

and whether officers directed to forward future comments ☐ Yes ☐ No

8) Is inmate to appear again ☐ No ☐ Yes Date _____
(on reappearance use Form 2156 – Adjustment Committee Reappearance Report)

9) Where inmate was locked in cell or in special housing unit prior to disposition specify length of time to date

_____

10) Does present disposition necessitate automatic review ☐ No ☐ Yes

*W.J. Rivers*
Signature of Chairman

*R.J. Welch*

*Lt.*
Title

*Cor. Counselor*

**10/5/81**
Date

**10/5/81**

Form 251-AS

G. M. — No. 563

SEC.

State New York · Department of Correctional Ser

## GREAT MEADOW CORRECTIONAL FACILITY

### SUPPLEMENTARY SHEET FOR INMATE
### MISBEHAVIOR REPORT

Name of Inmate **Welch, Abert**   No. **766567** Cell **C 3·17**

shall attend Adjustment Committee Hearings as directed. Refusal to attend may result in further disciplinary action. Following upon the arrival of subject at this facility on 5/6/82 from CNYPC The behavior of inmate Welch has been totally inappropriate. A synopsis of his problematical behavior pattern is enumerated below:

1 - When ordered to leave his cell for mandatory programs he constantly refuses to comply.

2 - When ordered to attend Adjustment Committee for appearances he, for the vast majority of times, refuses to Comply.

3 - When present at Adjustment Committee he constantly stands mute in the face of Charges; an

4 - When interviewed by the Psychiatrist

| | |
|---|---|
| **10/12/80**<br>Date | **J.W. Griffith**<br>Signature of person making report |
| | correction officer<br>Title<br>Adj. Comm. Member/ |

Endorsements of other employee
Witnesses (if any)

_____
Signature

_____
Title

_____
Signature

_____
Title

**Instruction:**  (a)  Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b)  Additional and any confidential comments may be indicated on this form.
(c)  Names and numbers of inmate witnesses should be entered on this form.
(d)  Recommendations, if any, may be entered on this form.

Form 251-AB

G. M. — No. 563

SEC.

State   New York - Department of Correctional Se.

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPPLEMENTARY SHEET FOR INMATE
## MISBEHAVIOR REPORT

Name of Inmate __Welch, Abert__ No. 76C567 Cell __C3-17__

his tacit demeanor is thought to be manipulative and it is noted that while a CNYPC recently his non-communicative behavior was not evident.

Today at Committee inmate Welch again exemplified his unwillingness to talk abort and otherwise adjust his errant behavior. The Committee previously has twice recommended that inmate Welch be processed for Involuntary Protection Admission Consideration however, this recommendation was not withstanding in terms of permanence of assignment ( 9/1/82: Per Supt. Jones - Invol Prot Review: Release to Gen. Pop.).

Therefore, at this juncture the Adjustment Committee is fervently hopeful that its unanimous recommendation this date, that a Superintendent's Proceeding be held in connection with Inmate Welch, be upheld. Inmate Notified.

11/12/82
Date

Signature of person making report

Corr. Ofc/Adj. Com.
Member
Title

_____
Signature

_____
Title

**Endorsements of other employee**
Witnesses (if any)

_____
Signature

_____
Title

_____
Signature

_____
Title

Instruction: (a) Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b) Additional and any confidential comments may be indicated on this form.
(c) Names and numbers of inmate witnesses should be entered on this form.
(d) Recommendations, if any, may be entered on this form.

Form 251-AS

G. M. ── No. 563

SEC.

Sta.   New York - Department of Correctional Service

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPPLEMENTARY SHEET FOR INMATE
## MISBEHAVIOR REPORT

TO: ADJUSTMENT COMMITTEE

Investigation on inmate 76-C-567

Name of Inmate ___Albert Welch_____ No. __76-C-567__ Cell _____   C-3-17

On 11-11-82, I, Sgt. Copeland attempted to interview inmate Welch about his refusal to go to breakfast, and his disobeying a direct order.  Officer Quakenbush was ordered by myself (Sgt. Copeland) to bring inmate Welch to the interview room.  Officer Quakenbush states he approached inmate Welch at his cell and told him I, Sgt. Copeland, wanted to talk to him.  Inmate Welch stated he had nothing to say and refused to come out of his cell.  I, Sgt. Copeland went to inmate Welch cell and asked him why he wouldn't come out and talk to me.  Inmate Welch just stared at the wall in his cell and refused to answer.  I recommend inmate Welch be interviewed by the facility psychiatrist for further evaluation.

Respectfully submitted,

F. Copeland, Sgt.

jsh

| Date | Signature of person making report | Title |
|---|---|---|
| | Signature | Title |

Endorsements of other employee
Witnesses (if any)

| | Signature | Title |
|---|---|---|
| | Signature | Title |

Instruction:  (a)  Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b)  Additional and any confidential comments may be indicated on this form.
(c)  Names and numbers of inmate witnesses should be entered on this form.
(d)  Recommendations, if any, may be entered on this form.

*1370856*

Form 251-A
G.M. — No. 564

### STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

## GREAT MEADOW CORRECTIONAL FACILITY

#### TO SUPERINTENDENT

#### INMATE MISBEHAVIOR REPORT

1) Name of Inmate **WELCH**   No. **76C567** Cell **C-3-17**
   Last                                           First

2) Location of Incident **C-3 Company**   Date **Nov. 1, 1982** Time **7 $\frac{35}{Am}$**

3) Description **In violation of Rules 106.10 – Refusing to obey a direct order and 180.20 Posted and Distributed Rules and Procedures. At approximately 7 Am on 11-1-82, I was clearing C-3 company for breakfast. Inmate Welch 76C567 stayed in his cell and refused to come out of his** who told to come out of his **cell to go to breakfast. Inmate Welch did not say anything but just stayed inside his cell. I have been informed that this has happen quite frequently. Inmate was notified of this report via "Notice of Report" Issued on this Date.**

4) Was more than one inmate involved?                    Yes_____   No __✓__

5) If yes, give name and number of other inmates (where known) and describe role played by

   subject inmate_____

   _____

   _____

6) Was inmate locked in cell?                                  Yes __✓__ No_____
6a) Was inmate locked in cell on previous charge?              Yes_____ No_____
7) Was inmate locked in other housing unit?                    Yes_____ No __✓__

   If yes    (A) housing unit of present confinement _____ Cell _____

             (B) authorized by _____

8) Was physical force used by you?                              Yes_____   No __✓__

   (If answer is yes, also file form 251-D)

   *G. Goldsmith*
   Signature of Person Making Report

   *Correction Officer*
   Title

9) Endorsements of other

   employee witnesses (if any)   Date: **Nov. 1, 1982**

   *M. F. Blaise*
   Signature                        **CO**
                                    Title

   _____            _____
   Signature                        Title

   No. of
   Supplementary
   Sheets        ( _0_ )

Form 251-A
G.M. — No. 564

#1536351



STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

### TO SUPERINTENDENT

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate **Welch**   **Albert**   No. **76C567** Cell **C-3-17**
Last          First

2) Location of Incident **C-3-17**   Date **10/26/82** Time **8:05 A.M.**

3) Description **Violations of rules 106.10 Refusal to obey a direct order, 109.12 Violation of facility rules and regulations. On the above date and approx. time, I officer Beebe and officer M. Blaise were moving C-3 Company off gallery to morning chow, when we came to C-3-17, Welch 76C567 Cell, inmate Welch was standing in the doorway.**

4) Was more than one inmate involved?   Yes _____ No **∟**

5) If yes, give name and number of other inmates (where known) and describe role played by
subject inmate _____

_____

_____

6) Was inmate locked in cell?   Yes **✓** No _____
6a) Was inmate locked in cell on previous charge?   Yes _____ No **✓**
7) Was inmate locked in other housing unit?   Yes _____ No **✓**

If yes   (A) housing unit of present confinement _____ Cell _____

(B) authorized by _____

8) Was physical force used by you?   Yes _____ No **✓**

(If answer is yes, also file form 251-D)

**Richard M. Beebe**        **C/O**
Signature of Person Making Report        Title

9) Endorsements of other

employee witnesses (if any)   Date: **10-26-82**
**M. F. Blaise**                **C.O**
Signature                Title

_____        _____   No. of
Signature                Title   Supplementary
Sheets  ( **1** )

Form 251–AS

G. M. — No. 563

SEC.

e of New York · Department of Correctional Servi.

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPPLEMENTARY SHEET FOR INMATE
## MISBEHAVIOR REPORT

Name of Inmate __WElch , AlBErT__   No. __76C567__ Cell __C-3-17__

The cell door Then Closed, I Then had The cell door
opened again. Welch 76C567 did not come out
of his cell, I Then went back To see what
The Problem was and ordered inmate WElch "LeTS
Go", inmate STood There looking AT The Floor
with no responce. Officer BloiSE TolL inmate
iT WAS MAndaTory To go To The morning chow.
inmate did Not Respond. I had cell door shut,
inmate was Keep lock And given a notice of Report
Inmate Welch was Keep locked Twice Before
on Same charge.

| | | |
|---|---|---|
| 10/26/82 | Richard H. Buch | C/o |
| Date | Signature of person making report | Title |
| | M. F Blaisp | C.O. |
| | Signature | Title |

**Endorsements of other employee**

Witnesses (if any)

| | |
|---|---|
| Signature | Title |
| Signature | Title |

Instruction:  (a)  Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b)  Additional and any confidential comments may be indicated on this form.
(c)  Names and numbers of inmate witnesses should be entered on this form.
(d)  Recommendations, if any, may be entered on this form.

Form  251-A
G.M. —  No.  564



STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT  MEADOW  CORRECTIONAL  FACILITY

### TO  SUPERINTENDENT

### INMATE  MISBEHAVIOR  REPORT

1) Name of Inmate __Welch, Albert__                    No. __76-C-567__  Cell __C-3-17__
   Last                              First

2) Location of Incident __C-3-17 cell__                Date __10/21/82__ Time __approx. 7:30 A.M.__

3) Description __Violation! #106.10 refusing to obey a direct order:__
   __On the above date & approx. time, A/CO N Sokol, ordered__
   __inmate Welch, Albert #76-C-567 (C-3-17 cell) to accompany C-3__
   __to the messhall for breakfast, inmate Welch refused!__
   __Inmate Welch had just been released from keeplock__
   __status for this same type of misbehavior.__

4) Was more than one inmate involved?               Yes_____   No __/__

5) If yes, give name and number of other inmates (where known) and describe role played by

   subject inmate_____

   _____

   _____

6) Was inmate locked in cell?
6a) Was inmate locked in cell on previous charge?      Yes __X__   No_____
7) Was inmate locked in other housing unit?            Yes_____   No __x__
                                                       Yes_____   No __x__

   If yes    (A) housing unit of present confinement _____ Cell _____

             (B) authorized by _____

8) Was physical force used by you?                     Yes_____   No __X__

   (If answer is yes, also file form 251-D)

   _____[N Sokol]_____          _____C.O._____
   Signature of Person Making Report                    Title

9) Endorsements of other

   employee witnesses (if any)     Date: __10/21/82__

   __William E Donellon__          __C.O. TR.__
   Signature                       Title

   _____         _____
   Signature                       Title

                                   No. of
                                   Supplementary
                                   Sheets    ( 1 )

Form 251-AS

New York - Department of Correctional Services

G. M. — No. 563

SEC.

# GREAT MEADOW CORRECTIONAL FACILITY

## SUPPLEMENTARY SHEET FOR INMATE
## MISBEHAVIOR REPORT

Name of Inmate **Welch, Albert**          No. **76-C-567**   Cell   **C-3-17**

When I ordered inmate Welch to leave his cell and join the rest of the company, inmate Welch just stood there and looked down at his feet. Upon my third order, inmate Welch's refusal, I placed inmate Welch again in keeplock status.

A notice of report was served & attached

----

Date 10/21/82

Signature of person making report

Signature   *William E. Donaldson*

Title   **C.O.**

Title   **C.O. TR.**

**Endorsements of other employee**
**Witnesses (if any)**

Signature                    Title

Signature                    Title

Instruction:  (a)  Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b)  Additional and any confidential comments may be indicated on this form.
(c)  Names and numbers of inmate witnesses should be entered on this form.
(d)  Recommendations, if any, may be entered on this form.

FORM 2174 (Rev. 3/83)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERV

ATTICA CORRECTIONAL FACILITY
_____
FACILITY

## DISCIPLINARY HEARING DISPOSITION RENDERED

INMATE NAME: ___WELCH, Albert_____ NO: _76-C-567___ CELL: __31-9___

Based on Formal Charge(s) dated: _____8-15-85_____ which were delivered by: __CO R. Covert__

on _8-16-85_ Time: _10:00AM_ Hearing conducted by: _R. Henneberg, Lt_ Date: _8-21-85_ Time: _1:04 PM_

NOT GUILTY OF: _____

_____

GUILTY OF: _106.10 and 109.12_____

_____

PENALTY IMPOSED: _15 days continuous confinement to cell w/o_
_Yard, Rec. or Phone Program. Start 8-15-85. Release 8-31-_
_85. Recommend psychiatric evaluation._

## STATEMENT OF EVIDENCE RELIED UPON:

(1) Findings, evidence relied upon:

Written report submitted by Officer Chelius
in concert with inmate Welchs refusal to attend
hearing to testify in his own behalf or to select
witnesses for same.

(2) Reasons for disposition, penalty imposed:

To deter this type of behavior in the future
and to provide psychiatric counselling which
his behavior indicates is necessary.

I have received a copy of this hearing disposition dated: _8-21-85_

_R. Henneberg, Lt_ / _ref. to attend - Welch_ / _8-21-85   1:16 PM_

Hearing Officer's Signature        /        Inmates Signature        /        Date and Time Received

Notice to Inmate:  You are hereby notified that you have a right to appeal the disposition of this Disciplinary Hearing by submitting a written appeal to the Facility Superintendent within 72 hours of the receipt of this notice. Use appeal Form 2178 obtained from Unit Officer.

DISTRIBUTION:        SERVICE UNIT        DISCIPLINARY FILE        D.S.S.        INMATE

Form 251-A
G.M. — No. 564

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

TcB

## TO SUPERINTENDENT

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate __Welch, Albert__ No. __26-C-567__ Cell __C-3-17__
       Last                        First

2) Location of Incident __C-3-17 cell__    Date __9/17/82__ Time __7:45 A.m approx.__

3) Description __Violation #106.10 refusing to obey a direct order:__
__On the above date & approx time, I, C.O. N. Sokal, ordered__
__inmate Welch, Albert 26-C-567, C-3-17 to accompany the__
__rest of C-3 company to the messhall for breakfast. Inmate__
__Welch refused. I explained that during Monday thru Friday,__
__excluding holidays, the morning & noon meal were__

4) Was more than one inmate involved?            Yes_____ No___X___

5) If yes, give name and number of other inmates (where known) and describe role played by
   subject inmate_____

_____

_____

6) Was inmate locked in cell?                           Yes_X___ No_____
6a) Was inmate locked in cell on previous charge?       Yes_____ No__X__
7) Was inmate locked in other housing unit?             Yes_____ No__X__

   If yes   (A) housing unit of present confinement _____ Cell _____

            (B) authorized by _____

8) Was physical force used by you?                      Yes_____ No___X___

   (If answer is yes, also file form 251-B)

   _____                _____
   Signature of Person Making Report              Title   C.O.

9) Endorsements of other

   employee witnesses (if any)     Date:_____

   _____                _____
          Signature                             Title

   _____                _____
          Signature                             Title

No. of
Supplementary
Sheets   (1)

Form 251–AS

G. M. — No. 563

SEC.

State of New York - Department of Correctional Services

## GREAT MEADOW CORRECTIONAL FACILITY

### SUPPLEMENTARY SHEET FOR INMATE
### MISBEHAVIOR REPORT

Name of Inmate __Welch, Albert__ No. __766562__ Cell __C-3-17__

MandaTory. Inmate welch still refused.
A notice of report was issued & attached

Date __8/7/82__  Signature of person making report  Title __C.O.__

Signature                                Title

Endorsements of other employee
Witnesses (if any)

Signature                                Title

Signature                                Title

Instruction: (a) Use this form to supplement information furnished on form 251A if needed and for supervisory officer's investigations.
(b) Additional and any confidential comments may be indicated on this form.
(c) Names and numbers of inmate witnesses should be entered on this form.
(d) Recommendations, if any, may be entered on this form.

FORM 2161

STATE OF NEW YORK – DEPARTMENT OF CORRECTIONAL SERVICES

358

CLINTON CORRECTIONAL FACILITY

## SUPERINTENDENT'S PROCEEDING REPORT

*(For Automatic Review Dispositions & Notice to Inmate)*

1) Name of Inmate   **WELCH, Albert**   No.   **76C567**   Conditional Release Date   **2/17/96**

2) Date of Disposition of Charge   **12/14/79**

3) Time Spent in Confinement or Other Disciplinary Action Taken Prior to this Disposition   (specify)

**Confined SHU #14 from a previous proceedings pending Superintendent's Proceedings.**

4) Disposition Ordered

**30 days SHU consec. with present sentence, 50 days loss of good behavior allowance.**

5) Summary of the Case   (Evidence Relied on & Reasons for Disposition)

**All reports as stated in the formal charges (copy attached). Interview of C.O. D. Pescia.   Inmate Welch was written up on Superintendent's Proceedings Formal Charges on 12/3/79, and charges were delivered to him on 12/5/79.   Inmate Welch stated he did require assistance and he had no witnesses. On 12/14/79, he refused to appear at Superintendent's Proceedings before Captain J. Curran.   The charges and specifics were read.   Witnesses were interviewed. C.O. D. Pescia, eyewitness and reporting C.O. gave testimony substantiating the charges.   When ordered by Sgt. to leave his cell, he refused.   Based on the eyewitness creditable testimony of C.O. Pescia, the charges were affirmed and an appropriate disposition was ordered.**

**Reason:   Seriousness of charges.   Refusal to obey orders by inmates or officers cannot be tolerated.**

6) Inmate's Explanation

**Inmate refused to appear to give his explanation.**

| | | |
|---|---|---|
| _____ Signature | **Captain** Title | **12/14/79** Date |

To inmate:   *IMPORTANT   See reverse side*

FORM 2174 (9/82)          STATI       W YORK - DEPARTMENT OF CORRECTIONA       ICES

## CLINTON CORRECTIONAL FACILITY

### DISCIPLINARY HEARING DISPOSITION RENDERED

INMATE NAME: _Welch, Albert_          NO: _76 C 567_   CELL: _E-1-7_

Based on Formal Charge(s) dated: _4-14-84_ _____ which were delivered by _W. Marquis, CO_

on _4-15-84_ Time: _11:30 Am_ Hearing conducted by: _R Way Lt_ Date: _4/24/84_ Time: _2:35 pm_

NOT GUILTY OF: _____

GUILTY OF: _106.10 disobeying a direct order_
_118-30 cleanliness of person_

PENALTY IMPOSED: _20 days conf to cell w/loss of pkg, comm + phone calls_
_cs with present time  Rel 5/31/84_

### STATEMENT OF EVIDENCE RELIED UPON:

(1) Findings, evidence relied upon:

_Written misbehavoir report of CO M. Canning states on 4/14/84 he opened Inmate Welch's cell door and ordered Welch to take his mandatory shower. Inmate Welch closed his door refusing officer Canning's order and the mandatory Shower._

(2) Reasons for disposition, penalty imposed:

_This disposition is given to impress upon Inmate Welch that the standards of behavior for all inmate population is to be obeyed and enforced in order to maintain conformity to these guidelines set up by the department._

I have received a copy of this hearing disposition dated: _4/24/84_

_R Way Lt_          / To be delivered to Inmate _4/24/84_
Hearing Officer's Signature   / Inmates Signature _Today_   / Date and Time Received

Notice to Inmate:  You are hereby notified that you have a right to appeal the disposition of this Disciplinary Hearing by submitting a written appeal to the Facility Superintendent within 72 hours of the receipt of this notice. Use appeal Form _____ obtained from Unit Officer.

_2/78_

DISTRIBUTION          SERVICE UNIT     DISCIPLINARY FILE     D.S.S.     INMATE

FORM 2151 (REV. 12/76)
(2151—A)

Sta.  ̧ New York – Department of Correctional Serv.

*Clinton Corr.*

(Facility)

### INMATE MISBEHAVIOR REPORT
### TO SUPERINTENDENT

1) Name of Inmate  *Welch*  No.*76c561*  Cell *H-1-7*

            Last                 First

2) Location of Incident  *H-1-7*  Date *10-4-81*  Time *aprox 1 45 P.M.*

3) Description  *Violation of Rules 1.90, 3.20*

*At aprox 1 45 P.M. Inmate Welch's cell was open for him to go to mandatory shower, Inmate Welch refused to go. He has been notified of this report.*

4) Was more than one inmate involved?  Yes ☐  No ☒

5) If yes, give name and number of other inmates (where known) and describe role played by subject inmate _____

6) Was inmate locked in cell?  Yes ☐  No ☒

   If yes, authorized by _____

7) Was inmate locked in other housing unit?  Yes ☐  No ☒

   If Yes (a) housing unit of present confinement _____ Cell _____

       (b) authorized by _____

8) Was physical force used by you?  Yes ☐  No ☒

   (If answer is yes, also file Form 2104 – Use of Force)

*H. Kaplin*        *C.O.*

         Signature of Person Making Report     Title

9) Endorsements of other
   employee witnesses  Date: *10-4-81*
   (if any)

_____  _____
     Signature           Title

                 (No. of Supplementary Sheets _____)

_____  _____
     Signature           Title

*Form 251-A*
*G.M. — No. 564*

*Picture of Report*
*# 24 22956*

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

### TO SUPERINTENDENT

### INMATE MISBEHAVIOR REPORT



*ExC-2-2*

1) Name of Inmate __Welch_____ __Albert__ No. _766587_ Cell _C3-17_
                         Last                  First

2) Location of Incident __C3 gallery__ Date _12-1-2_ Time _Approx 8:00 A_

3) Description _Violation(s) - 106.10 - Refusal to obey a
direct order. On the above date and time
while running C3 to morning chow, I officer M. Blaise
ordered inmate Welch #766587 out of his cell for
chow. Inmate would not come out of cell or respond
to my order. I don't know why incident happened. Notice of Report
given_

4) Was more than one inmate involved? Yes_____ No_✓_ given

5) If yes, give name and number of other inmates (where known) and describe role played by
subject inmate_____

_____

_____

6) Was inmate locked in cell? Yes_✓_ No_____

7) Was inmate locked in other housing unit? Yes_____ No_✓_

If yes   (A) housing unit of present confinement _____ Cell _____

            (B) authorized by _____

8) Was physical force used by you? Yes_____ No_✓_

(If answer is yes, also file form 251-D)

__M.E. Blaise__          __C.O.__
Signature of Person Making Report          Title

9) Endorsements of other

employee witnesses (if any)    Date: _12-1-82_

_____     _____
     Signature                  Title

_____     _____
     Signature                  Title

No. of
Supplementary
Sheets ( _0_ )

FORM 215L (REV. 12/76)
(1-A)

State of New York – Department of Correctional Service

## Clinton
(Facility)

### INMATE MISBEHAVIOR REPORT
### TO SUPERINTENDENT

1) Name of Inmate __Welch__ _____ No. _76C567_ Cell _LH1/38_
   Last                          First

2) Location of Incident __LH1-38 cell__ Date _1/10/82_ Time _appl2 50 PM_

3) Description _1.90, 21.10 Refusing mandatory shower_
   _On 1/10/82 at approximately 12:50 an inmate_
   _Welch came out for his mandatory shower_
   _but refused to take it when CO H. Turner_
   _got him to the shower. Welch was put_
   _back to his cell by CO Turner and locked_
   _in without incident. Welch was notified_
   _of this report 1/10/82._

4) Was more than one inmate involved?

5) If yes, give name and number of other inmates involved,
   known, and describe role played by subject inmate.

6) Was inmate locked in cell? _rel date 1-16-82_
   If yes, authorized by

7) Was inmate locked in other housing unit?
   If Yes (a) housing unit of present confinement
   (b) authorized by

8) Was physical force used by you?
   (If answer is yes, also file Form 2104 – Use of Force)

   _____
   Signature & Title of Person Making Report

9) Endorsements of other
   employee witnesses
   (if any)                        Date: _1/10/82_

   _____        _____
   Signature                               Title

                                           (No. of Supplementary Sheets)

   _____        _____
   Signature                               Title

Form 2151   251-A

CA 159

STATE OF NEW YORK--DEPARTMENT OF CORRECTION SERVICES

## C.C.F.
(Facility)

### INMATE MISBEHAVIOR REPORT TO SUPERINTENDENT

SHU

1.) Name __Welch__     No. __76C567__ Cell __# 22__

     Last        First

2.) Location of Incident __SHU__    Date __12-9-79__ Time __12:05 pm__

3.) Description __1.90, 1.75 & 3.30__

On Sunday 12-9-79 I approached the front of Inmate Welch's (76C567) cell and told him to get ready for a shower. He then told me he didn't want one. I then told him that it was mandatory for all Inmates to take a shower in SHU on Sundays and he said that he didn't care and to forget it, because he wasn't coming out for any shower.

4.) Was more than one inmate involved?    Yes ☐   No ☑

5.) If yes, give name and number of other inmates (where known) and describe role played by subject inmate:

6.) Was inmate locked in cell?    Yes ☐   No ☑

7.) Was inmate locked in other housing unit?    Yes ☐   No ☑
   if yes,  (a) housing unit of present confinement _____ Cell ____

       (b) authorized by _____

8.) Was physical force used by you?    Yes ☐   No ☑
   (If answer is yes, also file Form 2104--Use of Force)

       Signature of Person Making Report     Title __C.O.__

9.) Endorsements of other
   employee witnesses    Date: __12-9-79__
   (if any)

_____    _____
Signature        Title

(No. of supplementary sheets _____ )

_____    _____
Signature        Title

Form 2151   251-A

STATE OF N    YORK--DEPARTMENT OF CORRECTION   SERVICES          CA-169

*Clinton Correctional*                    *Recall 3/17/80*
(Facility)

## INMATE MISBEHAVIOR REPORT TO SUPERINTENDENT

1.) Name __Welch__     __Albert__ No. __76C567__ Cell __E-3-10__
        Last          First

2.) Location of Incident __E-Block.__     Date __3-14-80__ Time __10ºº Am__

3.) Description  Violation of Rules 1.90 & 1.75.
Inmate Refused to come out of his Cell to go to the adjustment Committee. Inmate Stated that he wanted to remain in his Cell all the time, that he didn't want a Job and that he refused to have anything to do with any inmates. he also stated that the administration here at Clinton was to protect him from the inmates here at Clinton.

4.) Was more than one inmate involved?          Yes ☐   No ☑

5.) If yes, give name and number of other inmates (where known) and describe role played by subject inmate: _____

6.) Was inmate locked in cell?  Section 251.6(A), chapt I - Sgt Frank     Yes ☑   No ☐

7.) Was inmate locked in other housing unit?     Yes ☐   No ☑
    If yes,  (a) housing unit of present confinement _____ Cell ____
             (b) authorized by _____

8.) Was physical force used by you?             Yes ☐   No ☑
    (If answer is yes, also file Form 2104—Use of Force)
                              __E. Dick__          __C.O.__
                      Signature of Person Making Report    Title

9.) Endorsements of other        Date: __March 14, 1980__
    employee witnesses
    (if any)

_____    _____
Signature          Title
                              (No. of supplementary sheets __0__ )
_____    _____
Signature          Title

FACILITY CENTRAL FILE

Form 251-A
G.M. — No. 564

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

# GREAT MEADOW CORRECTIONAL FACILITY

TO SUPERINTENDENT

INMATE MISBEHAVIOR REPORT

1) Name of Inmate __WELCH__ __ALBERT__ No. __76C567__ Cell __C-3-17__
                        Last               First

2) Location of Incident __C-3 GALLERY, 17 CELL__ Date __11/29/82__ Time __(APPROX. 745 AM)__

3) Description __106.10 , DISOBEY A DIRECT ORDER__
On 11/29/82 at approximately 7⁴⁵ AM while dropping C-3 company for chow, I, Officer Dunster ordered Inmate Welch, # 76C567 to come out of his cell for chow a Inmate Welch did not respond to my order and stayed in his cell Inmate Welch # 76C567 placed in keeplock status and given a "Notice of this report."

4) Was more than one inmate involved?           Yes_____ No __✓__

5) If yes, give name and number of other inmates (where known) and describe role played by subject inmate_____

_____

_____

_____

6) Was inmate locked in cell?                                Yes __✓__ No____
6a) Was inmate locked in cell on previous charge?    Yes____ No ✓
7) Was inmate locked in other housing unit?          Yes____ No __✓__

    If yes     (A) housing unit of present confinement _____ Cell _____

               (B) authorized by _____

8) Was physical force used by you?              Yes_____ No __✓__

    (If answer is yes, also file form 251-D)

             _Harold M Dunster_                _C. O._
             Signature of Person Making Report            Title

9) Endorsements of other

    employee witnesses (if any)    Date: __11/29/82__

_____     _____
        Signature                     Title

_____     _____
        Signature                     Title

No. of
Supplementary
Sheets   (__O__)